

**FILED**
December 04, 2023 11:34 AM
SX-2018-CV-00146
TAMARA CHARLES
CLERK OF THE COURT

## SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **ERBEY HOLDING CORPORATION**; **JOHN R. ERBEY FAMILY LIMITED PARTNERSHIP**, BY ITS GENERAL PARTNER JUPITER CAPITAL INC.; **SALT POND HOLDINGS, LLC**; **MUNUS, L.P.**; **CARISMA TRUST**, BY ITS TRUSTEE VENIA, LLC; **TRIBUE LIMITED PARTNERSHIP**; AND **ALTISOURCE ASSET MANAGEMENT CORPORATION**, | **CASE NO. SX-2018-CV-00146** |
| | Complex Litigation Division |
| **PLAINTIFFS**, | Action for Damages |
| **v.** | Jury Trial Demanded |
| **BLACKROCK FINANCIAL MANAGEMENT, INC.**; **BLACKROCK INVESTMENT MANAGEMENT, LLC**; **BLACKROCK INVESTMENTS, LLC**; **BLACKROCK CAPITAL MANAGEMENT, INC.**; **BLACKROCK, INC.**; **PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC**; **PIMCO INVESTMENTS LLC**; AND **JOHN AND JANE DOES 1-10**, | |
| **DEFENDANTS.** | |

Cite as 2023 VI Super 75

**Appearances**:

**JOEL H. HOLT, ESQ.**
Law Offices of Joel H. Holt, P.C.
Christiansted, VI 00820
*For Plaintiffs*

**GORDON RHEA, ESQ.**
Law Offices of Gordon Rhea, P.C.
St. Thomas, VI 00803
*For Plaintiffs*

**PAUL A. KOCHES, ESQ.** (*pro hac vice*)
Farragut Law PLLC
Naples, FL. 34103
*For Plaintiffs*

**NICHOLAS CUTAIA, ESQ.** (*pro hac vice*)
**CHARLES R. JACOB, III, ESQ.** (*pro hac vice*)
**ADAM J. SAFER, ESQ.** (*pro hac vice*)
**ISABEL P. SUKHOLITSKY, ESQ.** (*pro hac vice*)
**JOEL E. ANTWI, ESQ.** (*pro hac vice*)
**MATTHEW P. HORVITZ, ESQ.** (*pro hac vice*)
**KIMAN KOUR, ESQ.**
Goulston & Storrs
New York, NY 10022
*For Plaintiffs*

**MARIA TANKENSON HODGE, ESQ.**
Hodge & Hodge
St. Thomas, VI 00802
*For the BlackRock Defendants*

**MARK A. KIRSCH, ESQ.** (*pro hac vice*)
King & Spalding LLP
New York, NY 10036
*For the BlackRock Defendants*

**CHRISTOPHER M. JORALEMON, ESQ.** (*pro hac vice*)
**JEFFERSON E. BELL, ESQ.** (*pro hac vice*)
Gibson Dunn & Crutcher, LLP
New York, NY 10166
*For the BlackRock Defendants*

**KEVIN F. D'AMOUR, ESQ.**
**GAYLIN VOGEL, ESQ.**
Barnes, D'Amour & Vogel
St. Thomas, VI 00801
*For the PIMCO Defendants*

**JOHN C. ERTMAN, ESQ.** (*pro hac vice*)
Ropes & Gray LLP
New York, NY 10036
*For the PIMCO Defendants*

## <u>MEMORANDUM OPINION</u>

**WILLOCKS**, *Administrative Judge*.

¶1     **BEFORE THE COURT** are motions filed by the Plaintiffs and by the Defendants to adopt in part

and objections to the recommendations Staff Master Joseph T. Gasper issued on July 13, 2023. The

BlackRock Defendants and the PIMCO Defendants filed motions to dismiss for lack of personal jurisdiction, for failure to state a claim for relief, and for *forum non conveniens*. Regarding the Defendants' personal jurisdiction challenge, the Staff Master recommended that the Court find that Plaintiffs failed to establish a *prima facie* case for exercising personal jurisdiction over the Defendants under Title 14, Section 607(j) of the Virgin Islands Code, a subsection of the Virgin Islands Criminally Influenced Corrupt Organizations ("CICO") Act that provides that principals engaging in conduct violative of CICO are deemed to submit to personal jurisdiction in the Virgin Islands. None of the conduct occurred in the Virgin Islands, so the Staff Master concluded that CICO could not supply personal jurisdiction here. The Staff Master next recommended that the Court find that Plaintiff Altisource Asset Management Corporation ("Altisource") established a *prima facie* case for exercising personal jurisdiction over its tort claims against all Defendants except BlackRock under the Virgin Islands Long Arm Statute, but that the other Plaintiffs, shareholders of Altisource (hereinafter "Shareholder Plaintiffs") did not. The Staff Master further recommended that the Court find that all Plaintiffs established a *prima facie* case for personal jurisdiction over all claims against all Defendants except BlackRock based on their having registered in the Virgin Islands as broker-dealers or investment advisors. Regarding the sufficiency of the complaint, the Staff Master recommended that the Court recognize prima facie tort and civil conspiracy as viable causes of action under Virgin Islands law and deny the motion to dismiss Altisource's prima facie tort, civil conspiracy, intentional interference with prospective business advantage, and intentional interference with contract claims, but grant the motion to dismiss the Shareholder Plaintiffs' prima facie tort and civil conspiracy claims. Regarding the forum challenge, the Staff Master recommended that the Court find that the Virgin Islands is not *a forum non conveniens* and deny the motion to dismiss.

¶2      Plaintiffs and Defendants have moved to adopt the portions of the Recommendation that are favorable to their respective positions and have objected to the portions that were unfavorable. Defendants

also move the Court to certify an interlocutory appeal on an issue addressed in the Recommendation regarding personal jurisdiction if the Court was to adopt the staff master's recommendations.

¶3     Having considered *de novo* the Recommendation as well as the parties' motions to adopt in part and objections thereto, the Court will, for reasons stated below, sustain one objection the Plaintiffs raise, but otherwise adopt the Recommendation in its entirety, a copy of which is appended to this Opinion. The Court will also grant the Defendants' motion to certify to the Supreme Court of the Virgin Islands the question whether submitting forms to the Lieutenant Governor's office to register as a broker-dealer (Form BD) or an investment advisor (Form ADV) constitutes consent to personal jurisdiction in the courts of the Virgin Islands. *Cf. Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028 (2023) (holding that registration statutes remain a valid basis for exercising personal jurisdiction). Given the differences of opinion on this question, and considering that it is controlling here, answering the question in the negative would require the Court to dismiss for lack of personal jurisdiction. Lastly, the Court will also certify the dismissal of BlackRock as final under Rule 54(b) of the Virgin Islands Rules of Civil Procedure.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

¶4     This lawsuit concerns the Ocwen Financial Corporation, along with several of its affiliates, including Altisource and Ocwen Mortgage Servicing, Inc., is "a leading mortgage servicer committed to foreclosure prevention for financially challenged homeowners serving households in all 50 states and the U.S. territories, including the USVI." (Sec. Am. Compl. ¶ 2.) "Ocwen USVI, through its offices in St. Croix, served as [Ocwen Financial Corporation's] corporate nerve center. Altisource . . . is a real estate asset management company also based in St. Croix." *Id.* Ocwen (used generally here to refer to the company and its affiliates) alleges that "is a pioneer in the mortgage industry that championed the idea of using mortgage loan modifications to protect distressed homeowners from losing their homes to foreclosure." *Id.* ¶ 3. "Between 2009 and 2012, Ocwen grew from big to bigger, expanding its portfolio

from approximately 350,000 loans with an unpaid principal balance of roughly $50 billion to more than 1.2 million loans with a balance north of $200 billion." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1313 (11th Cir. 2019). Ocwen encountered many problems after it expanded its portfolio. This lawsuit concerns what happened afterwards.

¶5      Some background is necessary about mortgage-backed securities (hereinafter "MBS"), also called residential mortgaged-backed securities (hereinafter "RMBS"). As the complaint explains,

> Banks and other mortgage originators that make mortgage loans to homeowners often sell those loans to investors. To do this, banks and mortgage originators package mortgages into pools and sell them to specially created trusts that issue securities (or bonds) called MBS. When an investor buys an MBS, the investor in effect buys an interest in all of the underlying mortgages owned by the trust. Mortgage trusts issue securities in "tranches" (from the French word for "slice"), which means that holders of the senior MBS tranche and holders of the junior MBS tranches are entitled to different "slices" of rights to the mortgages and resulting mortgage payments and other funds in the MBS trust. MBS trusts hire loan servicers like Ocwen to collect mortgage payments from homeowners whose mortgages are aggregated in the trust. The mortgage servicer collects principal and interest payments and remits them to the trustee overseeing the MBS trust. The trustee then passes the collections through to the senior and junior MBS holders through a payment "waterfall" that tracks the rights of the various tranches. Ocwen, as a loan servicer, has a duty to provide servicing to the MBS trust in accordance with the operative servicing contracts and well-established industry standards. One of Ocwen's primary duties is to service loans and maximize recoveries in a manner that is in the best interest of the MBS trust as a whole, thereby fairly benefitting both senior and junior MBS tranche holders rather than any particular class of investors. (Sec. Am. Compl. ¶¶ 66-70 (paragraph breaks omitted).)

Plaintiffs allege that certain senior MBS tranche holders did not agree with the way Ocwen and Altisource serviced its loans. What resulted was "a covert criminal conspiracy perpetrated by two of the largest, most powerful financial firms in the world – known as "BlackRock" and "PIMCO" . . . ." (Sec. Am. Comp. ¶ 1.) BlackRock and PIMCO conspired with others not named as defendants "to retaliate against and financially ruin USVI-based Ocwen/Altisource because Ocwen had the fortitude to stand up to Defendants and push back against their greed-driven pro-foreclosure campaign." *Id.*

¶6      William C. Erbey serves as president of Erbey Holding Corporation and general partner of the Tribue Limited Partnership, two of the Shareholder Plaintiffs in this case. Erbey Holding Corporation and

Tribue Limited Partnership commenced this action on their own behalf. John R. Erbey is president of Jupiter Capital, Inc., and a member of Venia LLC. Jupiter Capital, Inc. sues as general partner of the John R. Erbey Limited Partnership, while Venia, LLC sues as trustee for the Carisma Trust. Salt Pond Holdings, LLC and Munus, L.P. also sue on their own behalf. Altisource was initially named as a Nominal Defendant, but eventually joined as a Plaintiff. The other Plaintiffs, all of whom are shareholders of Ocwen (OCN) stock and Altisource (AAMC) stock, initially brought this lawsuit in part as a shareholder derivative lawsuit. But only as to Altisource stock, not Ocwen stock. The derivative claims were later mooted when the Defendants agreed to drop their objection to Altisource being realigned as a party-plaintiff, and now this is direct action brought by Altisource and the Shareholder Plaintiffs.

¶7      Plaintiffs allege that BlackRock and PIMCO's "unlawful scheme worked exactly as designed. By 2015, their wrongful and coordinated attacks, perpetrated through high-powered lawyers, influence-peddling Washington DC lobbyists and other operatives, had cast dark clouds over Ocwen/Altisource, causing them to lose significant business and greatly diminishing the value of their mortgage and real estate management businesses." *Id.* ¶ 11. Allegedly, Defendants' actions resulted in multiple regulator investigations. As a result, "banks and others who otherwise would have transferred their mortgage servicing to Ocwen or sold homes and loans to Altisource USVI were forced to find other parties to take the business or retain it for themselves, thereby depriving Ocwen/Altisource of opportunities to obtain new business." *Id.* ¶ 12. Ocwen and Altisource stock prices plummeted, and Altisource and Ocwen USVI were forced to layoff Virgin Islanders and to scale back operations. *See id.* ¶ 64 ("Defendants' misconduct caused Virgin Islanders to lose jobs and suffer lost job opportunities. In two years after Ocwen's operations were established in the USVI, Ocwen USVI had approximately eighty-five employees, the vast majority of whom were longtime residents of St. Croix, and who collectively were earning millions of dollars in compensation and benefits. Given Ocwen's rapidly increasing mortgage portfolio, significant

additional job growth in the USVI was expected. Additionally, Altisource USVI anticipated adding more than fifty St. Croix-based professionals. Instead of realizing this job growth in the USVI, Defendants crippled Ocwen/Altisource, causing Ocwen USVI's presence and employee workforce in the Territory to shrink and Altisource's USVI's growth to stagnate.")

¶8      BlackRock and its affiliates and Pacific Investment Management Company, LLC (hereinafter "PIMCO") and its affiliate paint a different picture. They contend that Ocwen's injuries were self-inflicted and caused by William C. Erbey and Ocwen engaging in illegal foreclosures, imposing deceptive fees, and mishandling mortgage payments. Further, Defendants contend they were only acting to protect their investments. The BlackRock and PIMCO Defendants appeared and moved to dismiss the complaint for lack of personal jurisdiction, for failure to state a claim for relief, and for *forum non conveniens*. How far outside the complaint a court can look when ruling on such a motion varies. The Court cannot look beyond the four corners of the complaint when assessing the sufficiency of the claims, except for certain matters of public record that the complaint may have relied on. *Cf.* V.I. R. Civ. P. 12(d). When assessing personal jurisdiction, however, the Court must consider matters outside the pleadings because the plaintiff has a burden to carry, a *prima facie* showing if jurisdiction is assessed based on affidavits and other supporting papers. *Cf. Molloy v. Indep. Blue Cross*, 56 V.I. 155, 172 (2012). While a motion challenging venue does not concern the merits, at least not directly, it too requires looking outside the complaint to address concerns about the location of witnesses and evidence. When one motion asserts different defenses at the same time, with different standards, it presents unique challenges.

¶9      Here, Defendants argue that Superior Court of the Virgin Islands lacks personal jurisdiction over them because they are all incorporated elsewhere, with their principal places of business elsewhere, and with no employees in the Virgin Islands. Further, whatever business they do here as broker-dealers or investment advisors is minimal and does not support exercising personal jurisdiction over them.

Exercising personal jurisdiction would violate due process, they contend. Defendants also contend that all of the claims in the complaint fail to state a basis for relief. The Shareholder Plaintiffs cannot sue on their own because any injury is Altisource's to pursue, and Altisource fails to state any claims for relief because the complaint focuses on Ocwen, and Altisource cannot sue for Ocwen's injuries. While the arguments changed somewhat after the parties agreed to allow Altisource to become a party-plaintiff, the gist remained the same. The Superior Court lacks personal jurisdiction over all Defendants, all Plaintiffs fail to state any claim for relief, and the Virgin Islands is an inconvenient forum because the witnesses, evidence, and alleged events are located in or took place somewhere else: New York, Washington, D.C., or California.

¶10     This Court heard oral argument on the Defendants' motion and then referred it to the Staff Master for a recommendation, which the Staff Master issued on July 13, 2023. The Staff Master recommended that the Court grant in part and deny in part the Defendants' motions to dismiss. The Staff Master concluded BlackRock should be dismissed for lack of personal jurisdiction and that the Court should certify its dismissal as final under Rule 54(b) of the Virgin Islands Rules of Civil Procedure. The Superior Court can exercise personal jurisdiction over the other Defendants based on their having registered to do business in the Territory. The Staff Master also concluded that the Shareholder Plaintiffs had failed to state civil conspiracy and prima facie tort claims and thus, Counts VII and VIII of the Second Amended Complaint should be dismissed. Otherwise, Defendants' motion to dismiss for failure to state a claim should be denied, and the Court should also find that the Virgin Islands is not more inconvenient than any other proposed forum. Finally, the Staff Master recommended that the Court should grant Plaintiffs leave to amend a key paragraph of the Second Amended Complaint to comply with Rule 9(b) of the Virgin Islands Rules of Civil Procedure.

¶11     Plaintiffs and Defendants jointly moved the Court for an extension of the time to file their responses to the Recommendation, for leave to exceed the page limits, and for permission to file one brief per side, which the Court granted. On August 24, 2023, Plaintiffs and Defendants filed their motions to adopt in part and objections to the Recommendation. Plaintiffs also move for a modification of the Recommendation, and the Defendants move, in the alternative, to certify the Staff Master's conclusion about personal jurisdiction to the Supreme Court of the Virgin Islands as a controlling question of law.

## II.     LEGAL STANDARD

¶12     Judges reviewing orders and recommendations of masters exercise a quasi-appellate role. *Cf.* V.I. R. Civ. P. 53(f)(3)-(5); *accord In re Chi., Milwaukee, St. Paul, & Pac R.R. Co.*, 841 F.2d 789, 794 (7th Cir. 1988) ("At the outset, we note that the district court's standard of review of the special master's findings and recommendations is the same as our standard of review of the district court."); *Dobler v. Dist. Ct. of Cnty. of Kit Carson*, 806 P.2d 944, 946 (Colo. 1991) ("A district judge may not disturb the master's findings simply because of dissatisfaction or disagreement with the findings of the master."). "But the judgment of the . . . master does not usurp that of the . . . judge," of course. *Cook v. Niedert*, 142 F.3d 1004, 1010 (7th Cir. 1998). "[T]he staff master is not a judicial officer. Masters are quasi-judicial officers. . . . Thus, inherent limitations on what a master can and cannot do remain." *Olson v. V.I. Water & Power Auth.*, 2023 VI Super 64, ¶ 15 (internal quotation marks and citations omitted). When the staff master issues a recommendation on a dispositive motion, ultimate authority remains with the judge.

¶13     To be clear, the judge "does not act as an appellate court when reviewing . . . the recommendations of a . . . master . . ." *Dorsey v. Dorsey*, 535 P.3d 1040, _____ (Idaho 2023) (citing 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2612 (3d ed. 2023); *Seccombe v. Weeks*, 767 P.2d 276, 278 (Idaho Ct. App. 1989)). But the judge does "assume[] a quasi-appellate role that entails assessing the legal validity of the conclusions reached by the non-judicial official." *Bell v. Jones*, No. A-1-CA-

35296, 2018 N.M. App. Unpub. LEXIS 250, *6 (N.M. Ct. App. July 17, 2018) This "'review permits correction of possible error at the earliest time' and 'will also give the appellate court the benefit of the [trial] court's reasoned consideration.'" *Id.* (quoting *Polin v. Dun & Bradstreet, Inc.*, 634 F.2d 1319, 1321 (10th Cir. 1980) (*en banc*). "Insofar as the . . .[m]aster made findings of fact, those findings 'deserve respect and a tacit presumption of correctness.' But at the end of the day, 'the ultimate responsibility for deciding what are correct findings of fact remains with [the judge]." *Florida v. Georgia*, 138 S. Ct. 2502, 2517 (2018) (citations omitted). "To give the master's disposition any weight beyond that of a recommendation would be an abdication of the judicial function." *Hardiman v. Hardiman*, 418 N.E.2d 347, 348 (Mass. Ct. App. 1981)

¶14     For these reasons, "[t]he court must decide *de novo* all objections to findings of fact made or recommended by a master, unless the parties, with the court's approval, stipulate that the findings will be reviewed for clear error; or . . . will be final." V.I. R. Civ. P. 53(f)(3) (A)-(B). "The court must [also] decide *de novo* all objections to conclusions of law made or recommended by a master." V.I. R. Civ. P. 53(f)(4). Additionally, "clear error is the applicable legal standard for reviewing an order or recommendation of a master no one objected to." *Stanley v. V.I. Bureau of Corr.*, 2022 VI Super 77, ¶ 29. And, the court retains discretion when reviewing a recommendation to "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." V.I. R. Civ. P. 53(f)(1). "[E]ven if no one objects to a recommendation of the staff master, the [c]ourt still has the obligation to act on [it] . . . ." *Stanley*, 2022 VI Super 77 at ¶ 30.

¶15     However, the Court does not believe "do-over" as such is required, even when objections are raised. Of course, the Court must conduct a *de novo* review of the law and of any factual findings, *see* V.I. R. Civ. P. 53(f)(3)-(4), and "*de novo*" does mean "anew." *Black's Law Dictionary* 548 (11th ed. 2019). But *de novo* review does not require that the court ignore the recommendation and do the work itself. "'*De*

*novo* means that the court's inquiry is not limited to or constricted by the record nor is any deference due the conclusions under review.'" *In re: Infant Sherman*, 49 V.I. 452, 460 (2008) (Swan, J., concurring) (quoting *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 230 n.2 (3d Cir. 2008)). Courts avoid using judicial adjuncts in a way that increases, rather than decreases, their work. *Cf. Martinez v. E.I. Dupont De Nemours & Co.*, No. N10C-04-209 ASB, 2012 Del. Super. LEXIS 550, *13 (Del. Super. Ct. Dec. 5, 2012) ("The Special Master and the routine asbestos motions calendar were developed to increase efficiency in asbestos cases. The use of a Special Master is 'for the purpose of assisting the Court and the parties in conducting and completing discovery, other pre-trial matters, and jury screening, in an orderly and *efficient* manner.'" (footnote omitted)); *accord Oleska v. Oleska*, 59 Pa. D. & C. 297, 298-99 (C.P. 1947) (finding master's report in divorce action inadequate). Doing over the work the staff master performed would be wasteful and contrary to the reason the position was created.

¶16     Instead, after conducting a *de novo* review, the court can adopt the master's recommendation in its entirety without further analysis. *Cf. In re: Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 488 (S.D.N.Y. 2011) ("Finding nothing to add to the Special Master's excellent Report and Recommendation, the Court hereby affirms and adopts in all respects the conclusions set forth above."); *In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. 424, 424 (E.D.N.Y. 1983) ("On February 11, 1983, Special Master Sol Schreiber submitted to the Court a 'recommended order to protect the confidentiality of documents contained within the MAC-V collection of documents'. Neither the government nor any party to the litigation has objected to his recommendation, and the order is adopted in full."). The court can also issue an opinion adopting and incorporating the master's recommendation as its own. *Cf. Destination Ventures v. FCC*, 844 F. Supp. 632, 635 (D. Or. 1994) ("[T}he court has made a *de novo* determination of the entire matter presented. The court adopts the Findings and Recommendation of Magistrate Judge Ashmanskas filed December 14, 1993 as its own opinion."); *see also United States v. Duncan*, 857 F. Supp. 852, 853 (D. Utah 1994)

("[T]he court has considered the entire matter *de novo* and concludes that the Report and Recommendation is correct in every material respect and adopts it as the court's own opinion."). When incorporating a recommendation, the court can append or attach the master's recommendation to its own opinion. *See Adv. Coating Tech, Inc. v. LEP Chem Ltd.*, 142 F.R.D. 91 (S.D.N.Y. 1992) (adopting magistrate's recommendation and incorporating it into opinion); *In Re; Actos (Pioglitazone) Prods. Liab.*, 274 F. Supp. 3d 485 (W.D. La. 2017) (same, recommendation of master); *accord In re: Refco Inc. Sec. Litig.*, 826 F. Supp. 2d at 488-541 (reporting recommendation of special master).

¶17    Alternatively, the court can issue an own opinion that adopts a portion of the recommendation, that amplifies or modifies the recommendation, or that addresses specific objections. *Cf. Kidwell v. Sheetz, Inc.*, 982 F. Supp. 1177, 1179 (W.D. Va. 1997) ("After a thorough examination of the parties' objections, the supporting memoranda, the applicable law, the documented record, and the Report and Recommendation itself, this court partially adopts the Report and Recommendation but, because it considers certain of the parties objections well-taken, it declines to adopt the Magistrate Judge's recommended disposition of COUNTS I and VI for the reasons stated herein."); *United States v. LeClerc*, 185 F. Supp. 3d 370, 373 (W.D.N.Y. 2016) ("The Court therefore adopts the Report and Recommendation, but as set forth below, the Court expands on and modifies some of the Report and Recommendation's reasoning."). The court can also reject the recommendation but with reasons why to enable later appellate review. *Cf. Smith v. Smith*, C6-94-417, 1994 Minn. App. LEXIS 924, *7 (Minn. Ct. App. Sep. 20, 1994) ("The trial court has discretion not to follow the recommendation of the custody evaluator. If the evaluator's recommendation is rejected, the trial court must either express its reasons for rejecting the recommendation or provide detailed findings . . . ." (citations omitted)); *Fisher v. Fisher*, 616 N.Y.S.2d 281, 282 (App. Div. 1994) ("[T]he court was not obliged to accept the opinion and the recommendations of the Law Guardian and it explained its reasons for rejecting them."); *accord Williams v. Conseco, Inc.*,

57 F. Supp. 2d 1311, 1312-13 (S.D. Ala. 1999) ("Currently pending in this action are plaintiffs' motion for remand, and the Report and Recommendation recommending that the motion for remand be granted. In this Memorandum Opinion, the court sets forth its reasons for rejecting the Report and Recommendation of the Magistrate Judge, and for denying the plaintiffs' motion." (citations omitted)).

## III.    DISCUSSION

¶18    The Court agrees with the Plaintiffs that the "majority of the conclusions in the Recommendation are . . . well-reasoned, fair and correct." (Pls.' Mot. to Adopt in Part and Modify in Part, and Objs. to, the Staff Master's Recommend. Dated July 13, 2023 3, filed Aug. 14, 2023 (hereinafter "Pls. Mot.").) Having considered and reviewed the Staff Master's recommendations, and the parties' Motions to Adopt in Part and their Objections to the Recommendation, and having reviewed the record *de novo*, including the Second Amended Complaint and the underlying motion papers on which the recommendations are based, the Court agrees that the Recommendation is sound and will adopt it in its entirety and append it to this Opinion.* The Court does acknowledge the Plaintiffs' objection to Section II(C)(ii)(4)(c) of the

---

* The Staff Master's Recommendation is available on the Superior Court's public docket, but it is not available on legal platforms like Westlaw or LexisNexis. Recommendations of masters and other judicial adjuncts can often be found on such platforms, however. *See, e.g.*, *Home Elevators, Inc. v. Millar Elevator Serv. Co.*, Civ. No. 1:95-CV-2274, 1997 U.S. Dist. LEXIS 23491 (N.D. Ga. Apr. 16, 1997) (report and recommendation of special master); *see also, e.g.*, *Diversey, Inc. v. Pops Techs. LLC*, Civil Action No. 1:18-cv-4210, 2021 U.S. Dist. LEXIS 147333 (N.D. Ga. June 14, 2021) (report and recommendation of special master), *adopted by* 2022 U.S. Dist. LEXIS 56913 (N.D. Ga. Jan. 12, 2022). In fact, opinions issued by masters and other judicial adjuncts like referees can also be found on Lexis and Westlaw, oftentimes with subsequent action by the judge. *See, e.g.*, *Dyncorp v. Certain Underwriters at Lloyd's, London*, No. 08C-09-218 JRJ, 2011 Del. Super. LEXIS 5373 (Del. Super. Ct. Oct. 28, 2011) (supplemental opinion of special master); *see also, e.g.*, *In re Lincoln Nat'l Coi Litig.*, No. 16-cv-6605, 2019 U.S. Dist. LEXIS 225011 (E.D. Pa. July 31, 2019) (opinion of special master), *adopted by* 2019 U.S. Dist. LEXIS 141746, at *12 (E.D. Pa. Aug. 21, 2019).*Standard Equip., Inc. v. Boeing Co.*, No. C84-1129, 1985 U.S. Dist. LEXIS 16721 (W.D. Wash. Aug. 19, 1985) (opinion and order of special master); *Orion Power Midwest, L.P. v. Am. Coal Sales Co.*, No. Civ. No. 05-0555, 2008 WL 11383356 (W.D. Pa. Sept. 24, 2008) (opinion of special master), *objections overruled by* 2008 WL 4462301 (W.D. Pa. Sept. 30, 2008). Even clerks of courts have even issued opinions on occasion to provide advice or give the reason for a decision. *See, e.g.*, *Opinion of the Clerk*, 345 So. 2d 1338 (Ala. 1977) (answering question submitted by administrative director as to whether certain documents require a filing fee); *Warner Chilcott Labs. Ir. Ltd. v. Impax Labs., Inc.*, No. 08-6304 (WJM), 2013 U.S. Dist. LEXIS 167429 *4 (D.N.J. Apr. 18, 2013) (opinion of clerk granting in part and denying in part motion to tax costs); *N.J. Mfrs. Ins. Grp. v. Electrolux, Inc.*, Civ. No. 10-1597, 2013 U.S. Dist. LEXIS 189347 (D.N.J. Oct. 21, 2013) (same); *see also, e.g.*, *White v. Thomas*, Case No. 2016-CP-10-4221, 2016 S.C. C.P. LEXIS 319 (S.C. C.P. Sept. 28, 2016) (order of clerk entering default and referring case to special referee for further proceeding); *Hafer v. Medtronic, Inc.*, No. 13-2340 SHM/DKV, 2013 WL 12051231 (W.D. Tenn. July 29, 2013) (report and recommendation of clerk on motion to transfer cases). It is not for the judge to determine if the staff master should make her or his recommendation available on Lexis or Westlaw or when an opinion as opposed to an order should be issued. However, this Court does note that

Recommendation, the portion that addressed their CICO claims, and will address their objections in more detail below. The Court addresses the following objections directly, and all others not addressed, having been considered, are overruled.

¶19     The opposing views of the Plaintiffs and Defendants as to the merits of this case is borne out in their respective responses to the Staff Master's recommendations. As stated before, each side moves the Court to adopt those portions of the recommendations favorable to their respective positions and objects to the portions that are not favorable. For example, the Defendants (but really BlackRock) move the Court to adopt the conclusion that the Plaintiffs failed to make a *prima facie* showing that the Superior Court has personal jurisdiction over BlackRock. (*See* Defs.' Mot. to Adopt in Part and Objs. in Part to the Staff Master's Recommend. 16, filed Aug. 24, 2023 ("The Court should order, as the Staff Master recommends, that BlackRock, Inc. be dismissed for lack of personal jurisdiction.") (hereinafter "Defs." Mot.").) The Plaintiffs objected, but not to this specific point. Instead, they objected to the Staff Master's "terse, two-sentence footnote" that rejected their argument that consent can be imputed to BlackRock based on its affiliates. (*See* Pls. Mot. 17 ("Given the exhaustive treatment of the various jurisdictional issues in the Recommendation, it is surprising that the Staff Master simply 'declined to address' the important issue of imputing the jurisdictional conduct of the BlackRock subsidiaries to their parent, BlackRock, Inc. In a

---

the Virgin Islands Judiciary encourages making court decisions available to the public. *Cf.* V.I. S. Ct. R. 106(a) (adopting a public domain citation format for court opinions "[g]iven the increasing amount of legal research being conducted via the internet and other electronic resources and the desire to promote *equal access* to the Virgin Islands' system of justice . . . ."). Additionally, the Virgin Islands Supreme Court has held that "all decisions of th[e Supreme] Court, whether published or unpublished, may be cited as authority." *Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 539 n.7 (2015) (citation omitted). Furthermore, the scope of the *Virgin Islands Reports* initially "include[d] opinions of the District Court Commissioners if not reversed," John D. Merwin, *The U.S. Virgins Come of Age: A Saga of Progress in the Law*, 47 A.B.A. J. 778, 780 (1961), and, although District Court Commissioners were appointed by the Governor of the Virgin Islands, they did function like master insofar as they retained as compensation fees they earned. *Cf. Willis v. People*, 71 V.I. 789, 845 (2019) (citation omitted). If the Staff Master's Recommendation were available on an electronic resource like Westlaw or Lexis, the Court may not have had to incorporate the Recommendation into this Opinion. The Recommendation is only available on the court's docket, however, and considering its breadth, the multiple issues of first impression it addressed, and further considering that the Court will certify its accompanying order for interlocutory appeal, the Court has exercised its discretion in this instance to incorporate the Recommendation and append it to this Opinion in full.

terse, two-sentence footnote, unsupported by any legal analysis, the Recommendation swept imputation aside as 'an attempt that appears to be foreclosed by precedent,' citing *Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014)." (brackets omitted)).) As another example, the Plaintiffs object to the recommendation that the complaint fails to state civil conspiracy and prima facie tort claims on behalf of the Shareholder Plaintiffs. *See id.* at 14 ("Plaintiffs object to the Recommendation's conclusion that the Shareholder Plaintiffs' claims for prima facie tort and civil conspiracy should be dismissed because they did not allege that Defendants intended to injure the Shareholder Plaintiffs in particular."). The Defendants move the Court to adopt this recommendation. (*See* Defs.' Mot. 17 ("The Court should adopt the Staff Master's recommendation to dismiss the Shareholder Plaintiffs' claims for prima facie tort (Count VII) and civil conspiracy (Count VIII) for failure to state a claim.").)

¶20    Since the Defendants filed the initial motions that the staff master addressed in his Recommendation, the Court shall address their objections first. In reference to the Staff Master's recommendation that the PIMCO Defendants and the BlackRock Defendants, except BlackRock, consented to jurisdiction by registering as broker-dealers or investment advisors, the Court overrules the objection.  The Staff Master relied on *Mallory*, a decision the Supreme Court of the United States issued this year, that reaffirmed a century-old decision of the Court. *See Mallory*, 143 S. Ct. 2028, 2033 (2023) ("The question before us is not a new one. In truth, it is a very old question—and one this Court resolved in *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 37 S. Ct. 344, 61 L. Ed. 610 (1917)."). This is a relatively new area of law, one which many thought was foreclosed. *See id.* at 2063 (Barett, J., dissenting) ("The Court asserts that *Pennsylvania Fire* controls our decision today. I disagree. The case was 'decided before this Court's transformative decision on personal jurisdiction in *International Shoe*,' and we have already stated that 'prior decisions that are inconsistent with this standard are overruled'. . . ." (brackets, ellipsis, and citations omitted)). The Recommendation

undertook a through analysis of the Virgin Islands Uniform Securities Act (hereinafter "VIUSA"), specifically Title 9, Section 656 of the Virgin Islands Code, and the forms, Form BD and Form ADV, filed with the Office of the Lieutenant Governor as Administrator under the VIUSA to register as a broker-dealer or as an investment advisor, respectively. The Defendants disagree with the Staff Master's Recommendation, which is their right to do so. Nevertheless, the Court will adopt the recommendation by the staff master, but will grant the Defendants' motion to certify the question to the Virgin Islands Supreme Court. Though it may be correct, that "no court has ever interpreted the appointment language of Form ADV or BD as consent to personal jurisdiction." (Defs.' Mot. 59.), the case law construing these forms appears are sparce. The Court agrees that this "would be a novel interpretation by the Virgin Islands courts of SEC-promulgated forms that are used nationwide by the investment management industry, with significant potential consequences for those businesses and the Territory." *Id.* at 59-60. For this reason, the Court need not belabor the point. The Court will certify the issue for interlocutory appeal and, if the parties petition the Virgin Islands Supreme Court to accept jurisdiction, and if the Supreme Court grants the petition, the question will be answered.

¶21    The Defendants' next objections concerns *forum non conveniens*. The Court agrees with the Staff Master that Delaware has no connection to this litigation, other than being the place of incorporation or organization for the Defendants, and that New York may be a convenient forum but the Defendants did not agree to forego any defense in exchange. Defendants blame the Plaintiffs, explaining that "the Staff Master directed the parties to meet and confer about the conditions under which Plaintiffs would be willing to re-file in New York or Delaware. Unfortunately, when the parties met and conferred, Plaintiffs refused to entertain the idea of re-filing elsewhere, so discussions ended immediately" *Id.* at 43. The Defendants take issue with the Recommendation's conclusion that the Defendants bear responsibility for not agreeing to waive their own defenses. *See id.* ("The Recommendation incorrectly suggests Defendants bear

responsibility for the lack of progress among the parties, stating that 'Defendants did not agree to forego any defense, including the statute of limitations,' and failed to agree to submit to the New York or Delaware courts such that Plaintiffs could refile this case elsewhere." (citation omitted)). The Court accepts the Defendants' representation that the "Plaintiffs . . . would not even discuss the possibility of the case being heard in another forum." *Id.* (emphasis omitted). But it is the Defendants who "ha[ve] it backwards . . . ." *Id.* The statute of limitations is an affirmative defense. The Plaintiffs cannot waive it for them. The Staff Master, understandably, asked the parties to meet and confer to see if there was any daylight between them. After all, the Virgin Islands Supreme Court has held that a factor courts could consider is "whether the party seeking dismissal on *forum non conveniens* grounds has agreed to waive the statute of limitations and other defenses that would preclude a merits adjudication in the other jurisdiction." *Evans-Freke v. Evans-Freke*, 75 V.I. 407, 419 (2021). The Defendants, as an incentive to the Plaintiffs, and as offer of good faith to the Court, should have done what they now seek to do in their Motion. (*See* Defs.' Mot. 43-44 (stipulating to "waive any defense or objection with respect to lack of personal jurisdiction, improper venue, or forum non conveniens" "in the courts located in New York County, New York or Wilmington County, Delaware" "[i]f the Court were to hold that personal jurisdiction exists in this action . . . .").). This *post hac* attempt to do what Defendant should have done when they initially filed their motion is rejected, as are the Defendants concerns about the distance of witnesses and what concerns were raised at oral argument before another judge several years ago. As everyone is well aware, the pandemic ushered in a sea of change, which the Recommendation correctly took note of. Electronic filing, remote attendance at depositions, remote appearance at hearings and at trial – none of this was possible when this case was commenced.

¶22    The Defendants' last objection concerns the merits of the complaint. Binding precedent has not yet addressed whether prima facie tort or civil conspiracy are recognized under Virgin Islands law, and

the Staff Master undertook the required analysis, *see generally Gov't of the V.I. v. Connor*, 60 V.I. 597 (2014) (*per curiam*), when questions of first impression in Virgin Islands common law are raised. The Staff Master concluded that both causes of action should be recognized under Virgin Islands law, but that the Shareholder Plaintiffs failed to state either claim because the complaint does not allege that the Defendants acted with intent to harm the Shareholder Plaintiffs. The Defendants do not object to this conclusion, but rather to the overall conclusion that the complaint should survive their motion to dismiss.

¶23    They contend that that Shareholder Plaintiffs cannot state direct claims for relief because the injury, if any, belongs either to Ocwen (who is not a party) or to Altisource. Since Altisource is now a party-plaintiff, the Shareholder Plaintiffs' claims should be dismissed. The Staff Master noted that this was a question of first impression, one the parties failed to brief. The BlackRock Defendants had noted that "the Virgin Islands Supreme Court has not ruled on this specific issue," but then argued that "it is well established in that 'a stockholder of a corporation may not recover for damages to an individual which are derived from an injury to the corporation.'" (Defs.' Mot. to Dismiss Am. Compl. 24, filed Aug. 28, 2018 (quoting *Pemberton Sales & Serv., Inc. v. Banco Popular de P.R.,* 877 F. Supp. 961, 965 (D.V.I. 1994)) (remaining citations omitted).) The Staff Master could have declined to address this issue because the Defendants failed to brief it. *Cf. In re Catalyst Third-Party Litig.*, 72 V.I. 726, 750 n.16 (Super. Ct. 2020) ("Absolutely no basis in Virgin Islands Supreme Court precedent for the proposition that attorneys are not required to fully brief all questions of law relevant to the issues that are being litigated, including all three Banks factors." (brackets, quotation marks, and citations omitted). The Staff Master did address it, however, and reasoned that the Defendants' direct / derivative arguments, which they couched as standing, should be rejected at this phase, but without prejudice. The Court agrees with this analysis. As the Staff Master pointed out, standing is akin to an affirmative defense in the Virgin Islands and, further, Virgin Islands law is unsettled on whether shareholders can assert direct claims. Altisource is a Virgin

Islands corporation and in some jurisdictions, claims can be direct and derivative. *Cf. Thornton v. Bernard Techs., Inc.*, No. 962-VCN, 2009 Del. Ch. LEXIS 29, *11 n.28 (Del. Ch. Ct. Feb. 20, 2009) ("It is possible for a claim to be both derivative and direct." (citing *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006)). The Plaintiffs allege that they suffered an injury separate and apart from the reduction in the price of their shares. The question at this juncture "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to present evidence to support the claims.'" *Grisar v. Am. Fed. Of Teachers*, 73 V.I. 491, 495 (2020) (quoting *In re: Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)).The Court believes the Plaintiffs are entitled to conduct discovery and should have a chance to present evidence in support. The Defendants can renew their argument on summary judgment if the Shareholder Plaintiffs cannot show an injury other than a reduction in the price of their shares.

¶24     Lastly, Defendant object to the Staff Master's conclusion that CICO liability may be premised on their potentially having violated Title 9, Section 652 of the Virgin Islands Code. Defendants correctly note that "Section 604(e) of Title 14 of the Virgin Islands Code specifically defines 'criminal activity' to include all felony violations of federal criminal law and enumerates the offenses under the Virgin Islands Code that fall within the scope of CICO." (Defs.' Mot. 53 (quoting 14 V.I.C. § 604(e)).) They argue that the "definition expressly does not extend to Title 9, Chapter 23 of the Virgin Islands Code, and therefore does not extend to Section 652 of Title 9." *Id.* In support, they contend that "Section 652 has never been recognized as a predicate offense under CICO," *id.*, and further, that "Defendants are unaware of any Virgin Islands case that stands for th[e] same proposition" the Staff Master reached. *Id.* at 53 n.9. That proposition, however, was reached based on the plain language of the statute. No case law is necessary.

> "'Criminal activity' means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in the crimes, offenses, violations or the prohibited conduct as variously described in the laws governing this jurisdiction including any Federal criminal law, the violation of which is a felony ***and, in addition***, those crimes, offenses, violations or prohibited conduct as found in the Virgin Islands Code as follows . . . ." 14 V.I.C. § 604€.

The Staff Master read this language as it is written, that engaging in, attempting to engage in, or conspiring, soliciting, coercing, or intimating another to engage in a crime, offense, or violation constitutes criminal activity for CICO so long as it is punishable as a felony. Violations of Section 652 are punishable as felonies. *See* 9 V.I.C. § 658(a). The Defendants would have the Court ignore the "and in addition" language and limit predicate offenses only to those enumerated in the statute. The objection is overruled.

¶25     Both sides also disagree as to whether Rule 9(b) of the Virgin Islands Rules of Civil Procedure applies here. The Defendants say it does, and the complaint should be dismissed because it fails to give them any specifics about the fraud they are alleged to have engaged in. The Plaintiffs disagree, contending that Rule 9(b) does not apply because fraud is not an element of any of their claims. The Staff Master observed  that the Supreme Court of the Virgin Islands has not addressed Rule 9(b) as it relates to Rule 8(a), but noted that Rule 9(b) refers to allegations of fraud generally. *Cf.* V.I. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). In other words, whether fraud is an element of a claim is not the question. Since the Plaintiffs' allegations, as a whole, are based in fraud, the Staff Master concluded that Rule 9(b) applies. The Staff Master also concluded that the complaint gave the Defendants enough information overall about the circumstances allegedly constituting fraud such that the Defendants could file their answers and admit or deny the Plaintiffs' allegations, with the exception of a key paragraph in the complaint. The Defendants object, as do the Plaintiffs. The Court overrules both objections and will adopt the Staff Master's recommendations, including the requirement that the Plaintiffs provide additional information in that key paragraph, paragraph 103 of their Second Amended Complaint. Plaintiffs state that "if the Court so requires, Plaintiffs will file an amended complaint to include that additional detail." (Pls.' Mot. 24.) The Court so requires.

¶26     Turning to the Plaintiffs' objections, in addition to objecting to the Staff Master's analysis of their CICO claims, which the Court will address last, the Plaintiffs also object to the Staff Master's

recommendation to dismiss the Shareholder Plaintiffs' prima facie and civil conspiracy claims. As with the Defendants' objection, the Court disagrees. The Staff Master conducted the requisite analysis to determine the soundest rule for the Virgin Islands and then applied that rule to the allegations of the complaint. He concluded that civil conspiracy and prima facie tort, as intentional torts, require proof of intent to injure and, by extension, that the complaint must allege intent to injure. The Court acknowledges that "intent to injure can be inferred from the repetition of an act that a person knows will cause injury or harm." *Lopez v. Am. Family Mut. Ins. Co.*, 148 P.3d 438, 439 (Colo. App. 2006). "Constructive intent to injure may also provide the mental state necessary for an intentional tort." *Pinckney v. Van Damme*, 447 S.E.2d 825, 828 (N.C. Ct. App. 1994) (quoting *Pleasant v. Johnson*, 325 S.E.2d 244, 248 (N.D. 1985)).

¶27     The Recommendation did not consider whether intent to injure could be inferred. But in this context, if it could, it might also mean that the BlackRock Defendants and the PIMCO Defendants could be facing liability to every shareholder of Altisource or Ocwen stock, not just the Shareholder Plaintiffs, even someone who owned just one share. The Court does not believe this is the soundest rule for the Virgin Islands in the context of a shareholder lawsuit like this. However, the Court will, upon appropriate motion, consider certifying the dismissal of the Shareholder Plaintiffs' prima facie and civil conspiracy claims under Rule 54(b) of the Virgin Islands Rules of Civil Procedure so they can appeal if they so chose. *Cf. Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 512 So. 2d 897, 900 (Miss. 1987) ("In complex litigation involving multiple claims or multiple parties, or both, Rule 54(b) is helpful because it allows judges to efficiently and fairly resolve separable claims before protracted litigation is finally resolved."); *accord Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 699 (Fed. Cir. 2001) ("Although it is recognized that piecemeal appeals are inappropriate in cases that should be given unitary review, the entry of judgment under Rule 54(b) was clearly reasonable in this case, for it would avoid an unnecessary and lengthy trial of complex issues if the Rule 54(b) judgment were sustained.").

¶28    Next, the Plaintiffs object that consent of the other BlackRock Defendants should be imputed to BlackRock. As the Court noted above, the Plaintiffs contend the Staff Master either ignored or failed to sufficiently address this issue. The Court does not agree because the Staff Master concluded that the issue was foreclosed by precedent of the United States Supreme Court. Not every issue must be addressed at length. Plaintiffs disagree with the Staff Master's conclusion. Nevertheless, the Court will overrule their objection. Virgin Islands precedent is silent on whether consent can be imputed for personal jurisdiction purposes and the United States Supreme Court implied that it cannot. Considering that the consent at issue here is the consent evidenced on the Forms ADV and BD that the BlackRock and PIMCO Defendants submitted to the Office of the Lieutenant Governor, it would be a stretch to impute that consent to BlackRock. Nonetheless, the Plaintiffs are correct that the Virgin Islands Supreme Court did recognize that "consent to jurisdiction 'can result from the acts of both the person or ***his/her agent***.'" (Pls.' Mot. 18 (quoting *Estate of Skepple v. Bank of N.S*, 69 V.I. 700, 745 (2018)) (other citations omitted).) However, the Supreme Court's statement was given in the context of a defendant who moved to vacate without challenging personal jurisdiction and thereby consented. *See Estate of Skepple*, 69 V.I. at 747. The Plaintiffs quote *Estate of Skepple* completely out of context. Again, the Plaintiffs can raise the issue on appeal. However, as the Court agrees with the Staff Master's recommendations that Plaintiffs failed to carry their burden to show personal jurisdiction under the Virgin Islands Long Arm Statute or the CICO Act, the Court is not convinced that consent can be imputed to BlackRock based on its affiliates having consented to persona jurisdiction by registering to do business in the Territory.

¶29    The Plaintiffs' other objections are to the Staff Master's analysis under the Virgin Islands Long Arm Statute and a section of CICO that provides that a person is deemed to have submitted to jurisdiction in the Territory if they engage in conduct that violates the statute. The Court has considered their objections and overrules them. The Court agrees with the Staff Master's analysis under the Long Arm

Statute and further that CICO, being the more specific statute, governs personal jurisdiction over CICO claims to the exclusion of the Long Arm Statute. The Plaintiffs argue that the fact that the effect was felt in the Virgin Islands should suffice. (*See* Pls.' Mot. 23 ("Section 607(j) cannot mean that the conduct at issue must have *occurred* within the USVI, but rather that it had an ***effect*** here.").) The Court does not agree. Section 607(j) of Title 14 of the Virgin Islands Codd provides that a "person shall be deemed, by having engaged in such conduct within this Territory, to have thereby submitted himself to the jurisdiction of the courts of this Territory for the purposes of this section." The Plaintiffs might have had a leg to stand on if any of the Defendants engaged in conduct in the Territory. But they did not and, as the Staff Master explained, the Plaintiffs are not asserting conspiracy jurisdiction. Their objections to the Staff Master's personal jurisdiction analysis are overruled..

¶30    Lastly, the Court turns to the Plaintiffs' objections to the Staff Master's analysis of the merits of their CICO claims. The Plaintiffs allege three predicate criminal acts in their complaint, violations of Sections 833 (fraud on creditors), 834 (obtaining money by false pretenses), and 1089 (embezzlement by public or private officers) of Title 14 of the Virgin Islands Code, based on the theory that the Defendants bought up RMBS at cheaper prices after their efforts to "take down" Ocwen began to pay off. The Staff Master rejected the allegations, finding that none of the Defendants were public or private officers, or parties to fraudulent conveyances of property or interests in property made with the intent of defeating creditors, and further that the Plaintiffs failed to connect the supposed false representations to anyone relying on them to their detriment. The Staff Master also found, as noted earlier, that Section 652 of Title 9 of the Virgin Islands Code (prohibited conduct in providing investment advice) could be a predicate act based on the allegations of the complaint and concluded, based on Section 652, that the CICO claims should survive the Defendants' challenge.

¶31    The Plaintiffs agree with the Staff Master's conclusions regarding Section 652, but not with his conclusions on the other predicate acts, and argue that the Court need not address the predicate acts at all, and, that the Court should reject the Staff Master's assessment of the predicate acts. The Plaintiffs contend that the complaint alleges a conspiracy and argue that that suffices under CICO. They acknowledge that their complaint does not cite Section 605(d) of Title 14 of the Virgin Islands Code, (*see* Pls.' Mot. 5 n.8), but they contend that it gives sufficient notice. A defendant may be a party to criminal enterprise, not commit a criminal act, and still be liable for engaging and furthering the conspiracy, they argue. *See id.* at 6-7 (quoting *United States v. Williams*, 974 F.3d 320, 369 (3d Cir. 2020)). Thus, the "Plaintiffs need not plead that Defendants engaged in specific predicate acts in order for Plaintiffs' CICO claims to proceed." *Id.* at 8.

¶32    Initially, the Court considered resubmitting this issue to the Staff Master because it does appear, at first blush, that the Staff Master may have "overlooked that Plaintiffs stated a CICO conspiracy claim under § 605(d), which does not require that Defendants engaged in any predicate act to impose liability." *Id.* at 5. Resubmitting to a master to consider an issue that was overlooked or to reconsider an issue with instructions from the judge is proper. *Cf. Bush v. Remington Rand, Inc.*, 213 F.2d 456, 465 (2d Cir. 1954) (finding proper judge resubmitting matter to master to reconsider his findings); *see also Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 566 n.2 (5th Cir. 1966) ("Though the District Court's resubmission of the case to the Master by use of specific interrogatories is an unusual method for passing on Exceptions to a Master's Report, it turns out to have been excellent. It has the distinct advantage of informing the District Court, and now this Court, of precisely what the Master found, together with precise legal holdings on such facts."). However, on further reflection, the Court decided against resubmitting the concerns the Plaintiffs raised because the Staff Master's ultimate conclusion, which the Court agrees with, is that the Defendants' motion to dismiss the CICO claims should be denied.

¶33     As noted earlier, the question raised by a motion to dismiss for failure to state a claim for relief "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to present evidence to support the claims.'" *Grisar*, 73 V.I. at 495 (citation omitted). The complaint "is the initiatory document in an action and a roadmap to a party's claim for relief . . . ." *Bunkers Int'l v. Orient Oil*, No. 08-cv-10905, 2008 U.S. Dist. LEXIS 117548, *2 (S.D.N.Y. Dec. 23, 2008). "The complaint need only outline a fraudulent scheme and reasonably notify each of the defendants of their respective roles." *Colo. Nat'l Bank v. Harrison*, No. 87-cv-10723, 1988 U.S. Dist. LEXIS 5768, *8 (N.D. Ill. June 8, 1988). Eventually, the pleadings, which includes the complaint, of course, will be "superceded by a pretrial order . . . ." *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 852 (N.D. Cal. 2011) (citing *DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 842 (9th Cir. 2001)); *accord Elvis Presley Enters. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998) ("'It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.'" (citation omitted). Moreover, "unlike pleadings, usually based on information and belief, the pre-trial order . . .is the result of discovery . . . [and] supersedes the pleadings and becomes the governing pattern of the lawsuit." *Case v. Abrams*, 352 F.2d 193, 195 (10th Cir. 1965).

¶34     While the complaint and the answer are vital for giving notice to the opposing parties of their respective claims and defenses, ultimately, the importance of the pleadings fades away. It is for this reason that the pleadings can be amended 'at any time, even after judgment" " to conform to the evidence and to raise an unpled issue." V.I. R. Civ. P. 15(b)(2). Thus, if the evidence shows fraud on creditors, or that money was obtained by false pretenses, or that the Defendants are public or private officers who engaged in embezzlement, that can be incorporated into a final pretrial order. If it does not, and the evidence only shows conspiracy, that too can be incorporated into a final pretrial order. At this juncture, the Defendant have enough information to either admit or deny the Plaintiffs' allegations and assert affirmative defenses.

The Court agrees with the Plaintiffs that it is unnecessary, at this juncture, to address the specific predicate acts. That section of the Staff Master's Recommendation will remain, however, as the Court is not entirely convinced that the Staff Master's conclusions about the predicate acts were incorrect. Moreover, even though the Plaintiffs may be correct that the complaint give fair notice of conspiracy as a basis for their claims and, therefore, liability under Section 605(d) of Title 14 of the Virgin Islands Code could be inferred, their opposition, like their complaint, never raised Section 605(d). Nevertheless, the Plaintiffs' objection, that to the extent the Staff Master did overlook that liability can be imposed on the participants of a conspiracy even if they did not commit a criminal act, is sustained. *Accord Williams*, 974 F.3d at 368 ("[E]ach conspirator is subject to the ordinary principles of co-conspirator liability. And he continues to be liable 'up to the time of abandonment or success.' Indeed, 'a defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it.'" (citations omitted)).

## IV. CONCLUSION

¶35      Accordingly, for the reasons stated above, the Court adopts the Recommendation of the Staff Master in full, which is incorporated into this Opinion and set forth below, and overrules all objections except the Plaintiffs' objection that the Recommendation overlooked that conspiracy may provide a basis for liability under CICO. The motion to dismiss based on lack of personal jurisdiction will be granted as to BlackRock, and BlackRock's dismissal will be certified as final, and otherwise denied. However, the Court will grant the Defendants request to certify the question whether the Superior Court can exercise consent jurisdiction based on the language in Form ADV and Form BD. The motion to dismiss will also be denied on the grounds of inconvenient forum, and denied for failure to state a claim for relief except with respect to the Shareholder Plaintiffs' civil conspiracy and prima facie tort claims. The Court will set a deadline for the Plaintiffs to file an amended complaint that provides more detail to paragraph 103 and

a deadline, if they choose, for them to file a motion to certify the dismissal of the Shareholder Plaintiffs'

claims as final. Appropriate orders and a judgment of dismissal follow.

**DONE** this _____ day of December, 2023.

**HAROLD W.L. WILLOCKS**
Administrative Judge of the Superior Court

**ATTEST**:
Tamara Charles
Clerk of the Court

By: _Paula Clayton_
Court Clerk
Dated: _December 4, 2023_

## RECOMMENDATION [†]

**GASPER**, *Staff Master.*

**THIS RECOMMENDATION** is submitted in furtherance of the staff master's duty to

"recommend findings of facts and conclusions of law on dispositive motions . . . ." *In re: Auth. for the*

*Creation & App't of Staff Master for the Complex Litig. Div. of the Super. Ct. of the V.I.*, Admin Order

No. 2021-0012, 2021 V.I. Supreme LEXIS 14, *3-4 (V.I. Aug. 12, 2021). Addressed herein are the *Motion*

*to Dismiss the Amended Complaint* filed by Defendants Blackrock Financial Management, Inc.; Blackrock

Investment Management, LLC; Blackrock Investments, LLC; Blackrock Capital Management, Inc.; and

Blackrock, Inc (collectively "BlackRock Defendants") and the *Motion to Dismiss the Amended Complaint*

filed by Defendants Pacific Investment Management Company, LLC and PIMCO Investments, LLC

(together "PIMCO Defendants"). The BlackRock Defendants and the PIMCO Defendants each filed a

motion to dismiss on August 28, 2018, that raised the same defenses and asserted largely the same

arguments: lack of personal jurisdiction, inconvenient forum, and failure to state a claim for relief. Given

---

[†] Except for correcting minor scrivener's errors, the Recommendation, as incorporated herein, is identical to that issued on July 13, 2023.

the similarity between the relief sought and the arguments asserted in support, both motions are addressed in one recommendation.

For the reasons given below, the undersigned **RECOMMENDS** that the Court **GRANT** the motion in part and **DENY** it in part. The motion should be granted and Defendant BlackRock, Inc. dismissed for lack of personal jurisdiction. The motion should be granted and Counts VII and VIII dismissed for failure to state a claim for relief. The Court should also **GRANT** the Plaintiffs leave to amend a paragraph in their complaint to comply with Rule 9(b). Otherwise, the motion should be denied. However, given the complexity of this case and the number of defendants, the undersigned also **RECOMMENDS** that the Court **CERTIFY** the dismissal of Defendant BlackRock, Inc. as final pursuant to Rule 54(b) of the Virgin Islands Rules of Civil Procedure.

## I.     Procedural Background

Erbey Holding Corporation, the John R. Erbey Family Limited Partnership (collectively "the Erbey Plaintiffs"), Salt Pond Holdings, LLC ("Salt Pond Holdings"), Munus, L.P. ("Munus"), Carisma Trust ("Carisma"), and Tribue Limited Partnership ("Tribue") (collectively "Shareholder Plaintiffs") commenced this lawsuit for damages, initially on their own behalf as well as derivatively on behalf of Altisource Asset Management Corporation (hereinafter "Altisource") as shareholders of Altisource (collectively "Plaintiffs"). Altisource, initially a nominal defendant, appeared and answered the complaint. The BlackRock Defendants and the PIMCO Defendants (together "Defendants") also appeared.[1] But the Defendants did not answer the complaint. Instead, after several extensions of time, the Defendants moved to dismiss, asserting lack of personal jurisdiction, failure to state claims on which relief could be granted, and inconvenient forum. The Shareholder Plaintiffs responded by amending the complaint, per Rule

---

[1] To date, Plaintiffs have not named the John and Jane Doe 1 through 10 Defendants. Accordingly, the term "Defendants" is used to refer only to the named Defendants.

15(a)(1)(B) of the Virgin Islands Rules of Civil Procedure, which mooted the Defendants' motions. The

BlackRock Defendants and the PIMCO Defendants responded to the First Amended Verified Complaint

by filing a motion to dismiss the amended complaint, asserting the same defenses and, for the most part,

the same arguments as before. Both motions are addressed below.[2, 3]

## II.     Motions to Dismiss

### A.     <u>Lack of Personal Jurisdiction</u>

#### i.  *Legal Standard*

"'Personal jurisdiction, also called *in personam* jurisdiction, is the court's power to bring a person

into its adjudicative process.'" *Evans-Freke v. Evans-Freke*, 75 V.I. 407, 415 (2021) (quoting *Estate of*

*Skepple v. Bank of N.S.*, 69 V.I. 700, 719 (2018)). A plaintiff submits to a court's jurisdiction by filing a

complaint and commencing an action. *See* 21 C.J.S *Courts* § 68 (2019) ("The court obtains personal

---

[2] When the Defendants filed their motions on August 28, 2018, the operative complaint was the First Amended Verified Complaint. Several months later, the Shareholder Plaintiffs with Altisource filed a motion, on January 18, 2019, for leave to file a second amended verified complaint, which the Defendants opposed. The amendment sought to realign Altisource as a party-plaintiff. Technically, the Second Amended Verified Complaint would have superseded the First Amended Verified Complaint. *See, e.g.*, *Seymour v. New Destiny, LLC*, 72 V.I. 156, 160-61 (Super. Ct. 2019) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."); *accord W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013) ("The amended complaint supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." (quotation marks and citation omitted)). Pending motions targeting a superseded complaint are typically denied as moot. *See Gourmet Gallery Crown Bay v. Crown Bay Marina, L.P.*, No. ST-2014-CV-513, 2019 V.I. LEXIS 147, *5 (V.I. Super. Ct. Nov. 5, 2019) ("[C]ourts . . . typically deny a pending motion directed at the original complaint as moot."). But courts can also "carry a pending motion directed at the original complaint to an amended complaint . . . if there are no new or different allegations of fact or legal theories." *Id.* "[P]rudentially, where . . . there are long spans of time between motions and their disposition, . . . [and] where there is any suggested uncertainty as to which complaint should be the operative one, it would seem more prudent for the trial court to consider putting such uncertainty to rest before ruling on a dispositive motion." *Pedro v. Ranger Am. of the V.I., Inc.*, 63 V.I. 511, 527 (2015) (Gomez, D.J., concurring in part and dissenting in part). To reduce uncertainty and delay, the undersigned directed the parties to meet and confer to see if they could agree on the motion to amend and its impact on the motions to dismiss, which they did, filing a joint notice on March 18, 2023, in which the parties agreed that the Defendants would withdraw their opposition to the motion to amend and, in exchange, the defenses raised and arguments made for and against dismissing the First Amended Verified Complaint would be carried over to the Second Amended Verified Complaint, as far as possible. The Court approved the stipulation on March 30, 2023. The operative complaint is the Second Amended Verified Complaint and Altisource is a party-plaintiff. All references to, and quotations from, the Complaint are construed to refer to the Second Amended Verified Complaint.

[3] Because the parties are familiar with the facts, and because the undersigned writes solely for them and the Court, the undersigned has omitted a section detailing the factual background of this litigation.

jurisdiction over a plaintiff by the plaintiff's filing of a pleading with the court, which jurisdiction then continues through all stages of the litigation."). Obtaining jurisdiction over a defendant requires process to issue and to be served properly and, for nonresident defendants, a statutory basis for exercising jurisdiction. *See Evans-Freke*, 75 V.I. at 447 (Swan, J., concurring) ("There must also be personal jurisdiction over all the parties, which has four components: (1) sufficient process, (2) service of that process, (3) statutory minimum contacts, and (4) constitutional minimum contacts."). Exercising jurisdiction over nonresident defendants must also comport with due process. *See id.*

But "unlike challenges to subject matter jurisdiction, 'objections to personal jurisdiction are personal defenses that are waived if not raised in a timely manner.'" *Id.* (brackets, ellipsis, and citation omitted); *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."). The Defendants did not object to the issuance of process or to how process was served, so those defenses have been waived. "The defense of lack of personal jurisdiction is ordinarily raised in a timely manner when it is asserted in a defendant's answer or pre-answer motion to dismiss." *Evans-Freke*, 75 V.I. at 415. The Defendants raised the defense of lack of personal jurisdiction. Plaintiffs did not dispute the timeliness of the Defendants' motions. Thus, the undersigned presumes, for purposes of this recommendation, that the Defendants timely raised their personal jurisdiction challenge.

When personal jurisdiction is challenged, the plaintiff has the burden of proving that exercising jurisdiction will be proper. *See Molloy v. Indep. Blue Cross*, 56 V.I. 155, 172 (2012) ("The plaintiff bears the ultimate responsibility to prove . . . that the trial court may exercise personal jurisdiction over the out-of-state defendant."); *see also St. Croix, Ltd. v. Shell Oil Co.*, 60 V.I. 468, 473 (2014) ("Once a defendant challenges the court's jurisdiction, the burden then shifts to the plaintiff to show that jurisdiction over the defendant is proper."). "However, at the motion to dismiss stage of the litigation, the burden on the

plaintiff depends on the actions a trial court takes in disposing of the motion." *Molloy*, 56 V.I. at 172. "If the trial court holds an evidentiary hearing on the issue of personal jurisdiction, then the plaintiff must come forward with evidence to prove the court's jurisdiction by a preponderance of the evidence." *Id.* "However, if the trial court does not hold an evidentiary hearing . . . the plaintiff is only required to establish a *prima facie* case for personal jurisdiction." *Id.*

To be clear, it is the court, not the parties, who decides what showing a plaintiff makes. *Cf. Dorf v. Complastik Corp.*, 735 A.2d 984, 988 (Me. 1999) ("The method chosen by the trial court to decide such motions will dictate the evidentiary showing necessary for the plaintiff to survive the defendant's motion to dismiss." (citing *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992)); *Trump v. Eighth Jud. Dist. Ct.*, 857 P.2d 740, 744 (Nev. 1993) ("The trial court . . . has the option of conducting a full evidentiary hearing on the personal jurisdiction issue prior to trial."); *see also* V.I. R. Civ. P. 12(i) (granting court discretion to defer 12(b)(2) motion until trial). Determining what the plaintiff must show matters, not just because of the way the court must evaluate the evidence. *Compare Molloy*, 56 V.I. at 172 ("At a 12(b)(2) factual hearing, the trial court *may accept* evidence, weigh the facts, and determine disputed factual issues, including credibility determinations." (emphasis added)), *with id.* at 173 ("When the Superior Court makes that *prima facie* determination, it *must accept* as true all of plaintiff's factual allegations that are supported by affidavits or other competent evidence which would be admissible at trial and *must resolve* all factual disputes in the plaintiff's favor." (emphasis added)). It matters also because the *prima facie* showing is a *preliminary* showing. *See Boit*, 967 F.2d at 676 ("If a district court applies the *prima facie* standard and allows a motion to dismiss, it complies with the directive that the motion 'shall be heard and determined before trial . . . .' If, instead, it applies the *prima facie* standard and *denies* the motion to dismiss, it is implicitly, if not explicitly, ordering 'that the hearing and determination [of the motion to dismiss] be deferred until the trial.'" (emphasis added) (quoting former Fed. R. Civ. P. 12(d)) (alterations in original)).

In other words, even "[i]f the plaintiff makes a *prima facie* case of jurisdiction prior to trial, the plaintiff must still prove personal jurisdiction . . . by a preponderance of the evidence." *Trump*, 857 P.2d at 744; *see also In re: Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. 267, 278 (Super. Ct. 2005) ("Eventually, however, plaintiff will bear the burden of establishing by the preponderance of the evidence that personal jurisdiction is proper at a pre-trial hearing or at trial."); *see generally AcryliCon USA , LLC v. Silikal GmbH*, 985 F.3d 1350, 1364-65 (11th Cir. 2021) (discussing pre-answer, trial, and post-trial challenges to personal jurisdiction).

Here, the undersigned as well as the current judge (Willocks, J.) and the former judge (Molloy, J.) all heard argument on the Defendants' personal jurisdiction challenge. But an evidentiary hearing, as such, was not held. *But cf. Boit*, 967 F.2d at 676 ("Not all 'evidentiary hearings,' however, involve evidence 'taken orally in open court' as that phrase is used in Federal Rule of Civil Procedure 43(a)."). Thus, the undersigned presumes, for purposes of this recommendation, that the Plaintiffs must only make "a *prima facie* showing by competent evidence to permit the Superior Court to exercise personal jurisdiction." *Molloy*, 56 V.I. at 173; *see Hamed v. Hamed*, 63 V.I. 529, 541 (2015) ("The phrase 'competent evidence' is a term of art that simply means admissible evidence." (citing *Molloy*, 56 V.I. at 173) (other citation omitted)). And "in determining whether the *prima facie* demonstration has been made, the [trial] court is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling *as a matter of law*." *Unit. Elec. Radio & Mach. Workers v. 163 Pleasant St. Corp.*, 987 F.2d 39, 44 (1st Cir. 1993) (emphasis added) (citing *Boit*, 967 F.2d at 675) (other citation omitted); *see also Molloy*, 56 V.I. at 173 (citing *163 Pleasant St. Corp.*).

"'The requirement that a court have personal jurisdiction flows from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual's liberty interest.'" *Estate of Skepple*, 69 V.I. at 717 (ellipsis omitted) (quoting *Ins. Corp. of Ir.*, 456 U.S. at 701-02). Since "personal

jurisdiction represents first of all an individual right," *Ins. Corp. of Ir.*, 456 U.S. at 703, a defendant not only can waive objection to a court's exercise of personal jurisdiction, it can also consent to it. *See Estate of Skepple*, 69 V.I. at 744-45 ("Objections to personal jurisdiction—including objections to process and service—are personal defenses that are waived if not raised in a timely manner. As such, consent to and waiver of personal jurisdiction could be effectuated by innumerably varying facts." (citations omitted)); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016) ("[A]n entity may contract or stipulate with another to permit proceedings in a state's courts, notwithstanding the remoteness from the state of its operations and organization."). Consent remains a valid basis for exercising personal jurisdiction over a nonresident defendant, including a defendant who appoints an agent to receive service of process pursuant to statute. *See generally Mallory v. Norfolk S. Ry. Co.*, No. 21-1168, 600 U.S. \_\_\_, 2023 WL 4187749, *7 (U.S. June 27, 2023).

"First, there must be a statutory basis for exercising jurisdiction over the nonresident defendant . . . ." *In re: Najawicz*, 52 V.I. 311, 336 (2009) (quoting *Metcalfe v. Renaissance Marine, Inc.*, 51 V.I. 1219, 1227-28 (3d Cir. 2009)). Long-arm statutes are one form of statutory authority, but so are registration statutes. *Cf. Mallory*, 2023 WL 4187749 at *5 ("Lawmakers across the country . . . adopted statutes requiring out-of-state corporations to consent to in-state suits in exchange for the rights to exploit the local market and to receive the full range of benefits enjoyed by in-state corporations."). Second, exercising jurisdiction must not violate the due process rights of the nonresident defendant. *Molloy*, 56 V.I. at 173 ("[P]laintiff must make a prima facie showing that the defendant's due process rights would not be violated by being haled into court in the Virgin Islands."). The order in which Virgin Islands courts have addressed these requirements has varied. *Compare id.* at 182 n.7 ("Because we agree . . . that the Molloys failed to prove the requirements to exercise personal jurisdiction . . . under the Virgin Islands long-arm statute . . . we are not required to review whether the Molloys provided the necessary showing . . . to exercise

jurisdiction under the Due Process Clause of the Fourteenth Amendment."), *with Godfrey v. Int'l Moving Consultants, Inc.*, 18 V.I. 60, 66 (D.V.I. 1980) ("The Virgin Islands long-arm statute has been construed to authorize the exercise of jurisdiction to the fullest extent permissible under the due process clause of the United States Constitution; so normally a constitutional analysis is all that would be necessary. However, the Court will discuss the applicability of the long-arm statute to the facts of this case, before turning to a constitutional analysis . . . ." (citations and footnote omitted)). *See also, e.g.*, *Metcalfe*, 51 V.I. at 1227 n.4 ("[W]e think it best to consider the statutory bases for exercising long-arm jurisdiction in addition to the constitutional requirements in order to ensure that we are honoring 'the law of the forum state.'" (citation omitted)).[4] Because this is a recommendation, the undersigned will address both requirements. *Accord Roselle v. Montana*, No. CV-07-515-E-EJL, 2008 U.S. Dist. LEXIS 128842, *5 n.2 (D. Idaho July 22, 2008) ("For the purpose of this Report and Recommendation, as well as for completeness sake, the Court will address both the Idaho long-arm statute and the Due Process Clause.").

Plaintiffs allege that the Superior Court has jurisdiction pursuant to the Virgin Islands Long-Arm Statute, *see* 5 V.I.C. § 4903, and the Virgin Islands Criminally Influenced and Corrupt Organizations Act (hereinafter "CICO"), *see* 14 V.I.C. § 607(j). (*See* Sec. Am. Ver. Compl. ¶ 47.) Plaintiffs also allege that the Superior Court has jurisdiction over the Defendants based on consent. *See id.* ¶ 54 ("This Court also has jurisdiction over the Blackrock Defendants and the PIMCO Defendants because they consented to jurisdiction by their conduct and statements, including by (i) registering to transact business and sell securities in the USVI and (ii) transacting business in the USVI (e.g., purchasing USVI government bonds

---

[4] The Virgin Islands Long-Arm Statute, section 4903 of title 5 of the Virgin Islands Code, was enacted in 1965 when the Virgin Islands Legislature adopted the Uniform Interstate and International Procedure Act. *See* Act No. 1339, § 1, 1965 V.I. Sess. L. 58, 58 (Mar. 15, 1965); *see also Jensen v. McInerney*, 7 V.I. 338, 347 (D.V.I. 1969); *Evans-Freke*, 75 V.I. at 418 ("The UIIPA . . . was only wholly adopted by five jurisdictions other than the Virgin Islands—Arkansas, the District of Columbia, Louisiana, Massachusetts, and Pennsylvania—before it was withdrawn by the NCCUSL in 1977 . . . ." (citations omitted)). Section 4903 corresponds to Section 1.03 of the UIPPA. *See* Uniform Interstate and International Procedures Act, *reprinted in* 11 Am. J. of Comp. Law 418, 418-36 (1962).

and managing investments on behalf of GERS).”). Each ground will be addressed below, beginning first with CICO.

### 1. CICO Jurisdiction

Section 607(j) of title 14 of the Virgin Islands Code provides for “[p]ersonal service of any process in a proceeding or action under this section . . . upon any person outside the Territory of the Virgin Islands if the person was a principal in any conduct constituting a violation of this chapter in this Territory.” 14 V.I.C. § 607(j). The statute contains a further proviso that a defendant “shall be deemed, by having engaged in such conduct *within this Territory*, to have thereby submitted himself to the jurisdiction of the courts of this Territory for the purposes of this section.” *Id.* (emphasis added). The scope of this section is a question of first impression. In one case, an argument was made that, if personal jurisdiction could be established over a nonresident defendant under section 607(j), it would violate the Constitution. *See Gov't of the U.S.V.I. v. Takata Corp.*, 67 V.I. 316, 365 n.151 (Super. Ct. 2017) (“With respect to Count I of the Complaint, Takata Japan contends that the CICO statute, specifically 14 V.I.C. § 607(j), does not vest this Court with personal jurisdiction over Takata Japan where doing so would violate constitutional due process.”). But the court declined to reach the argument, finding it moot. *See id.* (“However, because the Court has already found that the principals of due process are not violated by the Court's exercise of personal jurisdiction over Takata Japan in this case, this argument is moot.”).

Unlike *Takata*, the Plaintiffs in this case did not advance any argument in support of section 607(j) providing for jurisdiction over the Defendants. At least not at first that is. Section 607(j) does not appear in the Plaintiffs’ opposition to the Defendants’ motions to dismiss. In fact, section 607(j) was only raised when the Court, on May 4, 2022, noted that the parties had “argued solely under the Virgin Islands Long Arm Statute and failed to address one potentially controlling statute Section 607(j) of Title 14 of the Virgin Islands Code.” (Order 2, entered May 4, 2022.) The Court explained that “[n]either side ha[d] addressed

the effect of this authority or whether it provides a statutory basis for exercising jurisdiction separate and apart from the Virgin Islands Long Arm Statute." *Id.* at 3. The Court then pointed out that Territories are not sovereign, *cf. infra*, note 38, noted CICO's similarities with the federal Racketeer Influenced and Corrupt Organization ("RICO") act, acknowledged that federal courts had held that Congress could authorize nationwide service of process, further, that Congress—in its capacity as a super-legislature over territories—had not acted to abrogate or limit section 607(j), and then questioned whether section 607(j) was, in fact, "a valid attempt of the Legislature to expand personal jurisdiction for persons over whom local courts might not otherwise have had such jurisdiction under the long arm statutes." *Id.* at 5. The Court cautioned that "Section 607(j) may be vulnerable to a constitutional challenge if in fact it does authorize personal jurisdiction over Defendants in violation of the Constitution. But the threshold question to be answered first[,]" the Court explained, was "whether the Superior Court has personal jurisdiction pursuant to Section 607(j)." *Id.* The Court then scheduled this matter for argument and directed counsel to come prepared to address its concerns.

During oral argument,[5] rather than answer the question the Court asked, i.e., whether section 607(j) "provides an independent basis for exercising personal jurisdiction separate and apart from the Virgin Islands Long Arm Statutes," (Order 5), the Defendants instead argued that section 607(j) could not "*expand* long-arm jurisdiction." (Hr'g Tr. 7:7-8 (Aug. 3, 2022) (emphasis added).) The Defendants stressed—because case law has interpreted the Virgin Islands Long-Arm statute as authorizing

---

[5] The Defendants waived the right to argue waiver. "'[W]aiver of waiver generally occurs where a litigant fails to raise a procedural default that would result in waiver of the opposing party's position, and therefore waives the right to assert the waiver.'" *Der Weer v. Hess Oil V.I. Corp.*, 64 V.I. 107, 124 (Super. Ct. 2016) (quoting *Simpson v. Golden*, 56 V.I. 272, 281 n.6 (2012)). When the parties appeared for oral argument, the Defendants did not argue that the Plaintiffs had waived section 607(j) as a basis for personal jurisdiction by not arguing it. (*Cf.* Hr'g Tr. 12:9-14 (Aug. 3, 2022) ("The Parties have litigated personal jurisdiction for four years and Plaintiffs has never suggested that if a long-arm statute couldn't reach Defendants at least 607J does. They do reference it in one line in the complaint, but they've never argued it here.").) Instead, the Defendants argued the merits. The Defendants did note that, "but for Your Honor's invitation to discuss the matters here today, they [the Plaintiffs] wouldn't be speaking about 607J now." *Id.* at 12:16-16. But the Defendants did not claim wavier beforehand, so they waived waiver.

"'jurisdiction to the fullest extent permissible under the due process clause[,]'" *id.* at 8:10-12 (quoting *Jacobs v. Hilton Worldwide Holdings, Inc.*, Civ. No. 2018-0038, 2020 WL 5579825, *2 (D.V.I. Sept. 17, 2020)—that the Legislature could not go beyond the long-arm statute when enacting section 607(j). *See id.* at 27:25-28-6 ("We've never seen an instance where a legislature silently is attempted to say, we don't care what the United States Constitution says. We'll go beyond that. Can't do it. And that's why I think the long-arm statute has been interpreted as coextensive of the US Constitution . . . . There is no beyond it."). Plaintiffs countered that section 607(j) provides a separate and independent basis for exercising jurisdiction. *See id.* at 17:16-17. The undersigned agrees.

The Defendants are mistaken insofar as they contend that long arm statutes are the only source of statutory authority for exercising personal jurisdiction over nonresident defendants. In *Novak v. Mutual of Omaha Insurance Company*, the Court of Appeals of Kansas held that, "when the long arm statute does not cover a particular situation, resort must be had to the traditional bases of jurisdiction such as citizenship; domicile and residence; or consent, actual or implied." 28 P.3d 1033, 1037 (Kan. Ct. App. 2001). *Novak* relied on a similar decision by the Supreme Court of Missouri. *See id.* at 1037-38 (citing and discussing *State Ex Rel. K-Mart Corp. v. Holliger*, 986 S.W.2d 165 (Mo. 1999)); *see also Holliger*, 986 S.W.2d at 168 ("We reject K-Mart's argument that Missouri's long-arm statute is the exclusive means of obtaining jurisdiction over a foreign corporation."). And both cases were discussed at length by the Supreme Court of Kansas, agreeing (though not in so many words) that the state long-arm statute is not the only basis for exercising jurisdiction over "foreign corporations." *See generally Merriman v. Crompton Corp.*, 146 P.3d 162, 171-74 (Kan. 2006).

Other courts have reached the same conclusion – that a state's long-arm statute is not the only statutory authority for exercising jurisdiction over a nonresident defendant. *See Bulldog Inv'rs Gen. P'ship v. Sec'y of the Commonwealth*, 929 N.E.2d 293, 299 (Mass. 2010) ("By its terms, the long-arm statute

applies only to courts and cannot authorize an agency to exercise personal jurisdiction over nonresidents. However, the long-arm statute is not the only source for the exercise of personal jurisdiction over nonresidents." (citation and footnote omitted)); *State ex rel. W.A.*, 63 P.3d 607, 612 (Utah 2002) ("First, the court must assess whether Utah law confers personal jurisdiction over the nonresident defendant. This means that a court may rely on *any* Utah statute affording it personal jurisdiction, not just Utah's long-arm statute."); *see also Ward v. Flying J*, No. 2:06-cv-0210, 2006 U.S. Dist. LEXIS 112966, *24 (S.D. Ohio Dec. 29, 2006) ("[T]he Long-Arm Statute is not the exclusive means for exercising jurisdiction over out-of-state defendant."); *accord Evans-Freke*, 75 V.I. at 487 n.65 (Swan, J., concurring) (noting that 16 V.I.C. § 106(a), the more specific statute, should govern over the general statute, 5 V.I.C. § 4903, when evaluating personal jurisdiction in divorce actions). In fact, the Virgin Islands Long Arm Statute itself states that it does not affect any other statutory bases for exercising jurisdiction. *See also* 5 V.I.C. § 4941. Based on these authorities, the undersigned concludes that section 607(j) of title 14 of the Virgin Islands Code can provide a statutory basis for exercising jurisdiction separate and apart from the Virgin Islands Long Arm Statute.

Whether section 607(j) can go beyond the Virgin Islands Long Arm statute depends on whether the Virgin Islands Long Arm statute does authorize the exercise of jurisdiction to the fullest extent permitted by the Constitution. Virgin Islands courts have held that it does. *See, e.g.*, *Citibank, N.A. v. Chammah*, 44 V.I. 85, 95 (2001) ("The[] long arm statute has been construed to 'authorize the exercise of jurisdiction to the fullest extent permissible under the due process clause of the United States Constitution.'" (citation omitted)); *Godfrey*, 18 V.I. at 66 ("The Virgin Islands long-arm statute has been construed to authorize the exercise of jurisdiction to the fullest extent permissible under the due process clause of the United States Constitution . . ."). *But cf. Williams v. Ranger Am. of the V.I.*, No. 14-0017, 2016 U.S. Dist. LEXIS 172585, *6 (D.V.I. Dec. 13, 2016) ("The Virgin Islands long-arm statute *likely*

permits the exercise of personal jurisdiction to the full extent permitted by the due process clause." (emphasis added) (citing *Urgent v. Tech. Assistance Bureau, Inc.*, 255 F. Supp. 2d 532, 535 (D.V.I. 2003)). But the Virgin Islands Supreme Court has not reached the question yet, so it remains unsettled. The District Court's reasoning in *Urgent* and the authorities cited there is persuasive, however.

As *Urgent* noted, along with the Virgin Islands, "Arkansas, [the] District of Columbia, Oklahoma, and Massachusetts are other jurisdictions that adopted their long-arm statutes from Article I of the Uniform Act." *Urgent*, 255 F. Supp. 2d at 535; *see also supra* note 4. The highest courts of all four jurisdictions have "held that their respective long-arm statutes extend personal jurisdiction to its constitutional limits." 255 F. Supp. 2d. at 535. Considering that the Virgin Islands Uniform Interstate and International Procedure Act must be "interpreted and construed . . . to make uniform the laws of those states and territories which enact it[,]" 5 V.I.C. § 4942, the Virgin Islands Supreme Court would likely construe our long-arm statute to also "permit the exercise of personal jurisdiction over nonresident defendants to the extent permitted by the due process clause of the United States Constitution." *Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 810-11 (D.C. 1976); *accord Nix v. Dunavant*, 460 S.W.2d 762, 763 (Ark. 1970) ("[T]he purpose of the Uniform Act was to expand the state's personal jurisdiction over nonresidents, within the limits permitted by due process of law."); *Fields v. Volkswagen of Am., Inc.*, 555 P.2d 48, 52 (Okla. 1976) ("The intention in Oklahoma is to extend the jurisdiction of Oklahoma courts over non-residents to the outer limits permitted by the due process requirements of the United States Constitution."). But even if the Virgin Islands Long-Arm statute does apply to the furthest extent permitted by the Constitution, the outer limits of the Due Process Clause have shifted in the years since the Virgin Islands Uniform Interstate and International Procedure Act was adopted in 1965. Therefore, the undersigned will consider section 607(j) separately from the long-arm statute.

As Plaintiffs argued, section 607(j) authorizes service of process on nonresident defendants. (*See* Hr'g Tr. 19:10-22 (Aug. 3, 2022) ("Your Honor, if it meant what Defendants say it means, which you actually have to be in the territory engaging in conduct, the entire provision would be pointless and superfluous. . . . I think the only logical reading of what that means is that the conduct had an effect in the territory. . . . There would be no reason for the legislature to put a separate jurisdictional provision in 607J if it was more constrictive than the long-arm statute.")); *see* 14 V.I.C. § 607(j) ("Personal service of any process . . . may be made upon any person *outside the Territory* . . . if the person was a principal in any conduct constituting a violation of this chapter *in this Territory*." (emphasis added)). Clearly, the statute contemplates that persons will be located outside the Virgin Islands who participated in conduct occurring inside the Virgin Islands. *See id.* And "by having engaged in such conduct . . ." that "person shall be deemed . . . to have thereby submitted himself to the jurisdiction of the courts . . . ." *Id.* Although the statute does not use the word consent, by engaging in conduct that violates CICO, such persons are deemed to have consented to jurisdiction in the Virgin Islands. *Accord Pa. Fire Ins. Co. of Phila. v. Gold Issue Min. & Mill. Co.*, 243 U.S. 93, 95-96 (1917). As CICO is a "law of this territory [that] authorizes service outside this Territory," 5 V.I.C. § 4911(a), service would be made pursuant to the Virgin Islands Uniform Interstate and International Procedure Act. *See id.* In addition to being served through the Lieutenant Governor's office on April 19, 2018, the BlackRock Defendants were served on April 20, 2018, through Jessica Miller in Wilmington, Delaware, and the PIMCO Defendants were served on April 20, 2018, through Susan Reynolds in Dover, Delaware.

If the BlackRock Defendants or the PIMCO Defendants were "principal[s] in any conduct constituting a violation of" CICO, 14 V.I.C. § 607(j), they would be "deemed . . . to have thereby submitted . . . to the jurisdiction" of the Superior Court. *Id.* Thus, the question—for personal jurisdiction purposes—is whether Plaintiffs have put forth a *prima facie* case to show the Defendants were (1)

principals, (2) in conduct within the Virgin Islands, (3) that violated CICO. Counts I and II of the Second Amended Verified Complaint (hereinafter "Complaint" unless stated otherwise) are identical, so reason, the undersigned will consider them together. The only difference is that Count I was asserted by the Shareholder Plaintiffs, while Count II was asserted by Altisource.

Taking the factors out of order, the Plaintiffs contend the Defendants violated three statutes. (*See* Compl. ¶¶ 124, 137 (citing 14 V.I.C. §§ 834, 833, and 1089)). Section 834 of title 14 of the Virgin Islands Code provides:

> Whoever knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person of money or property, shall—
>
> > (1) if such property or money was less than $100 in value, be fined not more than $200 or imprisoned not more than 1 year, or both; or
> > (2) if such property or money was $100 or more in value, be imprisoned not more than 10 years.

 "The statute does not define false, fraudulent representations, or what constitutes defrauding another of money or property." *Todmann v. People*, 59 V.I. 926, 941 (2013). Thus, courts "use the definition of fraud that is consistent with the common law construction which establishes that 'a person "defrauds" another if he makes a representation of an existing material fact, knowing it to be false, intending one to rely and under circumstances in which such person does rely to his damage.'" *Id.* (ellipsis and citation omitted)). The statute also does not define property. But the Code defines property to include both real and personal property and further defines personal property to "include[] money, goods, chattels, things in action, and evidence of debt[.]" 1 V.I.C. § 41. Thus, Plaintiffs must make a *prima facie* showing that the Defendants made representations of material facts, knowing them to be false, and under circumstances in which the representations result in the loss of money or property valued at $100 or more.

In support, Plaintiffs submitted Exhibit 47, which is a June 28, 2013 letter sent by Kathy Patrick of Gibbs & Bruns LLP ("Gibbs & Bruns"), concerning the planned sale of OneWest mortgage servicing

rights, or MSRs, to Ocwen. Although Patrick does not name her clients, she states that Gibbs & Bruns "represents large institutional holders of residential mortgage-backed securities . . . . [and] write[s] on their behalf . . . ." (Ex. 47, Holt Decl. (hereinafter "June 28, 2013 Ltr."), attached to Pls.' Opp'n to Defs.' Mots. to Dismiss First Am. Ver. Compl., filed Sept. 18, 2018 (hereinafter "Pls.' Opp'n").) At the conclusion of her letter, following the signature, Patrick provides copies to, among others, "BlackRock Financial Management Inc. and its advisory affiliates" as well as "Pacific Investment Management Company LLC." *Id.* at 5. Given that all doubts as to the evidence must be resolved in favor of the plaintiff on a *prima facie* showing of personal jurisdiction, *see Molloy*, 56 V.I. at 173, the undersigned presumes that the BlackRock Defendants and PIMCO were among the clients of Gibs & Bruns on whose behalf Patrick sent the June 28, 2013 letter. The intent of that letter was to "urge" several banks and banking associations to "decline" their "consent to the transfer of any servicing [rights] to Ocwen . . . ." (June 28, 2013 Ltr. at 5.) Why? Because, according to Patrick, Ocwen was modifying the mortgages it serviced "at a higher rate" than other servicers, a practice Patrick contended was "common" at Ocwen but not authorized by the new pooling and service agreements, or PSAs, that Ocwen was about to acquire from OneWest. *Id.* at 4. Clearly, the June 28, 2013 letter clearly shows intent to interfere in a prospective transfer – by urging banks and banking associations to decline to agree to OneWest transferring its MSRs to Ocwen. But whether the letter shows that someone was defrauded of money or property by false representations is not clear.

First, Plaintiffs did not connect the June 28, 2013 letter with any effects or consequences. Plaintiffs did reference the letter in their complaint. (*See* Compl. ¶ 87.) But they failed to allege in the complaint— or assert in their opposition—that the banks and banking associations did what Patrick asked and declined to agree to the transfer of MSRs from OneWest to Ocwen. Even assuming that Patrick did represent an existing material fact, knowing it to be false, while intending that the banks and banking associations rely

on it, Plaintiffs also must show—for obtaining money by false pretenses—that the banks and banking associations did, in fact, rely on Patrick's false representation. *See Todmann*, 59 V.I. at 941 ("'[A] person "defrauds" another if he makes a representation of an existing material fact, knowing it to be false, intending one to rely and under circumstances in which such person *does rely* to his damage.'" (emphasis added) (citation omitted)). The pleadings, exhibits, and other materials are silent as to what happened with respect to the planned OneWest – Ocwen MSR transfer.

Plaintiffs also submitted Exhibit 46, a second letter sent on January 23, 2015, also by Kathy Patrick of Gibbs & Bruns, notifying securities administrators, trustees, services, and master servicers of an ongoing event of default concerning the mortgages serviced by Ocwen. Like the June 28, 2013 2013 letter, Patrick also copied BlackRock Financial Management, Inc. and its affiliates as well as PIMCO. Again, the undersigned presumes that this letter (hereinafter "January 23, 2015 letter") was also sent on behalf of the BlackRock Defendants and PIMCO. As with the June 28, 2013 letter, Plaintiffs did not connect the January 23, 2015 letter to anything else to show how Patrick's representations (which the undersigned presumes were false for the sake of argument), even if made with the intent that the servicers and trustees rely on them – how this letter resulted in anyone obtaining money or property fraudulently. The Gibbs & Bruns letters do not show a violation of CICO pursuant to section 834.

Plaintiffs next rely on section 833 of title 14 of the Virgin Islands Code, which provides

Whoever—

> (1) is a party to any fraudulent conveyance of any property, real or personal, or any right or interest issuing out of the same, or to any bond, suit, judgment, or execution, contract or conveyance, had, made or contrived, with intent to deceive and defraud others, or to defeat, hinder, or delay creditors or others of their just debts, damages, or demands; or
>
> (2) being a party as aforesaid, at any time wittingly and willingly puts in, uses, avows, maintains, justifies or defends the same, or any of them, as true, done, had, or made in good faith, or upon good consideration, or aliens, assigns, or sells any

of the property, real or personal, or other things before mentioned, conveyed to him as aforesaid, or any part thereof—

shall be fined not more than $200 or imprisoned not more than 1 year, or both.

Plaintiffs contend that the Defendants are parties to bonds, contracts, or conveyances had, made, or contrived with intent to deceive and defraud others, or to defeat, hinder, or delay others of their just debts. (*See* Compl. ¶ 124b.) Breaking this allegation down into its constituent parties is necessary to show why section 834 also fails here.

First, the Plaintiffs have not shown that the Defendants are parties to anything—bond, contract, or conveyance—entered into with the intent to defraud others. The Plaintiffs have not shown that the Defendants invested in residential mortgage-backed securities, or RMBSs, with the intent to deceive and defraud others. While the descriptive heading to section 833 is not a part of the law, *see* 1 V.I.C. § 45(a), it is instructive and explains that section 833 criminalizes the participation of fraud on creditors during the conveyance of property, for example, to remove property from the reach of a creditor. Plaintiffs' allegations—and the materials submitted in support—do not show that the Defendants entered into any bond, contract, or conveyance with an intent to defraud or deceive others of their just debts. The June 28, 2013 letter states that the BlackRock Defendants and PIMCO were not parties to the OneWest MSRs being transferred to Ocwen. And the January 23, 2015 letter shows that the BlackRock Defendants and PIMCO were already investors in RMBSs. To put it simply – Plaintiffs' evidence does not show anything having been fraudulently *conveyed*. The words "fraudulent conveyance" cover everything that comes after "of any property . . . or any right or interest arising out of the same . . . ." 14 V.I.C. § 833(a). Property, real or personal, or a right or interest in such property, must be conveyed fraudulently. Plaintiffs' evidence does not show conveyance. Even when all doubts are resolved in Plaintiffs' favor, the evidence, at best, shows that the BlackRock Defendants and PIMCO wanted properties to be conveyed. They wanted Ocwen to foreclose on the mortgages it serviced rather than modify them. But attempted fraudulent conveyance

is not what the Plaintiffs alleged. Thus, the Plaintiffs have not shown a violation of CICO pursuant to section 834.

The last statute Plaintiffs rely on as the predicate offence for their CICO claims is section 1089 of title 14 of the Virgin Islands Code, which provides:

> Whoever, being an officer of the Virgin Islands or a subdivision thereof, or a deputy, clerk, or servant of such officer, or an officer, director, trustee, clerk, servant, attorney, or agent of any association, society, or corporation (public or private), fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement.

Plaintiffs contend that the BlackRock Defendants and the PIMCO Defendants are private corporations who fraudulently appropriated to their own use property under their possession or control. (*See* Compl. ¶ 124c.) But Plaintiffs have not produced any evidence to make out a *prima facie* case for jurisdiction under section 607(j) regarding a violation of section 1089. Case law interpretating section 1089 outside the context of embezzlement by public officers is nonexistent. But the Virgin Islands Supreme Court has addressed embezzlement generally, explaining that "embezzlement is defined as 'the fraudulent appropriation of property by a person to whom it has been entrusted.'" *Richards v. People*, 74 V.I. 539, 550 (2021) (quoting 14 V.I.C. § 1087). "'Entrustment is shown where an owner delivered to another something in trust or committed something to another with a certain confidence regarding his care, use or disposal of it.' 'Thus, to establish the offense of embezzlement, it must be shown as a threshold matter that the initial possession was lawful.'" *Id.* (brackets, ellipses, and citations omitted). It must also be noted "'that the Virgin Islands have not consolidated their statutes governing larceny and embezzlement, and . . . . [thus courts continue] to observe the traditional procedural strictures [between the two] . . . .'" *Id.* at 555 n.10 (citation omitted). Plaintiffs have not shown any money or property entrusted to the Defendants that they appropriated to their own use. Thus, the Plaintiffs have not satisfied the third element of a *prima facie* case for jurisdiction under section 607(j).

Although the undersigned concludes that the three predicate statutes the Plaintiffs rely on in their complaint do not satisfy section 607(j), the undersigned that, because the Virgin Islands "is a notice pleading jurisdiction[,]" V.I. R. Civ. P. 8(a)(2), all that is required in a complaint is a "short and plain statement of the grounds for the court's jurisdiction," V.I. R. Civ. P. 8(a)(1), "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" V.I. R. Civ. P. 8(a)(2), and "a demand for the relief sought . . . ." V.I. R. Civ. P. 8(a)(3). The plaintiff "need not plead a statutory basis for jurisdiction . . . [and] a [c]ourt may exercise jurisdiction on a ground *sua sponte* despite a party's failure to even argue that basis[.]" *In re: Kelvin Manbodh Asbestos Litig.*, 47 V.I. at 280 (citing 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* §§ 1067.6 at 563-54 (3d ed. 2002); *D'Addario v. Geller*, 264 F.Supp.2d 367, 389-90 n. 29 (E.D. Va. 2003)). Furthermore, courts do recognize that "'[l]egal labels characterizing a claim cannot, standing alone, determine whether it fails.'" *Arno v. Hess Corp.*, 71 V.I. 463, 500 (Super. Ct. 2019) (ellipsis and citation omitted). The reason why courts disregard even "'a flat misapprehension by counsel respecting a claim's legal basis,'" *id.* (citation omitted), is because courts **must** grant leave to amend **unless** it will be futile. *Cf. Fleming v. Cruz*, 62 V.I. 702, 717 n.12 (2015) ("[W]ith respect to the claims which were dismissed for failure to state a claim, the trial court should have granted Plaintiff leave to amend his complaint unless any proposed amendments would have been futile."), *abrogated on other grounds as noted in Mills-Williams v. Mapp*, 67 V.I. 574, 584-86 (2017). "Even if a complaint is vague, inartfully drafted, a bare-bones outline, or not a model of specificity, the complaint may still be adequate so long as it can reasonably be read as supporting a claim for relief, giving the defendant notice of that claim." *Basic Servs., Inc. v. Gov't of the V.I.*, 71 V.I. 652, 660 (2019) (quotation marks and citation omitted).

When both principles are taken into account, it is clear that courts must consider whether the complaint states another predicate act, beyond those named in the complaint, that might supply jurisdiction

under section 607(j), particularly since CICO defines "criminal activity" to include "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in the crimes, offenses, violations or the prohibited conduct as variously described in the laws governing this jurisdiction[,]" so long as "the violation . . . is a felony . . . ." 14 V.I.C. § 604(e). CICO is not limited only to "those crimes, offenses, violations or prohibited conduct as found in the Virgin Islands Code" that are listed in the statute because of the words "and, in addition . . . ." *Id.* Further, "Federal criminal laws" can also provide the basis for a CICO claim or charge. *Id.* Thus, so long as conduct is punishable as a felony under local or federal law, it can be a predicate offense for a claim under CICO. *Cf. Takata*, 67 V.I. at 378 ("Obtaining money by false pretenses in violation of 14 V.I.C. § 834 falls within one of the enumerated crimes explicitly constituting 'criminal activity' under section 604(e), as do violations of 18 U.S.C. § 1343 and 49 U.S.C. § 30170(a)(1), which constitute felony offenses under federal law." (footnote omitted)).

Here, the complaint could be construed to allege a violation of section 652 of title 9 of the Virgin Islands Code as a predicate offense. Section 652 provides as follows:

> It is unlawful for a person that advises others, for compensation, either directly or indirectly, or through publications or writings, as to the value of securities or the advisability of investing in, purchasing or selling securities, or that, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities:
>
> > (1) to employ a device, scheme, or artifice to defraud another person; or
> > (2) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

9 V.I.C. § 652(a). The evidence the Plaintiffs submitted shows that the BlackRock and PIMCO Defendants advise others about securities for compensation and that they regularly issue reports and analyses on the propriety of investing in securities. Section 658 of title 9 declares that "[a] person that willfully violates this chapter . . . knowing the statement made to be false or misleading in a material respect, upon

conviction, shall be fined not more than $1,000,000 or imprisoned not more than 10 years, or both." *Id.* §

658(a). A violation of section 652 is punishable as a felony. *See* 14 V.I.C. § 2(b)(1) ("a felony is a crime

or offense which is punishable by imprisonment for more than one year"). And section 670 of title 9

extends jurisdiction outside the Territory for violations of section 652. *See* 9 V.I.C. § 670(f) ("Sections

633(a), 634(a), 635(a), 652, 655, and 656 apply to a person if the person engages in an act, practice, or

course of business instrumental in effecting prohibited or actionable conduct in this State, whether or not

either party is then present in this State.").

Viewed in the Plaintiffs' favor, January 23, 2015 letter makes a *prima facie* case of a predicate

violation of section 652 of title 9 under CICO. Plaintiffs have established that the Defendants advise others

for compensation about the value of securities. Plaintiffs allege that the January 23, 2015 letter contained

data that was "intentionally manipulated" and intended "to have Ocwen removed as a servicer . . . ."

(Compl. ¶¶ 103, 100.) Taking the Plaintiffs' allegations to be true, the January 23, 2015 letter could show

a scheme or artifice to defraud another person. The undersigned acknowledges that other offenses, e.g.,

under federal criminal law, could also qualify as predicate offenses under CICO. The undersigned also

acknowledges that courts should not rewrite a complaint in search of a claim. *Cf. Rombach v. Chang*, 355

F.3d 164, 176 (2d Cir. 2004) ("[C]ourts are not 'required to sift through allegations of fraud in search of

some "lesser included" claim of strict liability,' and instead should dismiss and permit counsel to offer an

amended claim 'that either pleads with the requisite particularity or drops the defective allegations and

still states a claim'" (citation omitted)). But if courts must disregard labels and citations to authority and

should independently consider whether basis for jurisdiction exists other than the grounds proffered by

the plaintiff – then the undersigned believes that examining other predicate acts is appropriate here.

The complaint alleges that the BlackRock Defendants "manage and/or advise dozens, if not

hundreds, of funds . . . including funds that hold MBS certificates at issue in this action." (Sec. Am. Ver.

Compl. ¶ 23.) The complaint alleges that "PIMCO acts as investment advisor to, and directs and controls the actions of, its subsidiaries, including PI, and the PIMCO Funds." *Id.* ¶ 40. The complaint also alleges a criminal scheme, *see id.* ¶ 77, in which the Defendants attempted to defraud others "by means of false and fraudulent misrepresentations . . . ." *Id.* ¶ 83. Again, when all doubts are resolved in Plaintiffs' favor, the evidence makes out a violation of section 652 as a predicate offense under CICO. *Cf., e.g.*, *Andreacchio v. Yax*, No. 3:21-CV-386-CWR-LGI, 2021 U.S. Dist. LEXIS 223710, at *3 (S.D. Miss. Nov. 19, 2021) (referring to the *prima facie* personal jurisdiction standard as a "relatively forgiving standard").

However, in addition to showing a predicate violation under CICO, Plaintiffs must also show— for purposes of a *prima facie* case for personal jurisdiction under section 607(j)—that the Defendants were principals. Virgin Islands law defines a principal as one who either "commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission," or who "willfully causes an act to be done which if directly performed by him or another person would be a crime or offense . . . ." 14 V.I.C. § 11(a)-(b). For CICO purposes, a principal can also be "a person who himself engages in conduct constituting a violation . . . ." 14 V.I.C. § 604(n); *see also id.* ("'Principal' means a person . . . who is accountable as a 'principal' under Title 14, chapter 1, section 11 of the Virgin Islands Code, for the conduct of another which conduct constitutes a violation.").

Plaintiffs did not submit any evidence to establish this element directly. However, the Plaintiffs do allege that Patrick is an attorney and Gibbs & Bruns is a law firm. Neither letter supports that assertion, however, because Patrick's signature does not include "Esq." The January 23, 2015 letter was not issued on letterhead. And, even though the June 28, 2013 was issued on letterhead, it indicates only that Gibbs & Bruns is an LLP, or limited liability partnership, not that it is a law firm. Nevertheless, Patrick does state in the June 28, 2013 letter that she is writing on behalf of "large institutional holders" and, in the January 23, 2015 letter, on behalf of "holders or investment managers for holders." Insofar as the

information Patrick conveyed to the banks and banking institutions in 2013 and 2015 constitutes prohibited conduct in providing investment advice, and was conveyed solely at the behest of PIMCO and BFM and its advisory affiliates, then PIMCO and the BlackRock Defendants could be accountable for the conduct of their agent. *Accord Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992) (recognizing respondeat superior and agency liability under RICO statute); *see also Crowe v. Smith*, 848 F. Supp. 1258, 1264 (W.D. La. 1994) (concluding that attorneys can act as principals in RICO fraudulent schemes) (citing *Blake v. Dierdorff*, 856 F.2d 1365 (9th Cir. 1988), and *Odesser v. Continental Bank*, 676 F. Supp. 1305 (E.D. Pa. 1987)). Again, considering the "forgiving" standard at this juncture, the undersigned concludes (and recommends that the Court find) that Plaintiffs' have made a *prima facie* case that the BlackRock Defendants and PIMCO acted as principals based on the acts of their agent, Patrick.

Lastly, the Plaintiffs must also establish a *prima facie* showing of conduct within the Virgin Islands for personal jurisdiction under section 607(j). And this is where the Plaintiffs fall short. Plaintiffs acknowledge that none of the acts at issue took place in the Territory. (*See* Hr'g Tr. 19:12-15 (Mar. 27, 2019) ("[W]e understand that the conduct took place outside the USVI but all of the focus of the intent to harm these companies was located here."); *see also* Hr'g Tr. 116:24-117: 2 (Mar. 3, 2023) ("[S]ubject to what we've alleged in the complaint . . . I believe it's not our allegation that any of the defendants were physically present in the forum during the conduct.").) At the August 3, 2022 hearing, however, counsel for the Plaintiffs argued that section 607(j) does not mean what it says. According to Plaintiffs' counsel, "the only logical reading"—of the phrase "having engaged in such conduct within this Territory" in section 607(j)—"is that the conduct had an *effect* in the territory." (Hr'g Tr. 19:14-15 (Aug. 3, 2022) (emphasis added).) Defendants rejected the Plaintiffs' construction, arguing that the phrase "having engaged in such conduct within this territory" meant "the conduct had to have been here." *Id.* at 25:22-23. The Court then played "devil's advocate" and asked the BlackRock Defendants, "with today's

technology, where . . . [someone] from Timbuktu . . . [can] scam people for millions of dollars electronically; you're saying that nothing can be done to that person because they're not physically within the territory?" *Id.* at 26:11-16. Counsel for the Defendants said yes – based on the plain language of the statute. The undersigned agrees.

Plaintiffs' concerns are understandable. *Cf. id.* at 19:20-22 ("There would be no reason for the legislature to put a separate jurisdictional provision in 607J if it was more constrictive than the long-arm statute."). But such concerns are for the Legislature, not the Judiciary. Court cannot "'rewrite, revise, modify, or amend statutory language in the guise of interpreting it.'" *In re: Joseph*, 65 V.I. 217, 228 (2016) (citation omitted). Section 607(j) could be used to reach nonresidents—such as drug dealers, gun suppliers, or scam artists, for example—so long as they have associated with a person located in the Territory when acts violating CICO have occurred. The nonresident—by having aided, abetted, counseled, commanded, induced or procured another to commit one or more acts that violate CICO—will be deemed to have submitted himself to the jurisdiction of Virgin Islands courts. *Accord Pa Fire Ins. Co.*, 243 U.S. at 96-96. Here, none of the Defendants were physically located within the Territory. The other members of the conspiracy are also not located in the Virgin Islands. Thus, Plaintiffs failed to satisfy the third element for exercising personal jurisdiction under section 607(j).

Based on the discussion above, the undersigned concludes—and recommends the Court conclude—that section 607(j) of title 14 of the Virgin Islands Code is an independent basis for exercising personal jurisdiction over a nonresident defendant. For a court in the Virgin Islands to have jurisdiction under section 607(j), a plaintiff must show that the nonresident defendant was served with process and was a principal in conduct that occurred within the Virgin Islands that violates CICO. Here, none of the evidence Plaintiffs submitted—even when all doubts are resolved in their favor, *Molloy*, 56 V.I. at 173— shows that any of the Defendants committed embezzlement (14 V.I.C. § 1089), fraud on creditors (14

V.I.C. § 833), or obtaining money by false pretenses (14 V.I.C. § 834). Plaintiffs' allegations and evidence

may establish, when viewed in their favor, that the Defendants engaged in conduct that violates section

652 of title 9 of the Virgin Islands Code, conduct prohibited of investment advisors. But the Plaintiffs did

submit evidence showing any conduct that occurred within the Territory. Since none of the conduct

occurred within the Territory, service of process on the Defendants cannot justify exercising personal

jurisdiction over them under section 607(j) of title 14 of the Virgin Islands Code.[6]

## 2.  Long-Arm Jurisdiction

In addition to section 607(j) of title 14 of the Virgin Islands Code, the Plaintiffs also assert that the

Superior Court has jurisdiction pursuant to the Virgin Islands Long-Arm statute. Section 4903 of title 5 of

the Virgin Islands Code authorizes a court in the Virgin Islands to exercise jurisdiction over claims against

a nonresident defendant under several instances including, for example, a claim arising out of "tortious

injury in this territory by an act or omission outside this territory if he regularly does or solicits business,

or engages in any other persistent course of conduct, or derives substantial revenue from goods used or

consumed or services rendered, in this territory[.]" 5 V.I.C. § 4903(a)(4). This is the statutory authority

---

[6] The undersigned does acknowledge that, while the Plaintiffs cited section 607(j) in their complaints, they failed to argue section 607(j) in their opposition. Further, as the Defendants pointed out, if it were not for the May 4, 2022 Order, the parties would not have addressed section 607(j). However, like the conclusion above, *see supra* note 5, the Plaintiffs forfeited the right to request leave to submit evidence to show personal jurisdiction under section 607(j). Once the Court referred both sides to section 607(j) and questioned "whether it provides an independent basis for exercising personal jurisdiction separate and apart from the Virgin Islands Long Arm Statute[]," (Order 5, entered May 4, 2022), it was incumbent on the Plaintiffs (as the party with the burden of proof) to request leave to submit evidence to establish a *prima facie* case for personal jurisdiction under section 607(j). They did not. Instead, they asked that the Court rule as quickly as possible. (*See* Hr'g Tr. 39:19-22 (Aug. 3, 2022) ("It's Plaintiffs' request that the Court rule as promptly as possible that there's no need for additional briefing. That's Plaintiffs' position.").) Additionally, while verified complaints can be considered as equivalent to an affidavit, *e.g.*, *Ratner v. Young*, 465 F. Supp. 386, 389 n.5. (D.V.I. 1979); *accord Asheville Sports Props., LLC v. City of Asheville*, 345, 683 S.E.2d 217, 219 (N.C. Ct. App. 2009), assuming it meets the standard for an affidavit, that is, *cf. Neal v. Kelly*, 963 F.2d 453, 457 & n.2 (D.C. Cir. 1992), here William C. Erbey and John R. Erbey verified the initial complaint and the amended complaint in their capacities as corporate officials of the Shareholder Plaintiffs, not as the former officers of Ocwen, for example. And while Jason Kopcak verified the current complaint, he did so in his capacity as CEO of Altisource. The parties had agreed (per their joint notice, approved on March 30, 2023) that Altisource would rely on the same evidence the Shareholder Plaintiffs submitted. Thus, the undersigned cannot consider Kopcak's verification as such. But more importantly, an April 27, 2022 press release on Altisource's website states that Kopcak had recently joined the company. He lacks personal knowledge of the events that predated the filing of the complaint in 2018 necessary to treat the current complaint as equivalent to an affidavit.

on which the Plaintiffs rely. But the Virgin Islands Supreme Court has held that "the correct procedure is for a court to determine (1) whether the defendant's contacts meet one of categories under section 4903(a) and then (2) whether the plaintiff's claim 'arises from' that contact." *Molloy*, 56 V.I. at 174. In other words, the court must look first at the defendants' contacts and then the plaintiff's claims. "Since section 4903 provides the court with authority to exercise personal jurisdiction on a per claim basis, each . . . claim[ also] must be separately analyzed to determine whether there is a basis under section 4903 to exercise personal jurisdiction . . . ." *Id.* (citing *In re: Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. at 278. *See also In re: Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. at 280 (citing *D'Addario v. Geller*, 264 F.Supp.2d 367, 389-90 n.29 (E.D. Va. 2003), and parenthetically explaining *D'Addario*'s holding as "finding that a Court may exercise jurisdiction on a ground *sua sponte* despite a party's failure to even argue that basis[.]").[7]

Regarding section 4903(a)(1), "transacting any business in this territory has been defined as 'a term of art which means less than doing business but more than performing some inconsequential act. It requires that a defendant engage in some type of purposeful activity within the territory.' A single act may constitute the transacting of business." *Molloy*, 56 V.I. at 176 (quoting *C & C/Manhattan v. Sunex Int'l, Inc.*, 42 V.I. 3, 8 (Terr. Ct. 1999)). Here, as a threshold matter, Defendants BlackRock Financial Management, Inc. ("BFM"), BlackRock Investment Management, LLC ("BIM"), BlackRock Investments, LLC ("BI"), and BlackRock Capital Management, Inc. ("BCM") admit that they are "involved in limited selling of securities to investors located in the U.S. Virgin Islands." (Ahrens Affid. ¶ 7, p.2, attached to BlackRock Defs.' Mem. in Supp. of Mot. to Dismiss First Am. Ver. Compl., filed Aug. 28, 2018 (hereinafter "BlackRock Mot.").) Defendant BlackRock, Inc. did not admit to transacting

---

[7] Based on *Manbodh* holding that courts have a duty to examine all bases for personal jurisdiction, even those not argued, and because *Molloy* cited *Manbodh* with approval, the undersigned considered section 607(j) of title 14 of the Virgin Islands Code and will also consider whether jurisdiction is shown under any section of the long-arm statute, not just the sections argued by the parties. *Manbodh* is also why the undersigned considers consent and registration statutes below.

business in the Territory. The evidence the Plaintiffs submitted also corroborates that BFM, BIM, BCM, and BI as well as the PIMCO Defendants transact business in the Territory, especially if a single act can constitute transacting business, and given that factual disputes must be resolved in the Plaintiffs' favor at this stage.

Exhibits 1 through 4 show that BFM, BCM., PIMCO, BIM, BI, and PIMCO Investments LLC (hereinafter "PI") all registered or notice-filed to operate as investment advisors in the Virgin Islands. Exhibit 5 is a motion that was filed in this case by GERS, a nonparty, to quash a subpoena the Plaintiffs issued. The memorandum of law GERS submitted in support states that GERS had a relationship with "PIMCO" from October 2002 until February 2015 and that GERS's relationship with "BlackRock" began in August 2013 and continues to the present. Which PIMCO Defendant(s) and which BlackRock Defendant(s) are not identified in the excerpt, however. Exhibits 6 and 8 further corroborate that "BlackRock" and "PIMCO" were among the investment managers retained by GERS. Exhibit 26 reflects a $485 million sale of HavenBrook Partners LLC and 3200 rental homes, both majority-owned by PIMCO, to Front Yard Residential Corporation, a USVI-based company and affiliate of Alitsource.[8] Discovery should identify which, if any, BlackRock Defendant(s) and PIMCO Defendant(a) served as investment managers for GERS but doubts about evidence must be resolved in the Plaintiffs' favor at this juncture. Thus, the undersigned concludes that Plaintiffs have made a *prima facie* showing of the PIMCO Defendants and BFM, BCM, BIM, and BI having transacted business in the Territory.

However, even though Plaintiffs have shown transacting business, they have not shown that any of their claims arose from this business. *Cf. Molloy*, 56 V.I. at 177. "[D]eciding whether a claim arises from a contact is a two step process: first we determine if the contact is a "but-for" cause for the claim and

---

[8] Front Yard Residential Corporation, previously Altisource Residential Corporation, was an affiliate of Ocwen and Altisource. (*See* ]BlackRock Mot., Ex. B, *In re: Ocwen Fin. Corp., et al.*, Consent Order Pursuant to N.Y. Banking Law § 44, 8 n.1 (Dec. 22, 2014).)

then we determine if the substantive obligations and privileges that accompany the contact are closely related to the action." *Id.* As in *Molloy*, the contacts of the Defendants fail the first part of this test, the "but-for" cause of the Plaintiffs' claims. In other words, the Plaintiffs have not shown that but for PIMCO or BlackRock (however defined) having advised GERS or having provided investment management advice or broker-dealer services in the Territory, their CICO claims or their prima facie tort claims would not have occurred. Thus, the Plaintiffs have not made a *prima facie* showing of long-arm jurisdiction under section 4903(a)(1).

Regarding section 4903(a)(2), "[c]ontracting to supply services or things in this territory," this subsection "has been interpreted to include contracts entered into, or partially performed in, the Virgin Islands . . . ." *Id.* at 178. Most cases addressing section 4903(a)(2) center on the supply of things. *E.g.*, *Epstein v. Fancelli Paneling, Inc.*, 55 V.I. 150, 162 (Super. Ct. 2011) "The language of the statute permits jurisdiction if the contract is 'to supply' goods to the Virgin Islands and it does not require that the defendant contract 'to deliver' or 'to ship' those goods." (footnotes omitted)), *reconsideration denied on other grounds*, ST-10-CV-443, 2012 V.I. LEXIS 165 (V.I. Super. Ct. Mar. 13, 2012).

Here, it is clear that none of the Defendants contacts satisfy section 4903(a)(2). The evidence the Plaintiffs submitted does not show any contract to supply things. And while the evidence may imply that the Defendants supplied (or supply) services—in the form of investment advice, investment management services, or broker-dealer services—the Plaintiffs have not submitted any contracts. Even if a written contract can be presumed—given the relationship between "BlackRock" and "PIMCO" and GERS, for example—Plaintiffs' claims do not arise out of any contract, including a contract with GERS. *See Molloy*, 56 V.I. at 178 ("[F]or the purposes of section 4903(a)(2) . . . the claim [must] arise[] from the contract."). The Plaintiffs have not made a *prima facie* showing of long-arm jurisdiction under section 4903(a)(2).

Regarding section 4903(a)(3), neither the BlackRock Defendants' contacts nor the PIMCO Defendants' contacts meet this category, which requires "causing tortious injury by act or omission in this territory" because, as discussed earlier, none of the actions of the Defendants' occurred within the Territory. The United States Court of Appeals for the Third Circuit, sitting as the former *de facto* court of last resort for the Virgin Islands, explained that "[t]he thrust of section 4903(a)(3) is directed to obtaining jurisdiction over those persons or entities who make a foray, even a single or isolated foray, into a jurisdiction and injury is caused as a result of that foray. The classic example is that of the non-resident motorist who has caused injury." *Carty v. Beech Aircraft Corp.*, 679 F.2d 1051, 1060 (3d Cir. 1982). Two years later, in *Dennie v. the University of Pittsburgh School of Medicine*, 589 F. Supp. 348, 354 (D.V.I. 1984), the District Court of the Virgin Islands explained that "the 'legislative history' to § 4903(a)(3) located in the Commission's Comment . . . notes that '(a)(3) applies when the tortious act or omission occurs in the state *even though the resulting injury occurs elsewhere*.'" (quoting 13 Unif. L. Ann. § 1.03 at 468). Under *Carty*'s interpretation, the act and the injury occur in the Territory, e.g., a non-resident motorist passing through, while *Dennie* construed section 4903(a)(a) as covering only acts (or failures to act) that occur in the Territory with the injury occurring outside the Territory. If the comments of the National Conference of Commissioners on Uniform State Laws can be viewed as legislative history, *Dennie* may be more accurate because those comments state plainly the equivalent to section 4903(a)(3) only "applies when the tortious act or omission occurs in the state even though the resulting *injury occurs elsewhere*. The state where the tortious act or omission occurs will often be the most appropriate location for the trial of the action." Uniform Interstate and International Procedure Act, *reprinted in* 11 Am. J. of Comp. L. 418, 420 (1962) (emphasis added). The comments explain further that this subsection "may have a narrower range of application than statutes which base jurisdiction upon the 'commission of a tortious act' within the state or upon the commission of a tort 'in whole or in part' in the state." *Id.* While

there may be a difference between how *Carty* and *Dennie* interpret section 4903(a)(3), the evidence the Plaintiffs submitted does not show any "act or omission in this territory." Plaintiffs have twice conceded that all of the acts complained of occurred outside the Virgin Islands. (*Cf.* Hr'g Tr. 19:12-15 (Mar. 27, 2019); Hr'g Tr. 116:24-117: 2 (Mar. 3, 2023).) The Plaintiffs have not made a *prima facie* showing of long-arm jurisdiction under section 4903(a)(3).

Regarding section 4903(a)(4), this section "requires a two part showing . . . ." *Molloy*, 56 V.I. at 179. Section 4903(a)(4) authorizes jurisdiction over a nonresident defendant if he "caus[es] tortious injury in this territory by an act or omission outside this territory [and] if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this territory[.]" 5 V.I.C. § 4903(a)(4). The first part requires that the plaintiff show that the defendant committed a tort outside the Virgin Islands that caused injury inside the Virgin Islands. *See Molloy*, 56 V.I. at 179-80. Then, the plaintiff must show that the defendant has "'additional unrelated forum contacts, a plus factor,'" *id.* at 180 (citation omitted), like regularly doing business in or soliciting business from the Virgin Islands, engaging in a "persistent course of conduct in the territory," *id.*, or deriving "substantial revenue from goods or services consumed in the Virgin Islands." *Id.* "'A court may consider each of these [three] factors individually, or all three cumulatively, for the purposes of satisfying th[e second] step of the analysis.'" *Id.* (citation omitted). What's more, "'[t]he conduct [of the defendant] establishing the plus factor does not need to have any relationship with the tortious activity.'" *Id.* (footnote and citation omitted).

Generally, personal jurisdiction must be evaluated on a claim-by-claim and defendant-by-defendant basis. *See Molloy*, 56 V.I. at 175; *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980). Where claims overlap, however, courts can consider them together. *See Molloy*, 56 V.I. at 175 (quoting *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 n.3 (3d Cir. 2007)). Here, the Plaintiffs contend that the tortious

injury the Defendants committed outside the Virgin Islands "includ[es] wrongfully pursuing foreclosures on hundreds of thousands of families, [which] had deleterious effects in the USVI." (Pls.' Opp'n 26.) The Defendants also interfered with "existing and prospective contracts", "prevented Ocwen from obtaining billions of dollars of additional MSR contracts (which generate significant tax revenue here)", and "caused significant job losses for Virgin Islanders . . . ." *Id.* In their complaint, Plaintiffs assert two counts of prima facie tort (Count V (Altisource); Count VII (Shareholder Plaintiffs)), and two counts of civil conspiracy (Count VI (Altisource); Count VIII (Shareholder Plaintiffs)). Altisource also asserts one count of intentional interference with contract (Count III) and intentional interference with prospective advantage (Count IV).[9] Per *Molloy*, the undersigned will consider the *prima facie* counts and then the civil conspiracy counts, followed by the tortious interference counts. But first a *Banks* analysis is necessary because neither prima facie tort nor civil conspiracy have been recognized by the Virgin Islands Supreme Court.

### a.   *Banks* analyses[10]

"To perform this inquiry—known as a *Banks* analysis—a court considers '(1) whether any Virgin Islands courts have previously adopted a particular rule; (2) the position taken by a majority of courts from other jurisdictions and (3) most importantly, which approach represents the soundest rule for the Virgin Islands.'" *Robertson v. Banco Popular de P.R.*, 2023 VI 3, ¶ 27 (citation and footnote omitted). "[T]he ultimate goal of a *Banks* analysis is 'to ensure the creation of indigenous Virgin Islands law free of undue outside influence—as intended by Congress and the Virgin Islands Legislature in creating a local judiciary independent of the federal judiciary.'" *Id.* at ¶ 28 (citation omitted).

---

[9] Counts I and II, the CICO claims, were considered in the prior section and are not addressed again here in light of the conclusion that section 607(j) of title 14 of the Virgin Islands Code governs to the exclusion of the Virgin Islands Long Arm Statute.

[10] Because a *Banks* analysis is also necessary to address the Defendants' 12(b)(6) arguments, the undersigned conducts the analysis here and will incorporate it later in the recommendation.

"The first factor—whether other Virgin Islands courts previously adopted a particular rule—in effect requires a court to consider *stare decisis*; that is, whether the legal community and the public have reason to rely on a particular common law rule despite it not having yet been adopted by th[e Supreme] Court." *Id.* This factor "involves more than simply the rote counting of judicial decisions . . . ." *Id.* at ¶ 30. Instead, in evaluating past precedent, courts should

> not just consider the number of judicial decisions, but also the character of those decisions. This requires consideration of additional elements besides the sheer number of judicial decisions, such as the age of the decisions, whether these judicial decisions are binding or non-binding precedent, and the general reasoning that underlies those decisions, i.e., whether the court performed a *Banks* analysis or otherwise considered the merits of a given rule, or simply applied it mechanistically or uncritically.

*Id.* Regarding the second factor, this too "is not intended as a rote counting exercise, but a process of review intended to inform the *Banks* analysis by allowing a court to benefit from any national debate and the experiences in other jurisdictions." *Id.* at ¶ 33.

> [T]he third and most important factor . . . requires a court to consider the practical implications of adopting a particular rule in the Virgin Islands as well as what rule is best in accord with the public policy of the Virgin Islands, including its consistency with related statutes, court rules, and judicial precedents.

*Id.* at ¶ 28.

After weighing all three factors, the court must determine, "not only . . . what common law rule to adopt, but whether to recognize a specific rule at all." *In re: Catalyst Third-Party Litig.*, 72 V.I. 726, 749 (Super. Ct. 2020). In other words, a *Banks* analysis could result in the dismissal of a claim or the rejection of a defense. *See Roberson*, 2022 VI 3 at ¶ 38 (rejecting gist of the action doctrine); *see also Matthew v. Herman*, 56 V.I. 674 (2012) (rejecting amatory torts under Virgin Islands common law, reversing jury verdict, and remanding for dismissal of complaint for failure to state a claim for relief).

### i. Prima facie tort

"A 'misty shroud" is how some courts, with considerable justification, have described the doctrine of prima facie tort." Kenneth J. Vandevelde, *The Modern* Prima facie tort *Doctrine*, 79 Ky. L.J. 519, 519 (1990-91) (footnote omitted). This "considerable justification" stems partly from the way the doctrine came about and how courts treated it. In simple terms, prima facie tort allows one to recover for spiteful acts done without justification and with intent to injure. *See J.S. DeWeese Co. v. Hughes-Treitler Mfg. Corp.*, 881 S.W.2d 638, 646 (Mo. Ct. App. 1994) ("The prima facie tort doctrine requires an actual intent to injure the plaintiff. Spite or ill-will is necessary to satisfy the requisite intent." (citation omitted)). So, for example, in *Tuttle v. Buck*, 119 N.W. 946 (Minn. 1909), the plaintiff, a barber, was able to recover against the defendant who had opened another barbershop – not to operate a barbershop, but to drive the plaintiff out of business. *See id.* at 948 ("To divert to one's self the customers of a business rival by the offer of goods at lower prices is in general a legitimate mode of serving one's own interest, and justifiable as fair competition. But when a man starts an opposition place of business, not for the sake of profit to himself, but regardless of loss to himself, and for the sole purpose of driving his competitor out of business, and with the intention of himself retiring upon the accomplishment of his malevolent purpose, he is guilty of a wanton wrong and an actionable tort."). Similarly, a person who, out of ill-will, removes needed medication from the reach of a very sick and bedridden person would be liable for resulting harm. *See, e.g.*, Philip Halpern, *Intentional Torts and the Restatement: A Petition for Rehearing*, 7 Buff. L. Rev. 7, 15 (1957) (giving such an example of how the doctrine should function) ("The plaintiff is a victim of an incapacitating disease which makes it impossible for him to move from his bed. The defendant, with the intention of injuring him, removes from his reach needed medicine and, as a result of his being deprived of the medicine, the plaintiff's illness is aggravated. The defendant is obviously liable for the physical harm resulting from his act . . . .").

Cases, for the most part, do not use "spite" or "spiteful" when discussing this cause of action. But the jurisprudence makes it clear that spite—or malice—is at the heart of the tort. *See, e.g.*, Kenneth J. Vandevelde, *A History of* Prima facie tort*: The Origins of a General Theory of Intentional Tort*, 19 Hofstra L. Rev. 447, 478 (1990) ("'[T]he intentional causing of such loss to another, without justifiable cause, and with the malicious purpose to inflict it, is of itself a wrong.'" (quoting *Walker v. Cronin*, 107 Mass. 555, 562 (1871))); *see also* Morris D. Forkosch, *Analysis of the* Prima facie tort *Cause of Action*, 42 Cornell L. Rev. 465, 481 (1957) (summarizing the "essential elements" of a prima facie tort claim) ("The presence of intent . . . and not merely motive, desire or purpose, is an essential element in such a cause of action . . . [and] contains aspects or elements of malice, a wicked or evil motive."). If facie tort seems cloaked by a "misty shroud" it results from judicial reluctance to understand it, with some courts observing that "'prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its own legs.'" *Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 876 (N.J. 2008) (quoting *Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 355 (N.Y. 1985)). Others acknowledged in dicta that even if their "'common law may admit of a cause of action for prima facie tort . . . [it would be] solely [as] a gap-filler." *Taylor v. D.C. Water & Sewer Auth.*, 957 A.2d 45, 50 n.13 (D.C. 2008) (quoting *Richard A. Pulaski Constr. Co.*, 950 A.2d at 870). Yet over sixty years ago, scholars had observed that "[t]he function of the prima facie doctrine is to *supplement* the traditional torts and not to *supplant* them." Halpern, *Intentional Torts and the Restatement: A Petition for Rehearing*, 7 Buff. L. Rev. at 11 (emphasis added).

With this background in mind, the undersigned turns to the first *Banks* factor. The lion's share of Virgin Islands decisions regarding prima facie tort were issued by the District Court of the Virgin Islands, with the first decision coming in 1987, and referring to it as "the general tort . . . or 'innominate tort.'" *Moore v. A.H. Riise Gift Shops*, 23 V.I. 227, 240 (D.V.I. 1987). *Moore* relied on the Restatement (Second)

of Torts—which explains that prima facie tort is "intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well established and named intentional torts[,]" *Restatement (Second) of Torts* § 870 cmt a. (1979)—and dismissed the prima facie tort claim for failure to state a claim for relief. *See Moore*, 23 V.I. at 240. In other words, even though prima facie tort had been referred to locally as "a 'catchall' tort, which 'assures the existence of a cause of action in those meritorious situations where a named and established tort action cannot be fashioned out of the intentional misconduct of the tortfeasor." *Joseph v. Tropical Shipping & Constr. Co.*, Civ. No. 86-169, 1988 U.S. Dist. LEXIS 18431, *8 (D.V.I. July 20, 1988) (quoting *Saunders v. Bluebeard's Castle, Inc.*, 1987 St. T. Supp. 449, 453 )),[11] and even though claims could be pled in the alternative, *Moore* (again, the first case to address prima facie tort) dismissed the claim as indistinguishable from the other torts the plaintiff had pleaded. *See Moore*, 23 V.I. at 240 ('The court is unable to determine what specific cause of action Count VI alleges, distinct from the torts alleged in the prior counts.").

Later cases followed *Moore* almost as if it were binding, dismissing prima facie tort claims as duplicative of other claims or because no unique facts were alleged to show how it differed from other claims. *E.g.*, *Pourzal v. Marriott Int'l, Inc.*, 45 V.I. 488, 494 (D.V.I. 2004) ("This Court has previously decided that a prima facie tort claim must be dismissed under Rule 12(b)(6) if it is duplicative of other asserted claims." (citing *Moore*, 23 V.I. at 240)); *Gov't Guarantee Fund of Fin. v. Hyatt Corp.*, 35 V.I.

---

[11] The *Saunders* decision is only available at present in the St. Thomas Supplement, a copy of which can be obtained from the law librarian at the District Court of the Virgin Islands. *Cf.* Joseph T. Gasper II, *The Case for a Territorial Reporter*, 91 Fordham L. Rev. 1711, 1722 (2023) ("[T]he judges of the District Court began in the 1970s to assemble their own 'homemade' reporters, dubbed the St. Thomas Supplement and the St. Croix Supplement. These 'reporters' were more like slip opinions or advance sheets than true reporters, though there was an effort at annotating the volumes. Each volume is organized by year and contains the typewritten decisions issued in the respective district, along with occasional orders and opinions of the Third Circuit in cases appealed from that district. At some point, the Third Circuit covered the cost to have these supplements bound. But the bound version only contains photocopies of typewritten opinions, paginated by hand in ink. Courts do cite the supplements. But the supplements only exist on the shelves of a few select libraries, containing many decisions found only in the pages of these supplements from a time when the District Court served as the court of general jurisdiction for the Territory." (footnotes omitted)).

356, 390 (D.V.I. 1997) (dismissing prima facie counterclaim) ("In this case, Hyatt alleges no facts of wrongful conduct to support any tort in addition to and distinct from the one tort it has sufficiently plead, namely tortious interference with contractual relations."); *id.* at 390 ("[N]o claim for prima facie tort lies if the action complained of fits within another category of tort." (citing *Moore*, 23 V.I. at 240)); *see also Glenn v. Dunlop*, 423 F. App'x 249, 255 (3d Cir. 2010) ("[C]ourts in the Virgin Islands have dismissed prima facie tort claims that they deem insufficiently 'distinct' from plaintiffs' other, more established tort claims." (citing *Moore*, 23 V.I. at 240; *Hyatt Corp.*, 35 V.I. at 390)); *Pourzal v. Marriott Int'l, Inc.*, No. 2001-140, 2006 U.S. Dist. LEXIS 60231, *9-10 (D.V.I. Aug. 17, 2006) ("This Court has dismissed tort claims that are duplicative or indistinct from other asserted claims." (citing *Moore*, 23 V.I. at 240-41); *Dias v. WVC St. John, Inc.*, 49 V.I. 802, 805 (D.V.I. 2008) (dismissing prima facie tort claim as "duplicative and materially indistinct from . . . emotional distress claim") ("'[N]o claim for prima facie tort lies if the action complained of fits within another category of tort.'" (quoting *Hyatt Corp.*, 35 V.I. at 390)). Recent decisions of the District Court still align with *Moore*. *See, e.g.*, *Garnett v. Leg. of the V.I.*, No. 2013-21, 2014 U.S. Dist. LEXIS 180681, *17-18 (D.V.I. Mar. 7, 2014) ("'Prima facie tort is recognized as a cause of action in the Virgin Islands.' However, 'no claim for prima facie tort lies if the action complained of fits within another category of tort.'" (citations omitted)).

There are no decisions, reported or unreported, issued by the Territorial Court of the Virgin Islands discussing prima facie tort, and none by the Superior Court of the Virgin Islands until 2010. The first Superior Court decision to reference the cause of action mentioned it only in listing the plaintiff's claims. *See Southwell v. Gov't of the V.I.*, No. ST-08-CV-0183, 2010 V.I. LEXIS 159, *2 (V.I. Super. Ct. May 3, 2010). It was not until 2011 that a Superior Court judge considered the merits of the cause of action; but there too, the court relied on District Court case law to dismiss the claim as duplicative. *See Sorber v. Glacial Energy VI, LLC*, No. ST-10-CV-S88, 2011 V.I. LEXIS 34, *11 & n. 19 (V.I. Super. Ct. June 7,

2011). The first case to conduct a *Banks* analysis, albeit a limited one, was in 2015 in *Edwards v. Marriott Hotel Management Company (V.I.), Inc.*, Case No. ST-14-CV-222, 2015 V.I. LEXIS 13, *16 n.42 (V.I. Super. Ct. Jan. 29, 2015). And even though the plaintiff in *Edwards* argued that he pleaded prima facie tort in the alternative, *see id.* at *16-17, the Superior Court still dismissed the claim as "insufficiently distinct," *id.* at *16, similar to the approach of the District Court and the Third Circuit. Later decisions followed *Edwards*, with *Bank of Nova Scotia v. Boynes*, No. ST-16-CV-29, 2016 V.I. LEXIS 175, *5 (V.I. Super. Ct. Oct. 18, 2016), dismissing a prima facie tort counterclaim as duplicative of other counterclaims. *See id.*

Turning to the second *Banks* factor, fewer than half of the other jurisdictions -- "twenty-one states . .. plus the . . . District of Columbia recognize prima facie tort." *Boynes*, 2016 V.I. LEXIS 175 at *5 n.16 (citing Kenneth J. Vandevelde, *The Modern* Prima facie tort *Doctrine*, 79 Ky. L.J. 519, 525-27 (1990-91)).[12, 13] Several courts have also relied on Professor Vandevelde's assessment of the number of jurisdictions who recognize the tort. *See id.*; *see also, e.g.*, *Taylor v. Metzger*, 706 A.2d 685, 701 (N.J. 1998) ("Several states recognize a prima facie tort cause of action." (citing Vandevelde among other authorities). But others disagree with him. *See, e.g.*, *Sweports, Ltd. v. Abrams*, 2021 IL App (1st) 200139-U, ¶ 67 (disagreeing with Vandevelde's assessment that Illinois recognized prima facie tort and declining "to expand existing jurisprudence to include prima facie tort as a cognizable cause of action under Illinois law."). In fact, the authority Professor Vandevelde cited for concluding that the US Virgin Islands

---

[12] *Boynes* attributed the quoted language to the Vandevelde article. That appear to be a scrivener's error, however.

[13] Vandevelde lists Arizona, California, Connecticut, Delaware, Idaho, Illinois, Massachusetts, Missouri, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Dakota, Tennessee, Puerto Rico, and the US Virgin Islands (along with the District of Columbia) as the jurisdictions that recognize prima facie tort as a cause of action. For reasons unclear, Professor Vandevelde did not include New York in that list. Perhaps he assumed the reader would know New York already recognizes prima facie tort. *Cf. Fromson v. State*, 848 A.2d 344, 350 (Vt. 2004) (stating that New York has the "greatest number of reported cases" regarding prima facie tort). Vandevelde also includes Hawaii, Kentucky, Maine, and Minnesota as jurisdictions that "have applied the prima facie tort doctrine to a relatively specific situation, leaving it unclear how broadly applicable the doctrine is." 79 Ky. L.J. at 527. Lastly, Professor Vandevelde lists Georgia and Virginia as jurisdictions where the federal courts siting in diversity there assumed the respective supreme courts would recognize it. *See id.*

recognizes prima facie tort is *Moore* which, for reasons discussed above, is problematic at best but more so because *Moore* was decided by the District Court of the Virgin Islands in its capacity as a trial court, not its former capacity as the intermediate appellate court for the Virgin Islands. Similarly, the authorized given for Puerto Rico, *see* 79 Ky. L.J. at 527 n. 46 (citing *Fed. Deposit Ins. Corp. v. Martinez Almodovar*, 671 F. Supp. 851 (D.P.R. 1987)), does reference the prima facie theory stated in the Restatement (Second) of Torts. *See Martinez Almodovar*, 671 F. Supp. at 881 ("This principle is essentially the same as the general doctrine applicable to tortious conduct involving harm intentionally inflicted set out in Restatement (Second) of Torts § 870 (1977)."). But the "principle" the court was discussing in *Martinez Almodovar* (and the authority the court applied) was statutory. *See id.* (citing 31 L.P.R.A. § 5141). Whether, being principally a civil law jurisdiction, the Supreme Court of Puerto Rico can recognize new causes of action in the same way common law courts of last resort do is beyond the scope of this Recommendation. But it suffices to say that the authorities cited by Professor Vandevelde for Puerto Rico and the Virgin Islands—coupled with other courts' rejection of his assessment—undermines the reliance *Boynes* (and other courts) placed on Professor Vandevelde's research. Further, nearly thirty years have passed since the article was published in 1991. For these reasons, the undersigned has undertaken an independent review to determine which courts of last resort have recognized prima facie tort as a cause of action.

Among the jurisdictions whose highest courts have recognize prima facie tort by name are only New Mexico,[14] Missouri,[15] and New York,[16] while Ohio initially rejected prima facie tort by name,[17] but then recognized the theory under the Restatement (Second) of Torts.[18] New Jersey acknowledged that it had not squarely addressed whether to adopt prima facie tort,[19] then addressed it,[20] but declined to decide whether to recognize it.[21] The District of Columbia acknowledged that it has not recognized prima facie tort,[22] while Wyoming observed that, if it were to recognize prima facie tort, it would be available only to the exclusion of other causes of action.[23] Utah too acknowledged that it has not recognized prima facie

---

[14] *See Martinez v. N. Rio Arriba Elec. Coop., Inc.*, 51 P.3d 1164, 1170 (N.M. 2002) ("New Mexico first recognized a cause of action for prima facie tort in *Schmitz v. Smentowski*, 109 N.M. 386, 393-94, 785 P.2d 726, 733-34 (1990). Prima facie tort is intended to provide a remedy for persons harmed by intentional and malicious, but otherwise lawful, acts that 'fall outside of the rigid traditional intentional tort categories.'" (quoting *Schmitz*, 785 P.2d at 734)).

[15] *See Dake v. Tuell*, 687 S.W.2d 191, 193 n.4 (Mo. 1985) ("The prima facie tort doctrine was first recognized in Missouri in *Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo. App. 1980).").

[16] *See Curiano v. Suozzi*, 469 N.E.2d 1324, 1327 (N.Y.1984) ("Some years ago this court recognized the general principle that harm intentionally inflicted is prima facie actionable unless justified. That principle has developed into the specific cause of action of prima facie tort consisting of four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." (citations omitted)).

[17] *See Costell v. Toledo Hosp.*, 527 N.E.2d 858, 860 (Ohio 1988) ("We note that Ohio's courts have not adopted the above-described intentional tort theory. Moreover, such theory has been expressly rejected on the basis that the motive behind an action is not material when one has a legal right to perform such act. . . . Thus, under the facts presented, we are not at this time persuaded that the adoption of the prima facie tort theory would contribute to that body of the law.").

[18] *See Haller v. Borror Corp.*, 552 N.E.2d 207, 212 (Ohio 1990). Interestingly, Haller cites and applies several sections of the Restatement (Second) of Torts, including Section 870, but did not use the phrase "prima facie tort" or overrule (or even cite to) *Costell* decision issued two years earlier.

[19] *See Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 874, 876 (N.J. 2008) (Although descriptions of the prima facie tort cause of action appear sporadically in our jurisprudence, this Court has neither upheld a prima facie tort claim nor explicitly defined its limits.").

[20] *See id.* at 874-76.

[21] *See id.* at 876 ("Because a prima facie tort cause of action, however defined, may lie only if no other tort is available, we need not address whether New Jersey recognizes that tort or otherwise defines its contours.")

[22] *See Taylor v. D.C. Water & Sewer Auth.*, 957 A.2d 45, 50 (D.C. 2008) ("The trial judge may have focused on the heading, prima facie tort, and properly concluded that we have not recognized this tort in the District.").

[23] *See Bextel v. Fork Rd. Ltd. Liab. Co.*, 474 P.3d 625, 631-32 (Wy. 2020) ("And, to the extent we might consider the availability of a prima facie tort, such claim is disfavored and would be viable only where no established tort claim is available.").

tort but observed in dicta that it would only be available for lawful acts.[24] Only Alabama,[25] Montana,[26] Oregon,[27] and Vermont[28] have explicitly declined to recognize it. Other jurisdictions' highest courts do not appear to have addressed whether to adopt prima facie tort.

Only three jurisdictions—New York, New Mexico, and Missouri—have clearly recognized a cause of action called prima facie tort. However, the second *Banks* "factor is not intended as a rote counting exercise, but [as] a process of review intended to inform the *Banks* analysis by allowing a court to benefit from any national debate and the experiences in other jurisdictions." *Robertson*, 2023 VI 3 at ¶ 33. Broadly speaking, two different approaches have emerged: the Missouri / New Mexico approach and the New York approach. *Cf. Tarrant v. Guthrie First Capital Bank*, 241 P.3d 280, 283 (Okla. Ct. App. 2010) ("Although between eight and twelve states appear to have recognized this theory, litigation pursuant to the prima facie tort theory is concentrated in three states: New York, New Mexico and Missouri. New Mexico and Missouri apply essentially the same definition of prima facie tort . . . ." (citations omitted)). To prevail on a prima facie tort claim under New Mexico or Missouri law, "the tort-feasor must act maliciously, with the intent to cause injury, and without justification or with insufficient justification." *Schmitz v. Smentowski*, 785 P.2d 726, 735 (N.M. 1990); *accord Nazeri v. Mo. Valley Coll.*,

---

[24] *See DOIT, Inc. v. Touche, Ross & Co.*, 926 P.2d 835, 841 n.11 (Utah 1996).

[25] *See Liberty Nat'l Life Ins. Co. v. Univ. of Ala. Health Servs. Found., P.C.*, 881 So. 2d 1013, 1025 (Ala. 2003 ("[W]e do not determine whether a claim for prima facie tort should be a recognized cause of action in this State under the claims and factual underpinnings involved here.").

[26] *See Pospisil v. First Nat'l Bank*, 398, 37 P.3d 704, 708 (Mont. 2001) ("Montana has not recognized a separate cause of action for prima facie tort. Under the facts of this case, we decline to address the issue now.").

[27] *See Nees v. Hocks*, 536 P.2d 512, 513 (Or. 1975) ("Plaintiff has labeled the tort she contends she pleaded and proved, 'prima facie tort.' . . . We are of the opinion that the term serves no purpose in Oregon and we will advance the jurisprudence of this state by eliminating it.").

[28] *See Fromson v. State*, 848 A.2d 344, 351 (Vt. 2004) ("Even if we were to make such a change in our law, we would do it by redefining the elements of IIED and not by adopting a new tort theory that would accomplish the same result. On this record, we decline to adopt prima facie tort.").

860 S.W.2d 303, 315 (Mo. 1993) ("The elements of a prima facie tort claim are: (1) an intentional lawful act by defendant; (2) defendant's intent to injure the plaintiff; (3) injury to the plaintiff; and (4) an absence of or insufficient justification for defendant's act."). Under New York law, a "prima facie tort consist[s] of four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Curiano v. Suozzi*, 469 N.E.2d 1324, 1327 (N.Y. 1984) (citations omitted). "A critical element of the cause of action" under New York law, "is that plaintiff suffered specific and measurable loss, which requires an allegation of special damages." *Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 355 (N.Y. 1985); *see also* Vandevelde, *The* Prima facie tort *Doctrine*, 79 Ky. L.J. at 536-37 ("New York arguably defines the scope of injuries . . . somewhat more narrowly than the Second Restatement and requires the plaintiff to prove as additional elements that the defendant's conduct was not otherwise tortious and that the defendant was motivated solely by malice.").

All three jurisdictions recognize that a "prima facie tort may be pleaded in the alternative; however, if at the close of the evidence, plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted to the jury on that cause and not under prima facie tort." *Schmitz*, 785 P.2d at 736 (citing *Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546, 552-53 (Mo. Ct. App. 1982); *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc., Local 1899, AFT AFL-CIO*, 343 N.E.2d 278, 284-85 (N.Y. 1975)). The New Mexico / Missouri approach differs in that New Mexico and Missouri do not require that the conduct of the defendant be intended solely to harm the plaintiff. *See Schmitz*, 785 P.2d at 735 ("[T]he act must be committed with the intent to injure plaintiff, or, in other words, without justification, but it need not be shown that the act was solely intended to injure plaintiff."); *see also id.* ("One early development in New York was that the defendant was required to have acted with 'disinterested malevolence' – the intent to harm being the sole

motivation for the action. This was a means to determine if otherwise lawful conduct was done without any beneficial end but solely to injure the plaintiff. We reject this approach . . . . A sole intent to injure is, by definition, unjustifiable – a purpose other than to injure the plaintiff is a justification for the act. Thus, if a defendant offers a purpose other than the motivation to harm the plaintiff as justification for his actions, that justification must be balanced to determine if it outweighs the bad motive of the defendant in attempting to cause injury." (paragraph break and citations omitted)).

Turning to the third *Banks* factor, the undersigned recommends that the Court recognize prima facie tort as a cause of action. Although there are, at present, only three jurisdictions that have adopted prima facie tort by name, the majority of judges and scholars that have considered the underlying theory have recognized its soundness. *Cf. id.* at 734 ("Although the concept that unjustified intentionally caused harm should be the basis for liability has been utilized without denominating the theory as prima facie tort throughout recent jurisprudence, New York was the first state to adopt prima facie tort as a specific cause of action." (citations omitted)); *accord* Kenneth J. Vandevelde, *A History of* Prima facie tort*: The Origins of a General Theory of Intentional Tort*, 19 Hofstra L. Rev. 447, 494 (1990) ("The prima facie tort doctrine is now an established doctrine of modern tort law, notwithstanding the relative inattention it has received from the commentators."); Halpern, *Intentional Torts and the Restatement*, 7 Buff. L. Rev. at ("In this country, the doctrine has had a much less stormy career. It has been widely accepted as the basic principle of tort liability. Dean Pound summed up the status of the doctrine in 1955 as follows: 'As late as 1914 it was regarded as debatable whether one who intentionally does anything which on its face is injurious to another must repair the resulting damage unless he can justify his act under some social or public interest or assert a privilege because of a countervailing interest of his own which there is a social or public interest in securing. This now generally received proposition only got gradual and piecemeal recognition for a long time. It could not give a name to a precisely defined tort.' *But by 1955*, Dean Pound concluded, the

doctrine was no longer open to debate." (emphasis added) (footnote omitted)). "Section 870 of the first Restatement . . . had little impact on case law." Vandevelde, *A History of* Prima facie tort, 19 Hofstra L. Rev. at 493. And no reported cases in the Virgin Islands applied the first Restatement rule. By the time Section 870 of the second Restatement came about, courts had, in essence, already formulated a similar approach. *Cf. id.* at 494 ("The majority of states which recognize the doctrine have adopted the formulation articulated by the second Restatement. In some cases, states have adopted what may be characterized as the second Restatement formulation, although they did so years, or even decades, before the second Restatement was published." (footnotes omitted)).

The undersigned further recommends that the Court adopt the New Mexico / Missouri approach as the soundest rule for the Virgin Islands. Adopting the New Mexico / Missouri approach would minimize any potential disruption since the approach taken by the Restatement (Second) of Torts was previously the *de facto* rule applied in the Virgin Islands. *See Boynes*, 2016 V.I. LEXIS 175 at *5; *Glenn*, 423 F. App'x at 255; *Moore*, 23 V.I. at 240. And unless public policy compels another result, the majority rule is generally presumed to be the soundest. *Cf. Matthew*, 56 V.I. at 680 ("[In general] the Virgin Islands Legislature intends [the] majority rule to govern in the absence of specific legislation.'" (quoting *Banks*, 55 V.I. at 983-84)). The only difference in following the New Mexico / Missouri as opposed continuing to follow *Moore*, *Hyatt Corporation*, and *Glenn* is that, rather than being hostile to prima facie tort, treating it as an "innominate" or "catchall" tort, the Virgin Islands would recognize prima facie tort as a proper, stand-alone cause of action. To state a claim for prima facie tort, a plaintiff must allege "(1) an intentional lawful act by defendant; (2) defendant's intent to injure the plaintiff; (3) injury to the plaintiff; and (4) an absence of or insufficient justification for defendant's act." *Nazeri*, 860 S.W.2d at 315.

Prima facie tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which 'fall outside of the rigid traditional intentional tort categories.'"

*Bogle v. Summit Inv. Co., L.L.C.*, 107 P.3d 520, 529 (N.M. 2005). "[P]rima facie tort is not a duplicative cause of action established either by the failure to prove a recognized tort claim, or by the failure of such a claim on account of a particular defense." *Nazeri.*, 860 S.W.2d at 315. "Prima facie tort is not a recent innovation; its development has been discussed in various law reviews and decisions spanning practically a century." *Schmitz*, 785 P.2d at 734. "It is not a duplicative remedy for claims that can be sounded in other traditionally recognized tort theories, or a catchall remedy of last resort for claims that are not otherwise salvageable under traditional causes of action." *Nazeri*, 860 S.W.2d at 315. "Instead, it is a particular and limited theory of recovery with specific elements, as any other tort." *Id.* The Virgin Islands Supreme Court has already recognized that a plaintiff is

> prohibited from receiving a double recovery that would require a defendant to pay twice
> for the same element of damages - not just when a plaintiff sues a defendant for both breach
> of contract and tort, but also when a plaintiff sues a defendant for two or more torts.

*Robertson*, 2023 VI 3 at ¶ 38. Prima facie tort can safely be asserted in the alternative and need not be dismissed at the pleading stage even if it happens to overlap with other claims.

Lastly, the idea that the Virgin Islands law would deny a remedy to one injured by another out of spite or malice and without justification solely because the facts do not fit neatly within an established cause of action is antithetical to modern Virgin Islands precedent. *Cf. Robertson*, 2023 VI 3 at ¶ 35 ("In analyzing this factor, it is important to consider not just the practicability of the doctrine, but also what purpose it serves."); *accord In re: Catalyst Third-Party Litig.*, 72 V.I. at 749 (explaining that a *Banks* analysis asks "not only . . . what common law rule to adopt, but whether to recognize a specific rule at all."). Virgin Islands courts generally err on the side of providing remedies not denying them. *Cf. Mapp v. Fawkes*, 61 V.I. 521, 534 n.11 (2014) ("As this Court has repeatedly held, it is presumed that the Virgin Islands Legislature will not create a right without a remedy, and thus 'statutes which are silent as to who has standing should be broadly interpreted to confer standing.'" (citations omitted)); *accord Robertson*,

2023 VI 3 at ¶ 37 ("[T]here is a 'strong public policy' in the Virgin Islands 'for determining civil cases on the merits,' as well as for considering claims and arguments based on their substance rather than their form." (citations omitted)). Contrary to what some courts have held, there is nothing "exotic" about the theory of recovery underlying prima facie tort. *Cf. Air Frame Hangars, Inc.*, 950 A.2d at 878. "[T]he concept that unjustified intentionally caused harm should be the basis for liability has been utilized without denominating the theory as prima facie tort throughout recent jurisprudence . . . ." *Schmitz*, 785 P.2d at 734 (citing *Diaz v. Kay-Dix Ranch*, 88 Cal. Rptr. 443, 445 n.3 (Ct. App. 1970); *Moran v. Dunphy*, 59 N.E. 125 (Mass. 1901); *Tuttle*, 119 N.W. 946 (Minn. 1909); and *Mangum Electric Co. v. Border*, 222 P. 1002 (Okla. 1923)). Thus, the undersigned recommends that the Court hold that recognizing prima facie tort as a cause of action is the soundest rule for the Virgin Islands and, further, that it be recognized not as a gap-filler, but as a stand-alone tort with its own elements that may be pleaded alongside other claims.

### ii.   Civil Conspiracy

"[A]lthough there is a 'crime of conspiracy,' in most jurisdictions there is no corresponding 'tort' of conspiracy." Martin H. Pritikin, *Toward Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule*, 84 Neb. L. Rev. 1, 8 (2005); *accord Beck v. Prupis*, 529 U.S. 494, 501 (2000 ("[A] plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious." (collecting cases)); *Isaac v. Crichlow*, 63 V.I. 38, 65 (Super. Ct. 2015) ("'There is no liability for civil conspiracy where there is no liability for the act or acts underlying the conspiracy.'" (citation omitted)). Some say civil conspiracy "is a theory of vicarious liability that renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he or she was a direct actor and regardless of the degree of his or her activity." Pritikin, *Toward Coherence in Civil Conspiracy Law*, 84 Neb. L. Rev. at 9. "The difference in treatment between the criminal and civil systems derives from tort's focus on compensation for harm suffered. Unlike the

criminal system, which prohibits acts that endanger the general safety and welfare, the civil tort system does not operate to deter socially dangerous conduct generally." *Id.* at 11 (footnote omitted). But other jurisdictions do treat civil conspiracy as a stand-alone cause of action. Thus, with this general background in mind, the undersigned turns to the three *Banks* factors.

The first Virgin Islands case to address civil conspiracy was *Cooper v. Vitraco, Inc.*, 8 V.I. 112, 120 (D.V.I. 1970), in which the District Court denied a motion to dismiss, explaining that "[c]ivil conspiracy consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff." The court relied partly on the Restatement (First) of Torts. *See id.* at 120 n.19. But the court also cautioned that "if there were no breach of contract by the corporation, or if there were no inducement by the individual defendants, an essential element of the wrongful act is absent, and the conspiracy count will not lie." *Id.* at 120.

The next case to address civil conspiracy was *Johnston v. Baker*, 8 V.I. 413 (3d Cir. 1971). Johnston sued Baker for "false arrest and malicious prosecution" as well as Baker, Poe, and Island Hotels, Ltd. for conspiracy. *See id.* at 415 ("The complaint charged Baker with false arrest and malicious prosecution and also alleged that Baker, Poe and Island Hotels, Ltd. conspired to injure, embarrass, harass and hinder the plaintiff in the conduct of the restaurant and bar business which he was operating in the Yacht Haven Hotel, St. Thomas."). was dismissed shortly before trial, leaving Poe and Island Hotel as defendants. Poe also served as president of Island Hotel. The jury found for Johnston and on appeal Poe and Island Hotel argued that a corporation could not conspire with its own officers. *See id.* at 417. The United States Court of Appeal for the Third Circuit rejected the defendants' claim, noting that others had joined with them to harass Johnston. *See id.* at 416-17 ("[They] initiated a campaign of harassment against Johnston. The hotel did not pay the plaintiff monies due him, and took other steps to cause plaintiff financial difficulty. The individuals blocked the entrance to the restaurant with an automobile, shut off the

restaurant's electricity, obstructed the water drain, advised hotel guests that the restaurant was closed when in fact it was open, refused the services of an electrician and plumber, and filed six criminal complaints against Johnston."). It appears that conspiracy and a counterclaim of Island Hotel were the only claims tried by the jury, implying that civil conspiracy proceeded as a stand-alone claim.

Next, in *Wells v. Rockefeller*, 728 F.2d 209 (3d Cir. 1984), the Third Circuit considered whether a two-year statute of limitations on civil conspiracy claims runs from the date of the last overt act or from each act. *See generally id.* at 217 ("There is a split of authority on when the limitations period for a civil conspiracy commences. Some courts apply the rule used in criminal cases, that is, the limitations period begins on the commission of the last overt act of the conspiracy. Other jurisdictions, including those of this circuit, have applied the rule that the period runs from each overt act causing damage." (citations and paragraph break omitted)). The court concluded that "[f]or each act causing injury, a claimant must seek redress within the prescribed limitations period. Such a rule is consistent with the distinction between civil and criminal conspiracies. In the civil case, actual injury is the focal point, not the illegal agreement per se . . . ." *Id.*

Civil conspiracy was discussed again by the District Court in *Government Guarantee Fund of the Republic of Finland v. Hyatt Corporation*, Civ. No. 1995-49, 1996 U.S. Dist. LEXIS 21722 (D.V.I. Jan. 8, 1996). There, the court relied on *Cooper* for the law. *See id.* at *14 ("Under Virgin Islands law, a civil conspiracy 'consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff.' (quoting *Cooper v. Vitraco, Inc.*, 320 F. Supp. 239, 242-43 (D.V.I. 1970)). But the court dismissed the conspiracy count, finding the allegations insufficient to support it. *See generally id.* at *15-20. In a later decision issued in the same case, the court pointed out that other courts had "held that a parent corporation and its wholly owned subsidiary cannot conspire for purposes of a civil conspiracy

claim . . . ." *Gov't Guarantee Fund of Republic of Fin. v. Hyatt Corp.*, 35 V.I. 356, 378 (D.V.I. 1997). The parent and the subsidiary are considered to be the same actor for purposes of civil conspiracy.

> "A civil conspiracy, by itself, is not actionable: there must be harm or injuries resulting from it and from conduct independently actionable. Where the alleged harm and motives are mostly economic in nature and the overt acts primarily attributable to the wholly owned subsidiary, a civil conspiracy claim in almost all circumstances would also exist against the parent corporation. By the very nature of their relationship, the parent corporation and its wholly owned subsidiary have shared goals, particularly economic ones, since the subsidiary acts for the benefit of the parent, its sole shareholder. If a civil conspiracy claim was actionable under these circumstances, the stricter burdens governing the alter ego doctrine and the policy value reflected in those burdens would be readily circumvented."

*Id.* at 379 (brackets and quotation marks omitted) (quoting *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1166 (D. Kan. 1990)). This "rationale" the court explained would apply "even when the subsidiary is not one hundred percent owned by the parent corporation." *Id.* at 380 (citing *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1133 & n. 7 (3d Cir. 1995)). Like before, the court again dismissed the conspiracy claim, finding a subsidiary could not conspire with its parent. *See id.* at 381.

There are no decision of the Territorial Court of the Virgin Islands addressing civil conspiracy in any depth, and the first decision of the Superior Court of the Virgin Islands to address it was not issued until 2011. *See generally Sorber v. Glacial Energy VI, LLC*, No. ST-10-CV-S88, 2011 V.I. LEXIS 34 (V.I. Super. Ct. June 7, 2011). *Sorber* relied on *Hyatt Corporation*, which had relied on *Cooper*, to state that "[a] civil conspiracy consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff. A conspiracy may also consist of an agreement to do a lawful act by unlawful means.'" *Id.* at *5 (quoting *Gov't Guar. Fund. of Repub. of Fin. v. Hyatt Corp.*, 955 F. Supp. 441, 456 (D.V.I. 1997)). The court further stated that "'a separate underlying tort'" was required "'as [a] predicate for liability.'" *Id.* (citation omitted). In *Sorber*, the underlying "tort" was a violation of a statute, the Wrongful Discharge Act. *See id.* at *5-6. *Sorber* also reasoned that agents could only be found liable for civil conspiracy if they acted out of personal motivation. *See generally id.* at *6-9.

Later decisions of the Superior Court continued to follow *Hyatt Corporation. See, e.g., Hill v. De Jongh*, No. ST-10-CV-585, 2012 V.I. LEXIS 11, at *11 (Super. Ct. Apr. 19, 2012) (quoting *Hyatt Corp.*, 955 F. Supp. at 456)); *Guardian Ins. Co. v. Khalil*, 63 V.I. 3, 22 (Super. Ct. 2012) (same). *See also Appleton v. Harrigan*, No. ST-10-CV-275, 2012 V.I. LEXIS 114, at *14 & nn. 29-30 (V.I. Super. Ct. Dec. 6, 2012) (quoting *Berrios v. Hovic*, No. 05-CV-192, 2010 U.S. Dist. LEXIS 54643, *14 (D.V.I. June 3, 2010)); *see Berrios*, 2010 U.S. Dist. LEXIS 54643 at *14 ("'Under Virgin Islands law, a civil conspiracy consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff. A conspiracy may also consist of an agreement to do a lawful act by unlawful means.'" (quoting *Shomo v. Mugar Enters., Inc.*, 52 V.I. 918, 928 (D.V.I. 2009)); *Shomo*, 52 V.I. at 928 (quoting *Hyatt Corp.*, 955 F. Supp. at 456).

The first Superior Court judge to conduct a *Banks* analysis prior to *Robertson* was *Isaac v. Crichlow*, 63 V.I. at 64-66. There, the court concluded that section 876(a) of the Restatement (Second) of Torts was "a reflection of the common law of this jurisdiction. It states: 'for harm resulting to a third person from the tortious conduct of another, one is subject to liability if he does a tortious act in concert with the other or pursuant to a common design with him.'" *Id.* at 64 (quoting Restatement (Second) of Torts § 876(a)). The court acknowledged that the restatement had "not been explicitly cited with respect to civil conspiracy by courts in this jurisdiction . . . ." *Id.* But the court reasoned "that the regularly cited common law definition of civil conspiracy . . . is in accord with the principles of Restatement (Second) of Torts § 876, is widely accepted, and is fundamental to the practice of law in the Virgin Islands." *Id.*; *see also id.* at 64 n.11 (citing, among other cases, *Berrios, Hyatt Corp., Sorber*, and *Khalil*). Later cases relied on the *Banks* analysis done by *Isaac. See, e.g., Donastorg v. Daily News Publ'g Co., Inc.*, 63 V.I. 196, 329-30 (Super. Ct. 2015); *Blue Water Constr., Inc. v. Hill*, 76 V.I. 15, 39 (Super. Ct. 2022); *Island Airlines, LLC v. Bohlke*, 76 V.I. 47, 66 (Super. Ct. 2022).

Turning to the second *Banks* factor, the vast majority of jurisdiction permit recovery for civil conspiracy. *See, e.g.*, *Isaac*, 63 V.I. at 64 n.12 (collecting cases); *see also Beck v. Prupis*, 529 U.S. 494, 501 (2000) ("By the time of RICO's enactment in 1970, it was widely accepted that a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious." (collecting authorities)). But the second step of the *Banks* analysis is not to simply count cases. *Robertson*, 2023 VI 3 at ¶ 33 (explaining that the second step in the *Banks* analysis "is not intended as a rote counting exercise, but a process of review intended to . . . allowing a court to benefit from any national debate and the experiences in other jurisdictions."). A review of other jurisdictions shows not just that the majority permit

recovery for civil conspiracy. They do. Almost every States,[29] and several Territories,[30] provide some

form of redress for civil conspiracy. But reviewing the different approaches reveals several important

---

[29] *See Luck v. Primus Auto. Fin. Servs.*, 763 So. 2d 243, 247 (Ala. 2000) ("In order to succeed on a civil-conspiracy claim, a plaintiff must prove a concerted action by two or more people that achieved an unlawful purpose or a lawful end by unlawful means."); *Estate of Hernandez by Hernandez-Wheeler v. Flavio*, 930 P.2d 1309, 1313 (Ariz. 1997) ("In Arizona, there is no civil action for conspiracy. However, there is an action for damages caused by acts committed pursuant to a conspiracy."); *Faulkner v. Ark. Children's Hosp.*, 69 S.W.3d 393, 406 (Ark. 2002) ("To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive or immoral means, to the injury of another. A civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy. A civil conspiracy is an intentional tort which requires a specific intent to accomplish the contemplated wrong." (citations omitted)); *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989) ("There are five elements required to establish a civil conspiracy in Colorado. There must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." (paragraph break and citation omitted)); *Chapman Lumber, Inc. v. Tager*, 952 A.2d 1, 23 (Conn. 2008) ("Pursuant to Connecticut's jurisprudence, there is, precisely speaking, no independent claim for civil conspiracy. 'Rather, the action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself.' '[T]he purpose of a civil conspiracy claim is to impose civil liability for damages on those who agree to join in a tortfeasor's conduct and, thereby, become liable for the ensuing damage, simply by virtue of their agreement to engage in the wrongdoing.'" (citations and brackets omitted)); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987) ("Delaware law imposing liability for civil conspiracy is well settled. Plaintiffs must prove: (1) A confederation or combination of two or more persons; (2) An unlawful act done in furtherance of the conspiracy; and (3) Actual damage." (citation and paragraph breaks omitted)); *U.S. Anchor Mfg. v. Rule Indus.*, 443 S.E.2d 833, 835 (Ga. 1994) ("A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. Accurately speaking, *there is no such thing as a civil action for conspiracy.* There is an action for damages caused by acts pursuant to a formed conspiracy, but none for the conspiracy alone." (citations and quotation marks omitted)); *Mock v. Castro*, No. 23474, 2004 Haw. LEXIS 594, *30 (Haw. Sep. 3, 2004) ("A plaintiff must allege an actionable underlying claim upon which to base a claim of conspiracy."); *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977) ("A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful. It may be proven by substantial evidence. . . . It is a recognized aspect of Iowa substantive law."); *Brass Metal Prods. v. E-J Enters.*, 984 A.2d 361, 386 (Md. 2009) ("A civil conspiracy is 'a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.' Civil conspiracy 'is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" (citations omitted)); *Gallagher Bassett Servs. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004) ("Under Mississippi law, 'a conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully.' Where a civil conspiracy gives rise to damages, a right of recovery may arise." (citation omitted)); *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574, 579-80 (S.C. 2009) ("'It is well-settled in South Carolina that the tort of civil conspiracy contains three elements: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) causing plaintiff special damage.' 'An action for civil conspiracy may exist even though respondents committed no unlawful act and no unlawful means were used.' 'Specifically, it is not necessary for a plaintiff asserting a civil conspiracy cause of action to allege an unlawful act in order to state a cause of action, although a civil conspiracy may be furthered by an unlawful act.'" (citations and paragraph break omitted)); *Reuben C. Setliff, III, M.D., P.C. v. Stewart*, 694 N.W.2d 859, 866–67 (S.D. 2005) ("South Dakota law recognizes a cause of action for civil conspiracy. . . . This is not an independent cause of action, but is 'sustainable only after an underlying tort claim has been established.' A civil conspiracy is, fundamentally, an agreement 'to commit a tort.'" (citations omitted)); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) ("An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." (citations omitted)); *City of Milwaukee v. NL Indus.*, 691 N.W.2d 888, 896 (Wis. 2005) ("A civil conspiracy in Wisconsin is 'a combination of two or more persons by some concerted action to accomplish some unlawful

questions.[31] As the Supreme Court of Guam explained, "civil conspiracy is either an independent tort, or a theory of vicarious liability. In both circumstances, the law imposes liability for damages stemming from the actions of two or more people working together to cause harm." *Chung v. Blair Constr. Co.*, 2019 Guam 28, ¶ 26 (citations omitted); *accord Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 140 (Tex. 2019) ("In most jurisdictions, civil conspiracy is a vicarious liability theory that imparts joint-and-several liability to a co-conspirator who may not be liable for the underlying tort. . . . By contrast, a minority of states treat civil conspiracy as an independent claim where defendants may be held liable for damages caused by the conspiracy itself, even in the absence of an unlawful act.").

New York, for example, has held that it does not recognize a civil conspiracy tort. *See Carlson v. Am. Int'l Grp., Inc.*, 89 N.E.3d 490, 504 (N.Y. 2017) ("New York does not recognize a freestanding claim for conspiracy." (citation omitted)). Instead, allegations of conspiracy are allowed but only to establish the defendant's own liability. *See Alexander & Alexander of N.Y., Inc. v. Fritzen*, 503 N.E.2d 102, 103

---

purpose or to accomplish by unlawful means some purpose not in itself unlawful.' 'To state a cause of action for civil conspiracy, the complaint must allege: (1) The formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts.'" (citations omitted)).

[30] *See Chung v. Blair Constr. Co.*, 2019 Guam 28, ¶¶ 26-27 (affirming civil conspiracy judgment); *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) ("The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme. In addition, civil conspiracy depends on the performance of some underlying tortious act. It is thus not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort." (citations omitted)). *But see I.G.I. Gen. Contractor & Dev. v. Pub. Sch. Sys.*, 5 N. Mar. I. 250, 252 (1992) ("The trial court found, and we agree, there is no written law in the Commonwealth recognizing the tort of civil conspiracy.").

[31] Reviewing the approaches of other jurisdictions raises at least two questions. First, whether civil conspiracy can be based on negligence or only an intentional tort. *Cf. Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 173 (Iowa 2002) ("Notwithstanding the lack of support in general legal authorities for a requirement that the tortious conduct of the actor be intentional, some jurisdictions require that a civil conspiracy claim be based on an intentional tort, not simple negligence. These authorities suggest that since civil conspiracy is an intentional tort, it is illogical to conclude that persons can conspire to commit negligence. We think this reasoning is faulty." (citations omitted)). Here, all claims are either intentional torts or statutory claims. The second and perhaps more important question is whether the Virgin Islands should incorporate the independent duty doctrine. *See* Mark A. Behrens & Christopher E. Appel, *The Need for Rational Boundaries in Civil Conspiracy Claims*, 31 N. Ill. Univ. L. Rev. 37, 43 (2010) ("The leading case is from the California Supreme Court, which has held that liability for civil conspiracy is limited to those defendants that owed an independent duty to the specific plaintiff. On the other end is Delaware, which does not require an independent duty." (footnote omitted)). The parties have not raised these issues in their motion papers and, thus, the undersigned declines to consider and address it *sua sponte* without the benefit of briefing from the parties.

(N.Y. 1986) ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." (citations omitted)). This appears to be the approach taken by Connecticut as well. *Cf. Harp v. King*, 835 A.2d 953, 972 n.37 (Conn. 2003) ("We note that there is no independent claim of civil conspiracy. Rather, 'the action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself.' Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." (citations and brackets omitted)). By contrast, South Carolina appears to not only permit a stand-alone claim for civil conspiracy, *cf. Paradis v. Charleston Cnty. Sch. Dist.*, 861 S.E.2d 774, 781 (S.C. 2021) (rejecting attempt to raise on appeal "whether civil conspiracy itself should be 'abolished' as an independent claim in this state and should, instead, always be dependent on an underlying actionable wrong or tort."), but also to allow an "'action for civil conspiracy . . . [to] exist even . . . [when] no unlawful act [was committed] and no unlawful means were used.'" *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574, 579-80 (S.C. 2009) (citation omitted). *But cf. id.* at 580 ("'Because the quiddity of a civil conspiracy claim is the damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in *other causes of action*.'" (citation omitted)). And Texas recently acknowledged that its own precedent had been unclear. *See Agar Corp., Inc.*, 580 S.W.3d at 140 ("Our case law on civil conspiracy leaves Texas's position on the debate arguably unclear. Although we have not expressly said whether a civil conspiracy claim is in the nature of a vicarious liability theory or an independent tort, we have at various times used language implying that it was one or the other."). After surveying Texas precedent and the approaches of other jurisdictions, *see id.* at 140-41, the Supreme Court of Texas concluded that civil conspiracy was a form of vicarious liability, not an independent tort. *See id.* at 142 ("Having determined that civil conspiracy is not an independent tort, it follows that the claim does not have its own statute of limitations.").

Turning then to the last step in the *Banks* analysis, the undersigned concludes, and recommends the Court find, that the soundest rule for the Virgin Islands is to continue to allow recovery for civil conspiracy. Virgin Islands courts have recognized civil conspiracy for over fifty years. *Cf. Cooper*, 8 V.I. at 112 (decision issued in 1970). But *Johnston* stands out as an example of why civil conspiracy should be recognized as an independent claim that may be asserted on its own. *Isaac* did not consider competing approaches. However, by denying the plaintiff's own motion for summary judgment, the court implicitly treated civil conspiracy as an independent claim. *Cf. Isaac*, 63 V.I. at 66. Maintaining civil conspiracy as an independent claim would avoid disruption to *Isaac* as well as *Cooper*, *Johnston*, *Hyatt Corporation*, *Shomo*, and *Sorber* – to name a few – all of which treated civil conspiracy as a claim not a theory of liability. *E.g.*, *Shomo*, 52 V.I. at 928-29 (assessing merits of "Count II – Civil Conspiracy"); *Hyatt Corp.*, 35 V.I. at 377 ("Conspiracy Against Skopbank and GGF (Count Five)"); *Cooper*, 8 V.I. at 120 ("Defendants' final contention is that plaintiff's pleadings are insufficient to support a *count of conspiracy*." (emphasis added)). Treating civil conspiracy as a form of vicarious or joint and several liability like Texas and New York do, *cf. Agar Corp., Inc.*, 580 S.W.3d at 140, might run afoul of Virgin Islands statutory law. *See* 5 V.I.C. § 1451(d); *see also World Fresh Mkts., LLC v. Palermo*, 74 V.I. 455, 462 (2021) ("Every court to consider the question has determined that laws providing for apportionment of fault are substantive, not procedural, for such laws define the rights, duties, and obligations between those to whom they apply.").

However, the undersigned does not agree with, and therefore does not recommend adopting, the definition adopted by *Isaac*. *See Isaac*, 63 V.I. at 64 ("The Court determines that Restatement (Second) of Torts § 876(a) is a reflection of the common law of this jurisdiction. It states: '[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he does a tortious act in concert with the other or pursuant to a common design with him.'" (quoting Restatement (Second) of

Torts § 876(a))). First, *Isaac* recognized that "section 876(a) ha[d] not been explicitly cited with respect to civil conspiracy by courts in this jurisdiction . . . ." *Id.* Thus, stare decisis is not furthered by changing the rule. Second, the undersigned agrees with *Willie v. Amerada Hess Corporation*, 66 V.I. 23, 108 (Super. Ct. 2017), that "the better approach is not to adopt a section of the restatements. Instead, the better approach is to simply state the rule for this jurisdiction." (citation omitted)). Third, perhaps most importantly, the rule adopted in *Isaac* (as well as the rule stated in *Cooper*) would limit recovery to "a *wrongful* act that results in damage to the plaintiff." *Cooper*, 8 V.I. at 120 (emphasis added); *accord Isaac*, 63 V.I. at 64 ("'[F]or harm resulting to a third person from the *tortious* conduct of another . . . ." (emphasis added)). The review of the approaches taken by other jurisdictions reveals that some tortfeasors might be immunized if recovery were limited to wrongful or tortious acts.

To be sure, many jurisdictions do require a wrongful or tortious act. *See, e.g.*, *Stewart*, 694 N.W.2d at 866–67 ("South Dakota law recognizes a cause of action for civil conspiracy. . . . This is not an independent cause of action, but is 'sustainable only after an underlying tort claim has been established.' A civil conspiracy is, fundamentally, an agreement 'to commit a tort.'" (citations omitted)); *Nicolet, Inc.*, 525 A.2d at 149-50 ("Delaware law imposing liability for civil conspiracy is well settled. Plaintiffs must prove: (1) A confederation or combination of two or more persons; (2) An unlawful act done in furtherance of the conspiracy; and (3) Actual damage." (citation and paragraph breaks omitted)). But other jurisdictions recognized that two or more persons can commit lawful acts for unlawful purposes. *See, e.g.*, *Luck*, 763 So. 2d at 247 ("In order to succeed on a civil-conspiracy claim, a plaintiff must prove a concerted action by two or more people that achieved an unlawful purpose or a lawful end by unlawful means."); *Massey*, 652 S.W.2d at 934 ("An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."). Again, *Johnston* is instructive here.

Johnston was "a professional entertainer who had been in the restaurant and bar business previously . . . ."[32] 8 V.I. at 415. He "negotiated with Poe for the right to operate the restaurant and bar[,]" *id.*, located within the now-former Yacht Haven Hotel on St. Thomas. *See id.* Poe was president of Island Hotels, Ltd., which owned the hotel; he was also the general manager of the hotel. *See id.* Poe and Johnston had agreed on the terms of a lease but needed to wait for it to be reduced to writing. *See id.* at 415-16. In the meantime, Johnston opened the restaurant and bar, which quickly became a success. *See id.* at 416. Several months later, "Baker, who had been residing on a boat moored at Yacht Haven, began working with Poe and the hotel as a 'non-salaried employee.'" *Id.* Around the same time, Baker, Poe, Baker's fiancée, and "Elizabeth Smith, who had a lease on a portion of the hotel property for the sale of liquor and boutique items, initiated a campaign of harassment against Johnston." *Id.* Island Hotels did not pay Johnston monies due to him, "and took other steps to cause [him] financial difficulty." *Id.* Poe, Baker, and Smith also "blocked the entrance to the restaurant with an automobile, shut off the restaurant's electricity, obstructed the water drain, advised hotel guests that the restaurant was closed when in fact it was open, refused the services of an electrician and plumber, and filed six criminal complaints against Johnston." *Id.* at 416-17. "As a result of the criminal accusations, Johnston was arrested, held in jail temporarily until bond could be posted, and subsequently cleared on five of the six charges . . . ." *Id.* at 417. Roughly six months after opening the restaurant, "Johnston left the premises, and four days later Baker began operating the business." *Id.* Johnston later sued Baker for false arrest and malicious prosecution. *See id.* at 415. He also sued his former landlord, Island Hotels, and its president, Poe, but only for civil conspiracy, at least so far as the opinion discloses. *See id.* He did not sue Baker's fiancée or Smith the other two co-

---

[32] Johnston, popular in the 1940s and 50s, was described by the Virgin Islands Daily News as a "singing idol, star of radio, TV, and movies and the nightclub circuit . . . ." *TV Star Buys Coffee House*, The V.I. Daily News, May 13, 1966, at 10. Johnston had started in, among other films, *This Time is for Keeps* (1947) with Jimmy Durante, and is perhaps best known for his recording of "Laura" from the 1944 film of the same name. *See generally* Obituary, *Johnny Johnston, 80, a Big-Band Singer*, N.Y. Times, Jan. 17, 1966, at A17.

conspirators. Island Hotel also counterclaimed for back rent. *See id.* "The jury rendered a verdict for Johnston of $20,000 compensatory damages and $15,000 punitive damages, and judgment was entered for the plaintiff on the counterclaim." *See id.* at 417.

If Johnston had been limited to asserting civil conspiracy as a theory of vicarious liability or restricted to alleging civil conspiracy based only on unlawful or tortious acts, recovery might have been limited or even barred. Refusing the services of an electrician or a plumber may have violated the lease, but it was not illegal. Obstructing a water drain was not illegal and might not, on its own, have been tortious, so long as water did not back up and damage Johnston's property. Similarly, telling customers the restaurant was closed when it was open was not illegal. It may have constituted interference with Johnston's business, however. If Virgin Islands law were to restrict recovery for civil conspiracy to conduct that is criminal or tortious, it might limit or bar recovery. Here, for example, the Plaintiffs allege that the Defendants engaged in manipulative short selling of Ocwen stock and made statements about Ocwen and Altisource they knew were false, with the intention of "destroying USVI-based companies and targeted unrelated homeowners by forcing unnecessary foreclosures . . . ." (Sec. Am. Ver. Compl. ¶¶ 160, 172.) "Short sales are federally regulated." *Marriott Int'l Resorts, L.P. v. United States*, 83 Fed. Cl. 291, 298 (2008) (citing *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 705 (2d Cir. 1998)). But short-selling stock is not *per se* unlawful or tortious. Speaking with regulators is not unlawful or tortious. And Gibbs & Bruns issuing the January 23, 2015 letter was not improper as such. But if, as the Plaintiffs allege, the Defendants conspired together and acted through Gibbs & Bruns to have Ocwen and Altisource removed from existing mortgage-servicing contracts and blocked from acquiring additional mortgage-servicing contracts through means that were not, in and of themselves, unlawful, then the Plaintiffs may be able to recover for civil conspiracy. But only if civil conspiracy is recognized as an independent claim and not limited to unlawful or wrongful acts.

Instead, the undersigned concludes, and recommends that the Court find, that the soundest rule for the Virgin Islands is to allow recovery when two or more persons agree to engage in a wrongful act or engage in an otherwise lawful or proper act for an improper purpose, that results in damage to the target of the conspiracy. *Cf. Hill*, 2012 V.I. LEXIS 11 at *11 ("'Under Virgin Islands law, a civil conspiracy consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff. *A conspiracy may also consist of an agreement to commit a lawful act by unlawful means*.'" (emphasis added) (quoting *Hyatt Corp.*, 955 F. Supp. at 456)). *Accord Basic Chems., Inc.*, 251 N.W.2d at 232 ("A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful."); *Brass Metal Prods.*, 984 A.2d at 386 ("A civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." (quotation marks and citation omitted)); *S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d at 579-80 ("An action for civil conspiracy may exist even though respondents committed no unlawful act and no unlawful means were used. Specifically, it is not necessary for a plaintiff asserting a civil conspiracy cause of action to allege an unlawful act in order to state a cause of action, although a civil conspiracy may be furthered by an unlawful act.'" (quotation marks and citations omitted)).

### b. Long-Arm Jurisdiction (continued)

Returning to the long-arm analysis, section 4903(a)(4) requires a two-part showing. *See Molloy*, 56 V.I. at 179-80 ("[F]irst . . . a tort outside the Virgin Islands causing an injury in the Virgin Islands and, second . . . a plus factor . . . ."). Section 4903(a)(4) authorizes the exercise of jurisdiction over a nonresident defendant who causes tortious injury in the Virgin Islands by an act or omission outside the Virgin Islands if the defendant regularly does or solicits business in or from the Virgin Islands, engages in a persistent

course of conduct in the Virgin Islands, or derives substantial revenue from services rendered in the Virgin Islands. *See* 5 V.I.C. § 4903(a)(4). "'A court may consider each . . . factor[] individually, or all three cumulatively, for the purposes of satisfying th[e second] step of the analysis.'" *Molloy*, 56 V.I. at 180 (citation omitted). Additionally, "'[t]he conduct [of the defendant] establishing the plus factor does not need to have any relationship with the tortious activity.'" *Id.* (footnote and citation omitted).

Here, the Plaintiffs have presented sufficient evidence to satisfy the second half of the two-part test. The PIMCO Defendants and all BlackRock Defendants except BlackRock are registered or notice-filed as broker-dealers or investment advisors in the Virgin Islands. Additionally, the motion that GERS previously filed as a nonparty on August 31, 2018, to quash the Shareholder Plaintiffs' subpoena, states that "GERS had a relationship with PIMCO from October 2002, until February 2015, when the contract was terminated." (GERS' Mem. of Law in Supp. of Mot. to Quash Subpoena 4, filed Aug. 31, 2018, attached as Ex. 5 to Pls.' Opp'n to Defs.' Mots. to Dismiss First Am. Compl.) GERS continues to have a relationship with BlackRock, at least as of the date GERS filed its motion to quash. *See id.* GERS referred to BlackRock and PIMCO as "investment managers" in its motion, and explained that, in that capacity, BlackRock and PIMCO were "required to conduct research on potential investments recommended to clients." *Id.* at 10. This evidence shows that the BlackRock and PIMCO Defendants derived substantial revenues from rendering investment management services in the Territory.

The BlackRock Defendants submitted an affidavit of Stephen Ahrens, in an attempt to refute the alleged relationship between BlackRock and GERS. Ahrens averred in his affidavit that "[t]he BlackRock Defendants do not serve as investment managers or fiduciaries for the Government Employees' Retirement System of the Virgin Islands." (S. Ahrens Affid. ¶ 6, attached to BlackRock Mot.) But Ahrens also conceded that all BlackRock Defendants except BlackRock, i.e., BFM, BIM, BI, and BCM, "are involved in limited selling of securities to investors located in the U.S. Virgin Islands." *Id.* ¶ 7. Plaintiffs countered

that the BlackRock Defendants are, in fact, investment managers for GERS, something GERS itself stated in its motion. While Ahrens's affidavit does raise a dispute over the evidence, per *Molloy*, that dispute must be resolved in the Plaintiffs' favor at this juncture.

Plaintiffs also submitted other evidence, e.g., Exhibit 26 is an announcement about the acquisition of HavenBrook Partners, LLC by Front Yard Residential Corporation, *cf. supra* note 8, and 3,200 rental homes, both majority-owned by PIMCO. But this evidence does not speak to any services the PIMCO Defendants rendered in the Territory, nor does it support finding that the PIMCO Defendants derived "substantial revenue from goods used or consumed . . . in this territory[.]" 5 V.I.C. § 4903(a)(4). Exhibit 26 does not indicate how many, if any, of the 3,200 rental homes were located in the Virgin Islands. And the sale was a one-time transaction between an affiliate of Altisource and PIMCO. Unlike section 4903(a)(1), where a single transaction may suffice, the plus factor under section 4903(a)(4) requires "a course of conduct." *See Hendrickson v. Reg O Co.*, 657 F.2d 9, 12 (3d Cir. 1981) (describing the conduct as "regularly advertises" or "continuous course of activity").

The lion's share of the evidence the Plaintiffs submitted is more difficult to assess because it speaks to various funds the BlackRock or PIMCO Defendants own, invest in, or manage. For example, Exhibit 30, a Form N-CSR for a fund named BlackRock Municipal 2020 Term Trust, shows that for fiscal year ending April 30, 2016, the fund owned municipal bonds issued by the Virgin Islands Public Finance Authority. Similar documents—Exhibits 32 through 39, Form N-Qs for BlackRock Muni Intermediate Duration Fund, Inc. (Ex. 32), and for PIMCO Funds (Exs. 33 – 39)—also show ownership of municipal bonds issued by the Virgin Islands Public Finance Authority. But the problem is that courts may have to treat mutual funds like subsidiaries. *Cf. Williams v. Bank One Corp.*, No. 03 C 8561, 2003 U.S. Dist. LEXIS 23522, *2 (N.D. Ill. Dec. 11, 2003) ("There is no precise parallel to the described arrangement in the corporate world, but the closest analogy still seems to be that of separate subsidiaries (the various

mutual funds) that share a common parent (the Massachusetts business trust).").") Mutual funds are "'a pool of assets, consisting primarily of a portfolio of securities, and belonging to the individual investors holding shares in the fund.' Mutual funds are typically managed by an investment adviser, a separate entity that 'selects the fund's directors, manages the fund's investments, and provides other services.'" *SEC v. Bauer*, 723 F.3d 758, 762 (7th Cir. 2013) (citations omitted). As the district court explained in *Stegall v. Ladner*, 394 F. Supp. 2d 358, 362 (D. Mass. 2005), albeit concerning standing not personal jurisdiction, "one clearly may not use the corporate structure of the broader investment company to confer standing across all funds within that company." (citing *In re: Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 41 (D. Mass. 2003)); *see also id.* ("That conclusion is not altered where, as here, each fund is not separately incorporated."). This is because "'each fund is a separate corporate entity with separate management contracts and share distribution plans.'" *Id.* (ellipsis omitted) (quoting *Wicks v. Putnam Inv. Mgmt.. LLP*, Civ. No. 04-10988, 2005 WL 705360, *3 (D. Mass. March 28, 2005)). It follows that a fund that owns bonds issued by the Virgin Islands Financial Housing Authority does not necessarily mean the "parent" of the mutual fund has jurisdictionally significant contacts with the Virgin Islands.

Weighing in on how Virgin Islands law should treat mutual funds for purposes of personal jurisdiction is clearly beyond the scope of this recommendation and neither the Plaintiffs nor the Defendants addressed the legal significance, if any, in their motion papers, though the BlackRock Defendants did object to some evidence regarding the funds they manage. (*See* BlackRock Defs.' Reply Mem. in Further Supp. of Mot. to Dismiss. First Am. Ver. Compl. 5, filed Oct. 9, 2018 (hereinafter "BlackRock Reply") ("Not only do the inappropriately cited documents provide no support for the involvement of *any* of the individual BlackRock Defendants in reaping these fees, but Plaintiffs' other inappropriately cited documents indicate that the funds are associated with BlackRock Fund Advisors and BlackRock Institutional Trust Company, N.A. Neither of those entities is a defendant in this action."

(citation omitted)).) The undersigned also has not uncovered any authority—whether persuasive or binding, judicial or academic—that discloses how courts should evaluate personal jurisdiction when mutual funds and similar entities are proffered as a basis for establishing jurisdiction over the larger, corporate "parent" of the fund.

Here, PIMCO Funds, for example, is the entity named in Exhibits 33 through 39 but "PIMCO Funds" is not a defendant in this case. Likewise, neither are BlackRock Municipal 2020 Term Trust, the entity named in Exhibit 30, nor BlackRock Muni Intermediate Duration Fund, Inc., the entity named in Exhibits 32 through 39. Yet the Plaintiffs would have the Court find personal jurisdiction under the long-arm statute over the BlackRock Defendants and the PIMCO Defendants because municipal bonds issued by the Virgin Islands Public Finance Authority are owned by entities with the name "BlackRock" or "PIMCO" in them. Neither side has addressed this issue. To be sure, the parties have weighed in on whether the Court can attribute contacts of subsidiaries like BIM or BFM to BlackRock, or PI to PIMCO. But the more nuanced issue of what effect, if any, ownership of municipal bonds by mutual funds has on personal jurisdiction, and whether ownership of bonds by funds managed or controlled by named defendants can be assessed in evaluating personal jurisdiction – these issues the parties (and the courts in general, it seems) have not considered. Given the lack of authority on this issue, the fact that the parties have not briefed it, and, further, that all doubts over evidence must be resolved in favor of the Plaintiffs at this phase – the undersigned declines to *sua sponte* raise and address issues neither side has briefed. Instead, the undersigned will resolve any doubts in the Plaintiffs' favor and recommend that the Court do so as well.

However, even though Plaintiffs may have shown that the BlackRock Defendants and the PIMCO Defendants have "regularly done business with or solicited business from the Virgin Islands . . . [and] derived substantial revenue from . . . services consumed in the Virgin Islands[,]" *Molloy*, 56 V.I. at 180,

the Shareholder Plaintiffs have not shown that the Defendants "committed a tort . . . that . . . an injury in the Virgin Islands . . . ." *Molloy*, 56 V.I. at 180 n.6. At least not with respect to prima facie tort, that is. To prevail on their prima facie tort claims, all Plaintiffs must allege (and ultimately prove) an intentional, lawful act by the Defendants, the Defendants' intent to injure the Plaintiffs, an injury, and no justification or an insufficient justification for the Defendants' actions. Prima facie tort is an intentional tort so intent to injure is necessary. The complaint alleges that the "Defendants intentionally took aforesaid actions, including false statements and short selling, to damage the business and property of *Ocwen/Altisource*." (Compl. ¶ 169 (emphasis added.). The complaint also alleges that the "Defendants knew that their acts would cause harm to *Ocwen/Altisource*." *Id.* ¶ 170 (emphasis added). Absent are any allegations that the Defendants issued false statements or shorted Ocwen's stock intending to harm the Erbey Plaintiffs, Carisma, Salt Pond Holdings, or Tribue. The complaint does not allege, for example, that the Defendants were on notice of the Schedule 13D or Schedule 13G filings with respect to the ownership of Ocwen stock. *See U.S. SEC v. Wey*, 246 F. Supp. 3d 894, 925 n.6 (S.D.N.Y. 2017) ("Section 13(d) of the Exchange Act mandates that any person who indirectly or directly acquires beneficial ownership of more than five percent of the stock of an issuer file a statement disclosing that ownership and other information to the SEC. 15 U.S.C. §78m(d). Rule 13d-1 requires that this information be submitted on a Schedule 13D or Schedule 13G. *See* 17 C.F.R. § 240.13d-1."). In fact, the complaint does not allege what percentage of Ocwen or Altisource stock each Shareholder Plaintiff owns or owned.[33] Thus, the undersigned concludes, and recommends that the Court find, that the Shareholder Plaintiffs have not established a *prima facie* case for personal jurisdiction under section 4903(a)(4) over Defendants as to prima facie tort (Count VI).

---

[33] Plaintiffs' Exhibit 60 does show that Salt Pond Holdings owned (as of December 7, 2017) 39.1% of Altisource stock, while Carisma Trust owned 1.7% (as of the same date). Percentages of ownership was not addressed in the complaint, however. Furthermore, Exhibit 60 reflects ownership as of 2017, long after the events the complaint occurred. Factual allegations can be supported by evidence on a 12(b)(2) motion, not supplemented by it. For these reasons, the undersigned disregarded Exhibit 60.

As for Altisource, Altisource has shown that the Defendants committed a tort outside the Virgin Islands, prima facie tort, that caused an injury inside the Virgin Islands. Again, to prevail on its claim for prima facie tort (Count V), Altisource must allege (and ultimately prove) an intentional, lawful act by the Defendants; the Defendants' intent to injure Altisource, an injury, and no justification or an insufficient justification for Defendants' actions. Although the Defendants criticize the "Ocwen/Altisource" pleading device the Plaintiffs use in their complaint, the complaint alleges intent to injure Altisource through lawful acts (speaking with regulators, bankers, short selling stock, issuing notices of default, forcing foreclosures, and so forth) that may not have been justified or may have had an insufficient justification. These actions occurred outside the Virgin Islands and caused injury inside the Virgin Islands in the form of lost revenue, lost business, and reduction in share value. (*See generally* Compl. ¶¶ 8-12.) Altisource may not be able to prove personal jurisdiction by a preponderance of the evidence with respect to Count V, assuming Defendants renew their objection.[34] But at the *prima facie* stage, the Court "must accept as true all of plaintiff's factual allegations that are supported by affidavits or other competent evidence which would be admissible at trial and must resolve all factual disputes in the plaintiff's favor." *Molloy*, 56 V.I. at 173. If the Plaintiffs' allegations regarding the January 23, 2015 letter are true, then Altisource has made a *prima facie* case for personal jurisdiction under section 4903(a)(4) over the Defendants with respect to Count V, prima facie tort.

---

[34] Much of the materials the Defendants submitted, which can be considered for their Rule 12(b)(2) motion but not their Rule 12(b)(6) motion, might support the defense of justification if raised on a motion for summary judgment. The materials chronical actions taken by state and federal regulators, and by courts, in response to criticisms of Ocwen's business practices, some of which may have occurred at the Defendants behest. In other words, there may be agreement among the parties that the Defendants' actions did cause regulators to take action against Ocwen, and by extension, Altisource. Plaintiffs contend the Defendants did this out of malice and spite with the aim of "put[ting] Ocwen/Altisource out of business altogether." (Compl. ¶ 8.) Defendants, though they have not yet answered the complaint, have implied in their motion papers that any actions they took was entirely proper, with their concerns ultimately being borne out by the regulators' findings. Because the materials the Defendants' submitted, with the exception of the Ahrens affidavit of the BlackRock Defendants, go more to the merits of the Plaintiffs' claim, and have no bearing on the Defendants' contacts with the Virgin Islands, the undersigned has not considered them in the personal jurisdiction analysis.

Regarding civil conspiracy (Count VI (Altisource), Count VIII (Shareholder Plaintiffs)), the Plaintiffs have shown that two or more persons agreed to engage in otherwise lawful or proper acts for an improper purpose. First, the Gibbs & Bruns letters clearly state that Patrick acted on behalf of multiple clients, including BFM "and its advisory affiliates" as well as PIMCO, among others. Agents are presumed to act on behalf of their clients and with their authority. The complaint alleges coordination by Gibbs & Bruns with BlueMountain Capital Management ("BlueMountain"), for example. Plaintiffs also point to lawful acts done for allegedly improper purposes, i.e., giving notice of default to "force foreclosures on tens, if not hundreds, of thousands of homeowners solely in order for Defendants to earn ill-gotten gains[,]" "the repeated short selling of OCN[,]" often "in concert with each other[,]" and, correspondence sent "with falsified and intentionally misleading data and other statements proffered in support of allegations that Ocwen/Altisource had improperly taken money from MBS trusts and investors, engaged in improper modifications and provided poor quality servicing." (Compl. ¶¶ 178, 10, 176, 100.) Plaintiffs also point to several coincidentally-timed events: BlueMountain giving notice of default the same day, January 23, 2015, that Gibbs & Bruns issued its default letter, both coming "on the same day Ocwen entered into a consent order with the California Department of Business Oversight[,]" *id.* ¶¶ 106-07; and a December 22, 2014 tweet posted by the Association of Mortgage Investors ("AMI") with a photo of a frontpage newspaper headline "Ocwen Head to Resign in Settlement" and a "Thank you!" written on an AMI booklet, quipping in the tweet that "AMI was making a list" and referring to the New York State Department of Financial Services and its Superintendent, Benjamin Lawsky, as "nice" and Ocwen and Mr. Erbey as "naughty", *see id.* ¶ 99.

Speaking with regulators, issuing default notices, shorting stock, and tweeting is not wrongful or illegal. Taking actions to protect investments is also not improper. *Accord Hyatt Corp.*, 35 V.I. at 373-74 ("A lawful foreclosure action instituted by a lender upon default by a borrower cannot be considered

'improper' simply because such an action may have the effect of interfering with the borrower's contracts with third persons. There is no tort liability when an actor acts to protect legitimate and prior property or contract interests of his own."). But when otherwise proper acts are done for an improper purpose or towards an improper end—here, allegedly, to destroy Ocwen, to have Ocwen's mortgage-servicing rights terminated, and to prevent Ocwen from obtaining new mortgage-servicing rights—then such proper acts as tweeting or sending letters may have been done with an improper end in mind. Altisource have submitted sufficient evidence, viewed in its favor, to show that the Defendants coordinated efforts to target Ocwen and its affiliate Altisource and thereby cause harm in the Virgin Islands.

Altisource is a Virgin Islands company, and Ocwen's mortgage servicing business was headquartered on St. Croix. "As to commercial injuries, the majority of authorities hold that, for the purposes of a long arm statute, the situs of a plaintiff's economic injury is its principal place of business." *Carty v. Beech Aircraft Corp.*, No. 78-96, 1981 U.S. Dist. LEXIS 10354, *22 (D.V.I. Jan. 19, 1981), *rev'd* 679 F.2d 1051 (3d Cir. 1982). Although *Carty* was reversed on appeal, it was reversed on narrow grounds, namely because the injury was to the corporation's personal property. *See Carty*, 679 F.2d at 1065 ("Thus, we hold that when a commercial entity sues for tortious injury to its physical property, the 'injury' takes place for jurisdictional purposes where the property has been damaged.") Here, neither side addressed where an economic injury to a corporation occurs, which would require a separate *Banks* analysis if the District Court is correct that there are majority and minority approaches. *See Carty*, 1981 U.S. Dist. LEXIS 10354 at *22-23. While the Third Circuit did limit its holding to injury to personal property, it also cited persuasive authority that, for personal jurisdiction purposes, "'[t]he place where economic harm is suffered is not determinative.'" *Id.* at 1064 (quoting *Londa Manufacturing Co. v. Saturn Rings, Inc.*, 503 F. Supp. 52, 55 (W.D.Okla.1980) parenthetically). For purposes of this recommendation, however, the undersigned will assume that Altisource has shown injury based on the majority rule, i.e., that "the situs

of a plaintiff's economic injury is its principal place of business." *Carty,* 1981 U.S. Dist. LEXIS 10354 at *22.

The Shareholder Plaintiffs have not shown such injury, however. It is Altisource and Ocwen who, according to the complaint, were "the target of a concerted campaign of lies and vilification." (Compl. ¶ 7.) "Defendants and their co-conspirators targeted Ocwen/Altisource for destruction . . . [which] not only seriously hurt Ocwen, but it also crippled Altisource USVI's business, ultimately ending Altisource USVI's strategic relationship with Ocwen." *Id.* ¶ 63. As with the Shareholder Plaintiffs' prima facie tort claim, the complaint does not allege any intent to harm the Erbey Plaintiffs, Salt Pond Holdings, Munus, Carisma, or Tribue. "Since civil conspiracy is an intentional tort, an intent to harm . . . remains an inherent part of the analysis." *Paradis*, 861 S.E.2d at 780 n.9 (citing 16 Am. Jur. 2d *Conspiracy* § 53 (2020)). No intent by the Defendants to harm the Shareholder Plaintiffs is alleged, even if doubts are resolved in their favor.[35] Thus, the undersigned concludes, and recommends that the Court find, that Altisource has made a *prima facie* case for personal jurisdiction over Defendants under section 4903(a)(4) for civil conspiracy as to Count VI, while the Shareholder Plaintiffs have not made a *prima facie* case as to Count VIII.

Lastly, regarding the interference torts—intentional interference with contract (Count III) and intentional interference with prospective advantage (Count IV)—Altisource has presented sufficient evidence to show personal jurisdiction over to both claims under section 4903(a)(4).[36] "In the Virgin Islands, there are principally two causes of action for a party's interference with another's contracts. One

---

[35] Further, three Shareholder Plaintiffs—the John R. Erbey Family Limited Partnership, Munus, and Carisma—are not Virgin Islands entities and do not have a principal place of business here. Per *Carty*, injury to them from civil conspiracy would have occurred in Florida, Nevada, and Georgia, respectively. (*See* Compl. ¶¶ 16, 18-19.) In other words, section 4903(a)(4)'s requirement that the injury occur within the Territory is lacking for these Shareholder Plaintiffs. *Cf. Molloy*, 56 V.I. at 180 n.6.

[36] *Love Peace* omitted "tortious" when referring to both torts. As the Restatement observes, "[t]he tort of interference with existing or prospective contractual relations . . . is an intentional tort." Restatement (Second) of Torts, ch. 37 Scope (1979). And "[t]he term 'tortious' is of course, circuitous and begs the question." *Id.* Intentional interference is more accurate, while tortious interference is redundant. The undersigned will refer to these torts as intentional interference. *Accord Love Peace v. Banco Popular de P.R.*, 75 V.I. 284, 294 (2021) (referring to claim as "intentional interference").

is interference with existing contracts and the second is interference with prospective business relations."

*Love Peace v. Banco Popular de P.R.*, 2022 V.I. Supreme LEXIS 2, *4 (V.I. Feb. 7, 2022).

> To recover on a claim for interference with existing contracts, a plaintiff must prove: (1) the existence of a cont[r]act between the plaintiff and a third party, (2) the defendant knew of the contract, (3) the defendant interfered with the contract using improper means or with an improper motive, and (4) the plaintiff was damaged as a result of the defendant's interference.

*Id.* at *4-5 (citing *Rondon v. Caribbean Leasing & Eco. Transp., Inc.*, 74 V.I. 397, 417 (Super. Ct. 2021) (pincite added)); *accord Love Peace v. Banco Popular de P.R.*, 75 V.I. 284, 295 (2021) ("Therefore, to prevail on her interference with existing business relations claim, Love Peace was required to demonstrate that (1) a contract existed between her and a third party; (2) Banco Popular knew of that contract; (3) Banco Popular interfered with the contract using improper means or with an improper motive; and (4) Love Peace was damaged as a result.").

> To prevail on a claim for interference with prospective contracts, a plaintiff must establish: (1) the existence of a professional business relationship that is reasonably certain to produce an economic benefit for the plaintiff, (2) intentional interference with that relationship by the defendant, (3) which the defendant accomplished through improper means or for an improper purpose, and (4) the defendant's interference damaged the plaintiff.

*Love Peace*, 2022 V.I. Supreme LEXIS 2 at *5 (citing *Rondon*, 74 V.I. at 418) (pincite added). Because "the requirements for . . . interference with business relations includes the same elements as interference with existing contracts[,]" *id.*, both torts will be considered together.

Resolving all doubts over evidence in Plaintiffs' favor, Altisource has shown a *prima facie* case for personal jurisdiction under section 4903(a)(4) with respect to its interference torts. The June 28, 2013 letter issued by Gibbs & Bruns was written on behalf of "large institutional holders of residential mortgage-backed securities . . . ." (June 28, 2013 Ltr. at 1.) The letter notes that "[o]ur clients have previously expressed to you their concern about Ocwen's servicing practices . . . ." *Id.* At least one of the prior communications concerned a bankruptcy sale of MSRs to Ocwen from affiliates of the debtor

Residential Capital LLC. *See id.* The 2013 letter was sent with the intent to urge various banks, including

the Bank of New York, Citibank, N.A., and HSBC Bank USA, among others,

> to decline to consent to the transfer of the servicing of these portfolios to Ocwen and to use
> all other contract remedies you have available to intercede to ensure these portfolio—if
> they are to be transferred to another servicer—are transferred to a servicer that employs
> prudent servicing practices that are in the best interests of Certificateholders.

*Id.* at 2. The June 28, 2013 letter clearly demonstrates knowledge of a prospective business relationship

that was certain to produce an economic benefit to Ocwen. Whether, in 2013, the Defendants knew of the

Ocwen/Altisource connection is not clear form the letter, but doubts must be resolved in Altisource's favor

at this juncture. Similarly, the January 23, 2015 letter, issued by Gibbs & Bruns on behalf of the

Defendants, also shows knowledge of contractual relationship between Ocwen and Altisource with respect

to Ocwen's MSRs. In fact, the affiliate relationship between Altisource and Ocwen was partly the reason

why Gibbs & Bruns gave notice of default.

When both letters are juxtaposed against the broader backdrop — a Multistate Mortgage

Committee identifying potential violations at Ocwen in 2012, which culminated in February 26, 2014

Consent Judgment with the Consumer Financial Protection Bureau, forty-nine States, and the District of

Columbia; a December 5, 2012 Consent Order with the New York State Department of Financial Services,

including the appointment of a Compliance Monitor, which eventually led to a December 22, 2014

Consent Order with the New York State Department of Financial Services; and the January 23, 2015

Consent Order issued by the California Department of Business Oversight, just to name a few —

collectively this all shows that regulators and government agencies were actively focusing their attention

on Ocwen. For the most part, their findings highlight incompetence on the part of Ocwen. For example,

the New York State Department of Financial Services found that Ocwen had inherited "a patchwork of

legacy systems . . . from acquired companies, many of which were incompatible." (*See* BlackRock Mot.,

Ex. B, *In re: Ocwen Fin. Corp., et al.*, Consent Order Pursuant to N.Y. Banking Law § 44, 8 n.1 (Dec. 22,

2014).) Other findings were less innocuous, findings that letters and other notices to homeowners had been backdated, and foreclosure rules and laws not followed. The focus of regulators and government agencies was predominantly (if not entirely) centered on borrowers, however. That is, the regulators were not concerned with persons or entities who invested in mortgage-backed securities. One could argue, on the one hand, that investors like the Defendants, who owned large tranches of MBSs, had legitimately concerns about their investments as a result of the increased attention on Ocwen. One could also argue, on the other hand, that investors like the Defendants were adding insult to injury to increase pressure on Ocwen and cause it to crack, so to speak. The February 26, 2014 Consent Judgment required to pay $127.3 million into an interest-bearing account within ten days and further required that Ocwen pay up to "$2 billon of relief to consumers . . . to remediate harms allegedly caused by the alleged unlawful conduct of [Ocwen]." (Ex C., Consent Jgmt. ¶¶ 3-4, *Consumer Fin. Protection Bur., et al. v. Ocwen Fin. Corp, et al.*, Case No. 1:13-cv-02025, ECF No. 12 (D.D.C. Feb. 26, 2014), attached to PIMCO Defs.' Mem. in Supp. of Mot. to Dismiss. Am. Compl., filed Aug. 28, 2018 (hereinafter "PIMCO Mot.")). The December 22, 2014 Consent Order required Ocwen to pay an additional $150 million to the New York State Department of Financial Services. Thus, in 2014 alone, Ocwen had to pay $127.3 million in February and $150 million in December, for a total of $277.3 million that year. And only three weeks into the next year, 2015, and Gibbs & Bruns and BlueMountain are sending letters to trustees who hired Ocwen, alerting them to events-of-default. A press release on Ocwen's website, which is referenced only for background, stated that Ocwen "reported a preliminary net loss of $(546.0) million, or $(4.18) per share, for the year ended December 31, 2014 compared to net income of $310.4 million, or $2.13 per share, for the year ended December 31, 2013." Ocwen Financial Announces Preliminary Operating Results for Fiscal Year 2014

(Apr. 14, 2015), *available at* https://shareholders.ocwen.com/static-files/c2aed6ff-791d-4ce4-87b3-097e38b7184e (last accessed June 7, 2023).[37] It would appear as though Ocwen couldn't get a break.

Unfortunately, the Plaintiffs did not submit evidence to support their other allegations, such as the alleged negative information publicized to the press in Las Vegas in January 2014, (*see* Compl. ¶ 89), or the February 2014 notices that "Gibbs & Bruns was working with certain Blackrock and PIMCO entities, as well as other investors, to consider legal action against Ocwen[,]" *id.* ¶ 90, or copies of the tweets AMI made in March and July 2014, *see id.* ¶¶ 93, 94, or copies of the event-of-default notices BlueMountain issued on January 23, 2015, and February 20, 2015, *see id.* ¶¶ 106, 108. But the evidence the Plaintiffs did submit—again, which has to be "considered in a light most favorable to an assertion of in personam jurisdiction . . . [even though] this presumption may be overcome at trial or upon a hearing on the motion[,]'" *Evans v. Gen. Gases of the V.I.*, 40 V.I. 3, 7 (Terr. Ct. 1998) (quoting *In re: Tutu Wells Contamination Litig.*, 29 V.I. 41, 72-73 (D.V.I. 1993))—does show a prima face claim of personal jurisdiction over the Defendants on Altisource's interference claims.

This evidence shows that the Defendants knew of contracts and other business prospects between Altisource and Ocwen (including Ocwen USVI), (*see* Jan. 23, 2015 Letter at 1 n.2), and intended to interfere with those contracts and prospects, specifically by forcing Ocwen to cure the defaults Gibbs & Bruns identified. Additionally, it does beg the question, when the bigger picture is considered, how Ocwen could comply with the February 26, 2014 Consent Judgment and the December 22, 2014 Consent Order, and cure the defaults Gibbs & Bruns identified in the January 23, 2015 Letter (as well those identified by

---

[37] Although this document is, technically, outside the record, the undersigned notes that the BlackRock Defendants did reference Ocwen's losses in their motion, (*see* BlackRock Mot. 2 ("In 2017, OCN reported a $94 million loss . . . ")), and submitted a copy of a presentation Ocwen gave to investors, *see id.* Ex F (Ocwen Inv. Pres. (Feb. 28. 2018). However, profit and loss data from 2017 is not helpful, as the events at issue occurred prior to 2017. The Court can take judicial notice of documents like Ocwen's profit and losses for FY 2014 as reflected in its SEC-filed 10K. *Cf. Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). But the quote from the press release, summarizing the filing, is taken only for background and not as recommended finding.

BlueMountain if they differed) – while simultaneously continuing to service all the mortgages it was responsible throughout the nation. Perhaps, Ocwen bit off more than it could chew by acquiring too many MSRs and the Defendants may ultimately prove that they acted properly, even if their actions did interfere with Altisource's agreements with Ocwen and its future business prospects. The Defendants have not denied any allegations yet because they have not answered. Instead, they contend that the Virgin Islands long-arm statute does not authorize jurisdiction over them. But when "considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court *shall accept* all of a nonmovant's factual allegations *as true* and construe all disputed jurisdictional facts in the nonmovant's favor." *In re: Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. at 277 (emphasis added). And when Plaintiffs' factual allegations are accepted as true, and when the evidence submitted is viewed in their favor, it shows that long arm jurisdiction over Defendants is proper under section 4903(a)(4) as to Altisource's interference claims.

Regarding the remaining sections of the Virgin Islands long-arm statute, it is clear that the contacts of the BlackRock Defendants and the contacts of the PIMCO Defendants do not meet any of the remaining categories. *See generally* 5 V.I.C. § 4903(a)(5)–(8) (interest in real property, issuance of insurance contracts, paternity/maternity of a child, and abandoning minors).

### c.  Due Process Clause

Even though the undersigned concludes that the Plaintiffs have shown a *prima facie* case for personal jurisdiction over the Defendants under the Virgin Islands Long Arm statute as to Altisource's claims, assessing the long arm statute is only the first half of the test. "The second half of the personal jurisdiction test requires a court to find that its exercise of personal jurisdiction over the defendant does not violate due process." *Molloy*, 56 V.I. at 181. "It has long been established that the Fourteenth Amendment limits the personal jurisdiction of state courts." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 261, 137 S. Ct. 1773, 1779 (2017); *accord Ford Motor Co. v. Mont. Eighth Jud. Dist.*

*Ct.*, 141 S. Ct. 1017, 1024 (2021) ("The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant.").[38] When a defendant challenges a court's personal jurisdiction, the Due Process inquiry focuses on that defendant's relationship to the forum. *See Bristol-Myers Squibb Co.*, 582 U.S. at 262 ("The primary focus of our personal jurisdiction inquiry is the defendant's relationship to the forum State."). Inquiring into the defendant's relationship with the forum starts with asking whether the defendant is "at home" in the jurisdiction and leads to examining general jurisdiction or specific jurisdiction since "general and specific jurisdiction a[re] analytically distinct categories, not two points on a sliding scale." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 321 (3d Cir. 2007); *see also Ford Motor Co.*, 141 S. Ct. at 1024 ("[T]he Court has long focused on the nature and extent of 'the defendant's relationship to the forum . . . .' That focus led to our recognizing two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." (citation omitted)). But even if a court does not have general or specific

---

[38] "Because a state court's assertion of jurisdiction exposes defendants to the *State*'s coercive power, it is subject to review for compatibility with the Fourteenth Amendment's Due Process Clause, which limits the power of a *state court* to render a valid personal judgment against a nonresident defendant . . . .'" *Bristol-Myers Squibb Co.*, 582 U.S. at 261-62 (emphasis added) (citations, brackets, and internal quotation marks omitted). Territories are not States, of course, and, technically, the Due Process Clause only applies to States. *See* U.S. Const. amend XIV, § ("*No State shall* make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor *shall any State* deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (emphasis added)); *accord S.F. Arts & Ath., Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n.21 (1987) (explaining that the Fourteenth Amendment only applies to States while the Fifth Amendment applies to the federal government). Congress extended the Fifth and Fourteenth Amendments to the Virgin Islands in the Revised Organic Act. *See* 48 U.S.C. § 1561. However, some have questioned whether territorial courts can adjudicate a dispute where a State, arguably, could have jurisdiction. *See, e.g.*, F. Andrew Hessick, *Federalism Limits on Non-Article III Adjudication*, 46 Pepp. L. Rev. 725, 744-745 & n. 133 (2019) (using words like "usurp" and "threat" and "infringe" regarding whether "territorial courts should be permitted to adjudicate suits over citizens of [other states] . . ."). Even though Territories are "'no more than' a federal instrumentality," *Ngiraingas v. Sanchez*, 495 U.S. 182, 184 (1990) (citation omitted); *see also Puerto Rico v. Sánchez Valle*, 579 U.S. 59, 71 (2016) ("U.S. [T]erritories . . . are not sovereigns distinct from the United States."), it is possible that the Due Process Clause of the Fifth Amendment carries imposes similar restrictions on Territories, like the protections provided by the Fourteenth Amendment, a question the United States Supreme Court has consistently avoided. *Cf. Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5, 108 S. Ct. 404, 409 (1987) (citing *Asahi Metal Industry Co. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987)); *see also* Brief for the United States as Amicus Curiae Supporting Petitioner, *DaimlerChrysler AG v. Bauman*, No. 11–965 (U.S. S. Ct. July 5, 2013), 2013 WL 3377321, *3 n.1 ("This Court has consistently reserved the question whether its Fourteenth Amendment personal jurisdiction precedents would apply in a case governed by the Fifth Amendment, and it should do so here."). *Accord Hendrickson v. Reg O Co.*, 657 F.2d 9, 13 n.2. (3d Cir. 1981) Since the parties assumed that state-like personal jurisdiction analysis applies here, the undersigned proceeds under the same assumption.

jurisdiction, if the defendant consents, the court can properly exercise jurisdiction over that defendant. Consent remains a valid basis for a court to exercise personal jurisdiction over a defendant. *Cf. Mallory*, 2023 WL 4187749 at *13 (Jackson, J., concurring) ("A defendant can waive its rights by explicitly or implicitly consenting to litigate future disputes in a particular State's courts." (citing *Ins. Corp. of Ir.*, 456 U.S. at 703-04)).

### i. General Jurisdiction

"'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.'" *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). If a court has general jurisdiction, it means that court "may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different [jurisdiction]." *Id.* There is no need for a long arm statute. States and Territories can always summon persons within their borders. But if the individual is not domiciled in the forum, and if the corporation is not "essentially at home" in the forum, then the forum lacks general jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 133 n.11 (2014) ("As the Court made plain in *Goodyear* and repeats here, general jurisdiction requires affiliations 'so continuous and systematic as to render the foreign corporation essentially at home in the forum State.', i.e., comparable to a domestic enterprise in that State." (quoting *Goodyear Dunlop Tires*, 564 U.S. at 919)).

Plaintiffs do not contend that the Superior Court has general jurisdiction over the Defendants. Not as traditionally understood, that is. And they cannot. "To establish general jurisdiction, the nonresident's contacts must be continuous and substantial. For a non-resident business entity, the contacts with the Virgin Islands should form a central part of the company's business." *Molloy*, 56 V.I. at 182-83 (citation

omitted). While the Defendants may do business in the Virgin Islands, their contacts with the Territory are not a central part of their businesses.

Instead, the Plaintiffs appear to have argued, at least initially, that the Superior Court has general jurisdiction over certain Defendants based on consent. That is, by registering as investment advisors or broker-dealers, the PIMCO Defendants and all BlackRock Defendants except BlackRock consented to general jurisdiction over them in the Virgin Islands.(*Cf.* Pls.' Opp'n 38 ("Finally, for purposes of both *general jurisdiction under the Consent Forms* and specific jurisdiction under § 4903(a)(4), there is little difference between the individual BlackRock Defendants and individual PIMCO Defendants such that they can be treated as agents and/or alter egos of each other and their respective parents." (emphasis added)).) Plaintiffs later disavowed consent as a form of general jurisdiction. (*Cf.* Pls.' Supp. Br. Concerning Juris. Issues Raised in Staff Master's Apr. 11, 2023 Order 8, filed Apr. 28, 2023 ("The Court need not wade into theoretical concerns associated with 'all-purpose general jurisdiction' that some authorities . . . and commentators have identified related to state registration statutes." (footnote omitted)).) The Defendants did treat consent as a form of general jurisdiction. (*Cf.* Defs.' Jt. Supp. Br. 5, filed Apr. 28, 2023 ("It would violate the Due Process rights of the RIA Defendants to interpret the Form ADV Appointment Language and the VIUSA's Appointment Requirement as amounting to a consent by the RIA Defendants to general jurisdiction of the Virgin Islands courts.").)

Whether consent should be treated a subset of general jurisdiction was unclear, until recently, because courts were inconsistent in how they addressed it. *Compare Acorda Therapeutics, Inc. v. Mylan Pharm., Inc.*, 817 F.3d 755, 766 (Fed. Cir. 2016) (O'Malley, J., concurring) (equating consent and registration statutes with general jurisdiction)), *with Fuld v. Palestine Liberation Org.*, 578 F. Supp. 3d 577, 585 (S.D.N.Y. 2022) ("Instead of relying on general or specific jurisdiction, Plaintiffs here rely entirely on the *third* traditional basis for personal jurisdiction: consent." (emphasis added)). The United

States Supreme Court did not expressly resolve the question in *Mallory*. But, in discussing the differences between general and specific jurisdiction, the Court noted that specific jurisdiction after *International Shoe* was an "additional" basis for jurisdiction over nonresident defendants. *See Mallory*, 2023 WL 4187749 at *8 (plurality opinion) ("In reality, then, all *International Shoe* did was stake out an *additional* road to jurisdiction over out-of-state corporations. *Pennsylvania Fire* held that an out-of-state corporation that *has* consented to in-state suits in order to do business in the forum is susceptible to suit there. *International Shoe* held that an out-of-state corporation that *has not* consented to in-state suits may also be susceptible to claims in the forum State based on 'the quality and nature of its activity' in the forum." (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 319 (1945)). For this reason, the undersigned will treat consent as a separate, or third, category, which will be addressed after specific jurisdiction.

### ii.  Specific Jurisdiction

Plaintiffs contend that the Superior Court can exercise specific jurisdiction over the Defendants without violating due process. "Where Defendants conducted extensive business here, intentionally directed their attacks into this forum, and damaged USVI-based companies, citizens and the USVI economy, it is plainly fair[,]" Plaintiffs contend, "for these Defendants to answer for their misconduct in this Court." (Pls.' Opp'n 31.) Defendants, of course, disagree, contending that their contacts with the Virgin Islands are, in fact, minimum and, more importantly, insufficient for due process. (*Cf.* BlackRock Mot. 11-12 ("Plaintiffs do not allege that any actual suit-related conduct – 'manipulative short selling of stock,' 'threats of legal action,' or the issuance of the so-called 'Fraudulent Default Notice' – took place in the Virgin Islands." In short, there is no specific jurisdiction here because 'suit-related conduct must create a *substantial* connection with the forum.'" (brackets and citation omitted)).) The undersigned agrees with the Defendants.

Over a decade ago, the Virgin Islands Supreme Court adopted a three-part test for assessing specific jurisdiction. *See Molloy*, 56 V.I. at 183 ("To determine whether specific jurisdiction exists, we apply a three-part test." (citing *O'Connor*, 496 F.3d at 317)).

> First, the defendant must have purposefully directed its activities at the forum. Second, the litigation must arise out of or relate to at least one of those activities. And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice.

*Id.* (quotation marks, brackets, and citations omitted). In the years since *Molloy* was decided, the United States Supreme Court rendered several decisions that narrowed specific jurisdiction.[39]

Regardless, "[t]he canonical decision in this area remains *International Shoe Co. v. Washington*, 326 U. S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)." *Ford Motor Co.*, 141 S. Ct. at 1024. "There, the Court held that a tribunal's authority depends on the defendant's having such 'contacts' with the forum . . . that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co.*, 326 U.S. at 316-17). For a nonresident defendant to be amenable to suit in a foreign jurisdiction, i.e., a forum where the individual does not live or where the company is not at home, that defendant must have sufficient contacts with the forum and "the suit must arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (brackets, question marks, and citation omitted). But not just any contacts will suffice. "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford Motor Co.*, 141 S. Ct. at 1025 (citation omitted). The defendant must also have

---

[39] Inasmuch as a long-arm statute permits the exercise of personal jurisdiction based on a plus factor, which "'does not need to have any relationship with the tortious activity[,]'" *Molloy*, 56 V.I. at 180 (quoting *In re: Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. at 281), that statute may no longer satisfy due process. "In order for a state court to exercise specific jurisdiction, 'the suit' *must* 'arise out of or relate to the defendant's contacts with the forum.'" *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (emphasis added) (brackets and citation omitted). Contacts establishing a plus factor, by their nature, are contacts that do not relate to the lawsuit.

"deliberately 'reached out beyond' its home—by, for example, 'exploiting a market' in the forum . . . or entering a contractual relationship centered there." *Id.* (brackets and citation omitted).

"Yet even then—because the defendant is not 'at home'—the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." *Id.* (citations omitted). "Or put just a bit differently, 'there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (citations omitted). "When (but only when) a company 'exercises the privilege of conducting activities within a state'—thus 'enjoying the benefits and protection of its laws'—the State may hold the company to account for related misconduct." (brackets omitted) (quoting *Int'l Shoe Co.*, 326 U.S. at 319)). That is, a defendant's conduct within the jurisdiction will entitle it to the benefits and protections of the law, while its misconduct may "'subject it to the jurisdiction of a foreign sovereign.'" *Id.* (brackets omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Specific jurisdiction is "founded . . . on . . . reciprocity between a defendant and a State . . . ." *Id.* "Therefore, 'in seeking to assert jurisdiction over a person located outside its borders, the Virgin Islands may only do so on the basis of minimum contacts among the parties, the contested transaction, and the forum state.'" *Evans-Freke*, 75 V.I. at 481 (brackets and citations omitted).

The problem here is that all of the alleged misconduct occurred outside the Virgin Islands. Plaintiffs conceded as much. (*See* Hr'g Tr. 19:12-15 (Mar. 27, 2019) ("[W]e understand that the conduct took place outside the USVI but all of the focus of the intent to harm these companies was located here."); Hr'g Tr. 116:24-117: 2 (Mar. 3, 2023) ("[S]ubject to what we've alleged in the complaint . . . I believe it's not our allegation that any of the defendants were physically present in the forum during the conduct.").) The prima facie tort claims, the civil conspiracy claims, and Altisource's interference claims, and even the CICO claims – none of these claims arose out of the Defendants' contacts with the Virgin

Islands, i.e., providing investment advice or being registered as broker-dealers. Plaintiffs have not alleged, for example, that the Defendants' efforts to steer banks, banking institutions, and investors in general away from Ocwen and Altisource included Virgin Islanders and Virgin Islands banks. The Plaintiffs' claims do not arise out of the Defendants' contacts with the Virgin Islands.

To be sure, "arising out of" is not the only basis for specific jurisdiction. In *Ford Motor Company*, the United States Supreme Court clarified that the "most common formulation of the rule demands that the suit 'arise out of *or relate to* the defendant's contacts with the forum.'" 141 S. Ct. at 1026 (citation omitted). "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* Thus, courts can exercise jurisdiction over nonresident defendants if the plaintiff's claims relate to the defendant's forum contacts. But here too, the Defendants' contacts with the Virgin Islands—acting as investment advisors for GERS, as brokers for Virgin Islanders purchasing securities, or as investment managers for Virgin Islanders— have nothing to do with the Plaintiffs' claims. The interference claims do not relate to the work of the Defendants in advising GERS. The civil conspiracy and prima facie tort claims do not relate to the sale of securities by the Defendants to investors in the Virgin Islands. There simply is no connection between the Plaintiffs' claims and Defendants' forum contacts. "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co.*, 582 U.S. at 264.

Plaintiffs contend that *Ford Motor Company* controls here. They argue that "[u]nder *Ford*, Defendants are subject to jurisdiction because they 'deliberately reached out beyond their home States to exploit the mortgage finance market by making tortious accusations about Ocwen USVI's loan servicing activities." (Pls.' Supp. Br. Concerning Pers. Juris. 2, filed Aug. 10, 2021 (brackets and quotation marks omitted) (quoting *Ford Motor Co.*, 141 S. Ct. at 1025)).) *Ford* did, as Plaintiffs assert, "confirm[] the well-

established jurisdictional principles that (1) Plaintiffs' claims need only 'relate to' – not necessarily 'arise from' – Defendants' forum contacts, and (2) the place of injury and plaintiff's residence – here, the Virgin Islands – can help form the basis for specific jurisdiction." *Id.* But Plaintiffs misread *Ford Motor Company* and Justice Alito's concurrence helps explain why. In his concurring opinion, Justice Alito wrote:

> Since *International Shoe*, the rule has been that a state court can exercise personal jurisdiction over a defendant if the defendant has "minimum contacts" with the forum— which means that the contacts must be "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"
>
> That standard is easily met here. Ford has long had a heavy presence in Minnesota and Montana. It spends billions on national advertising. It has many franchises in both States. Ford dealers in Minnesota and Montana sell and service Ford vehicles, and Ford ships replacement parts to both States. In entertaining these suits, Minnesota and Montana courts have not reached out and grabbed suits in which they "have little legitimate interest." *Their* residents, while riding in vehicles purchased within *their* borders, were killed or injured in accidents on *their* roads. Can anyone seriously argue that requiring Ford to litigate these cases in Minnesota and Montana would be fundamentally unfair?
>
> Well, Ford makes that argument. It would send the plaintiffs packing to the jurisdictions where the vehicles in question were assembled (Kentucky and Canada), designed (Michigan), or first sold (Washington and North Dakota) or where Ford is incorporated (Delaware) or has its principal place of business (Michigan).
>
> As might have been predicted, the Court unanimously rejects this understanding of "traditional notions of fair play and substantial justice." And in doing so, we merely follow what we said in *World-Wide Volkswagen Corp*[*oration*] *v. Woodson* . . . which was essentially this: If a car manufacturer makes substantial efforts to sell vehicles in States A and B (and other States), and a defect in a vehicle first sold in State A causes injuries in an accident in State B, the manufacturer can be sued in State B. That rule decides these cases.

*Ford Motor Co.*, 141 S. Ct. at 1032-33 (Alito, J., concurring) (citations omitted). If this case involved Virgin Islands investors incurring injury from fraudulent or misleading advice given by the BlackRock Defendants or the PIMCO Defendants, or if this case involved withholding crucial information from Virgin Islands clients that was offered to other clients – then perhaps this case would be more like *Ford Motor Company*. But it is not, because none of the products or services the Defendants provide in the Virgin Islands forms the basis of the wrongful acts Plaintiffs complaint of here.

A connection between what causes the right of action (or claim) to accrue and the jurisdiction where a suit on that claim will be heard is required. *Cf. id.* at 1027 n.3. "The purpose of the test is to ensure that the defendant has the requisite minimum contacts with a forum to receive 'fair warning' that the defendant may be haled into court in that forum to answer for its actions in relation to those contacts." *Molloy*, 56 V.I. at 183-84 (citing *Burger King Corp.*, 471 U.S. at 472). And here the Defendants would not have had "fair warning" that speaking with bankers in New York, Minnesota, Massachusetts, California, Illinois, Georgia, and Maryland through letters sent by a Texas-based law firm would have subjected them to litigation in the Virgin Islands for those communications. The Defendants would not have had fair warning that pressuring Ocwen at a meeting in California and attempting to coerce Ocwen into using sham discount rates (somewhere) would have exposed them to litigation in the Virgin Islands. The Defendants would not have had fair warning that shorting Ocwen stock, or timing default notices with BlueMountain, or having AMI tweet would have haled them into court in the Virgin Islands.

That said, the Plaintiffs are correct that Altisource felt injury in the Virgin Islands. Crediting the allegations in the complaint and resolving evidentiary doubts in Plaintiffs' favor, which the Court must do at the *prima facie* phase, some injury in the Virgin Islands is shown here. Altisource is incorporated in the Virgin Islands with its principal place of business on St. Croix. Again, assuming *Carty* is correct, and the majority rule is that "the situs of a plaintiff's economic injury is its principal place of business[,]" *Carty*, 1981 U.S. Dist. LEXIS 10354 at *22, then Altisource has shown injury here. Plaintiffs also allege that the Virgin Islands felt injury because the

> Defendants' misconduct caused Virgin Islanders to lose jobs and suffer lost job opportunities. In two years after Ocwen's operations were established in the USVI, Ocwen USVI had approximately eighty-five employees, the vast majority of whom were longtime residents of St. Croix, and who collectively were earning millions of dollars in compensation and benefits. Given Ocwen's rapidly increasing mortgage portfolio, significant additional job growth in the USVI was expected. Additionally, Altisource USVI anticipated adding more than fifty St. Croix-based professionals. Instead of realizing this job growth in the USVI, Defendants crippled Ocwen/Altisource, causing Ocwen USVI's

presence and employee workforce in the Territory to shrink and Altisource's USVI's growth to stagnate.

Compl. ¶ 64.) These allegations must be taken as true at this stage. But, as the PIMCO Defendants' correctly point out, "'feeling injury' from acts done outside the forum, standing alone, does not satisfy Due Process." (PIMCO Defs.' Supp. Br. 2, filed Aug. 10, 2021.) And as all Defendants assert, their "limited alleged activities in the Virgin Islands—deriving revenue from investments and registering to provide financial services—have no connection to Plaintiffs' claims." (BlackRock Defs.' Supp. Br. 2, filed Aug. 20, 2021; *accord* PIMCO Defs.' Supp. Br. 2 ("100% of the alleged bad acts by PIMCO took place State-side, and none of the meager contacts Plaintiffs claim PIMCO has had with the USVI in any way relate to the alleged bad conduct by PIMCO.").)

Plaintiffs also cite to *Calder v. Jones*, 465 U.S. 783 (1984), and the *Calder* effects test, which does provide a limited basis for exercising jurisdiction. *Cf. Brainstorm XX, LLC v. Wierman*, No. 4:21-CV-584-SDJ, 2022 U.S. Dist. LEXIS 171772, at *13 (E.D. Tex. Sep. 22, 2022) ("The *Calder* effects test provides a basis for personal jurisdiction only in 'rare' circumstances."). However, "since *Calder*, the United States Supreme Court has handed down *Walden v. Fiore*, in which the Court stated: '*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum.'" *Atrium, V.I., LLC v. Atrium Staffing, LLC*, 69 V.I. 259, 304 (Super. Ct. 2018). However, even if the *Calder* effects test remains viable post-*Walden* and, more importantly, post-*Ford Motor Company*, Plaintiffs cannot satisfy the test here because

> the *Calder* 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant *expressly aimed* its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity. Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement. The defendant must manifest behavior intentionally targeted at and focused on the forum for *Calder* to be satisfied. In the typical case, this will require some type of "entry" into the forum state by the defendant.

*Id.* at 303 (quoting *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998)).

In playing devil's advocate, the Court raised justifiable concerns about a nonresident scam artist or hacker based in Timbuktu reaching into the Virgin Islands to defraud residents, and the Virgin Islands not being able to exercise jurisdiction and provide redress. Those concerns echo *Calder*. But even the Court's example differs from this case because there the scam artist would have aimed its conduct expressly at the Virgin Islands and the contacts with the Territory would be directly related to the litigation and to the injury. Here, by contrast, three of the Shareholder Plaintiffs are not based in the Virgin Islands, so they could never satisfy *Calder*. The other Plaintiffs, including Altisource, also cannot satisfy *Calder* because they focus on the effects of the Defendants' actions, not on the Defendants' actions themselves.

Nothing in the evidence the Plaintiffs submitted shows that the Defendants intentionally targeted the Virgin Islands or even knew that Altisource was based here and that Ocwen had relocated its mortgage servicing business to St. Croix. Plaintiffs also do not point to record notice, so to speak, through filings with the SEC. "St. Croix", "Christiansted", and "Virgin Islands" do not appear anywhere within the Gibbs & Bruns letters, which is the only true evidence the Plaintiffs submitted that supports their claims of misconduct, if the complaint is taken as true, that is. To be sure, the January 23, 2015 letter does reference Altisource, multiple times in fact. But nothing in the letter (or in the other materials the Plaintiffs submitted) shows the conduct of the Defendants expressly aimed at the Virgin Islands.

"The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation.' And it is the defendant[s], not the plaintiff or third parties, who must create contacts with the forum . . . ." *Walden*, 571 U.S. at 291 (quoting *Calder*, 465 U.S. at 788). Here, Plaintiffs have failed to show that the contacts the Defendants do have with the Virgin Islands are minimum enough to satisfy due process. None of the conduct alleged in the complaint relates to the Defendants' having advised GERS or provided investment or broker-dealer services in the Territory. For this reason, the undersigned concludes, and recommends that the Court find, that the Plaintiffs have

not established a *prima facie* case that the exercise of specific personal jurisdiction would comport with

due process.

### iii.  Consent

Consent remains a valid basis for exercising jurisdiction over nonresident defendants. "A variety

of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction

of the court." *Ins. Corp. of Ir.*, 456 U.S. at 703. The question raised here is whether the Defendants

consented to jurisdiction in the Virgin Islands through registration forms, specifically Form ADV and

Form BD, which they filed with the Lieutenant Governor's office to appoint the Lieutenant Governor their

agent for service of process.

Form ADV, a form created by the SEC as a uniform application for investment advisor registration,

contains the following language regarding appointment of agents for service of process:

> By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

(Pls.' Opp'n, Ex. 1 (italics in original).[40]) The evidence shows that BFM, BCM, BIM, and PIMCO

executed this form. *See id.* at Ex. 1-2. As applicable here, the pertinent language provides that these

Defendants

---

[40] The form may also be found on the SEC's website at https://www.sec.gov/about/forms/formadv-execution.pdf (last accessed June 14, 2023).

> irrevocably appoint . . . [the] legally designated officer . . . as . . . agents to receive service . . . and you further agree that such service may be made by registered or certified mail, in any . . . state action . . . brought against you in any place subject to the jurisdiction of the United States, if the action . . . (a) arises out of any activity in connection with your investment advisory business . . . and (b) is *founded*, directly or indirectly, upon . . . (ii) the laws of . . . any state in which you are submitting a *notice filing*.

This language plainly shows that BFM, BCM, BIM, and PIMCO consented to suit in the Virgin Islands for claims that arise out of their investment advisory business and are based on the laws of the Territory.

The Defendants try to distinguish the language by arguing that it "does nothing but effect appointment of an agent to receive service of process." (Defs.' Jt. Supp. Br. 2.) They contend that "[i]n the more than 20 years the Appointment Language has appeared in Form ADV, no court has *ever* held that the Appointment Language does anything else." *Id.* But the Defendants do not cite any case in which a court has interpreted the relevant language and the undersigned has not found any. More importantly, however, the Defendants fail to question the function of such forms, or statutes authorizing appointment of an agent to receive service of process. But as the Virgin Islands Supreme Court noted, "'[n]o judicial process, whatever form it may assume, can have any lawful authority outside the limits of the jurisdiction of the court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence.'" *Estate of Skepple*, 69 V.I. at 745 n.37 (quoting *Ableman v. Booth*, 62 U.S. (21 How.) 506, 524 (1858), parenthetically). Relying on another United States Supreme Court case, the Virgin Islands Supreme Court also observed that "'[b]y consenting to service of process upon its agent . . . petitioner rendered itself present there for purposes of service.'" *Id.* (quoting *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 442 (1946)).

In *Murphree*, the petitioner had objected to being sued in federal court, contending that "by appointing an agent to receive service, [it] has only consented to service of process in suits brought in the *state courts*" not federal courts, "and in conformity to state statutes regulating the venue . . . ." *Murphree*, 326 U.S. at 443 (emphasis added). The United States Supreme Court rejected that argument:

> The answer to the suggestion that the consent to suit in the state is a consent to suit only in the state courts and subject to state statutes regulating venue in those courts is plain. Such consent has been uniformly construed to mean suits within the state which apply the law of the state, whether they be state or federal courts.

*Id.* Similar reasoning applies here.

Remarkably, there was no discussion in *Murphree* of personal jurisdiction, even though *International Shoe* had been decided only *a month earlier*. In fact, *International Shoe* itself stressed that "'[p]resence' in the state . . . has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, *even though* no consent to be sued or authorization to an agent to accept service of process has been given." *Int'l Shoe Co.*, 326 U.S. at 317 (emphasis added). *International Shoe* concerned a corporation that had not consented to suit or appointed an agent, which is why the Court was concerned with minimum contacts between the corporation and the forum and traditional notions of fair play. This is the very point the Court made in *Mallory*. *See* 2023 WL 4187749 at *8; *accord Segregated Account of Ambac Assurance Corp. v. Countrywide Home Loans*, 568, 898 N.W.2d 70, 90 (Wis. 2017) (Walsh Bradley, J., dissenting) ("*Int'l Shoe* limited its analysis to cases where 'no consent to be sued or authorization to an agent to accept service of process has been given.' 326 U.S. at 317. This distinction has been consistently recognized by the United States Supreme Court." (collecting cases)). *International Shoe* explained that

> [h]istorically the jurisdiction of courts to render judgment *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. *Pennoyer v. Neff*, 95 U.S. 714, 733. But now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, *if he be not present within the territory of the forum*, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer*, 311 U.S. 457, 463. *See* Holmes, J., in *McDonald v. Mabee*, 243 U.S. 90, 91. Compare *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316, 319. *See Blackmer v. United States*, 284 U.S. 421; *Hess v. Pawloski*, 274 U.S. 352; *Young v. Masci*, 289 U.S. 253.

*Id.* at 316 (emphasis added). Appointing an agent for service of process, as *Estate of Skepple* noted, has the effect of rendering the defendant present within the forum. *McDonald*, which *International Shoe* cited in support, explained that "submission to the jurisdiction by appearance may take the place of service upon the person." 243 U.S. at 91. And *Hess* held that "[t]he process of a court of one State cannot run into another and summon a party there domiciled to respond to proceedings against him. Notice sent outside the State to a non-resident is unavailing to give jurisdiction in an action against him personally for money recovery." 274 U.S. at 355. "There must be actual service within the State of notice upon him or *upon some one authorized to accept service for him*." *Id.*

*Hess* upheld the constitutionality of now-obsolete non-resident motorist statutes. *See id.* at 356 ("The measure in question operates to require a non-resident to answer for his conduct in the State where arise causes of action alleged against him, as well as to provide for a claimant a convenient method by which he may sue to enforce his rights. Under the statute the implied consent is limited to proceedings growing out of accidents or collisions on a highway in which the non-resident may be involved. It is required that he shall actually receive and receipt for notice of the service and a copy of the process. And it contemplates such continuances as may be found necessary to give reasonable time and opportunity for defense."). *Hess*, in turn, relied in part on *Pennsylvania Fire Insurance Company v. Gold Issue Mining & Milling Company*, 243 U.S. 93 (1917), which upheld an appointment of agent statute. There the Court explained that

> [t]he defendant had executed a power of attorney that made service on the superintendent the equivalent of personal service. If by a corporate vote it had accepted service in this specific case there would be no doubt of the jurisdiction of the state court over a transitory action of contract. If it had appointed an agent authorized in terms to receive service in such cases, *there would be equally little doubt*.

243 U.S. at 95. In affirming the judgment and rejecting the due process challenge, the Supreme Court reasoned that "when a power actually is conferred by a document, the party executing it takes the risk of the interpretation that may be put upon it by the courts." *Id.* at 96.

Fast forward more than a century later and *Pennsylvania Fire* is still good law. *See Mallory*, 2023 WL 4187749 at \*7 ("*Pennsylvania Fire* controls this case."). "*Pennsylvania Fire* held that suits premised on these grounds do not deny a defendant due process of law." *Id.* And by "these grounds", the Court was referring to statutes that require nonresident companies appoint an agent for service of process. The statute at issue in *Pennsylvania Fire* provided as follows:

> Any insurance company not incorporated by or organized under the laws of this state, desiring to transact any business by any agent or agents in this state, shall first file with the superintendent of the insurance department a written instrument or power of attorney, duly signed and sealed, appointing and authorizing said superintendent to acknowledge or receive service of process issued from any court of record, justice of the peace, or other inferior court, and upon whom such process may be served for and in behalf of such company, in any court of this state, and consenting that service of process upon said superintendent shall be taken and held to be as valid as if served upon the company, according to the laws of this or any other state. Service of process as aforesaid, issued by any such court, as aforesaid, upon the superintendent, shall be valid and be deemed personal service upon such company, so long as it shall have any policies or liabilities outstanding in this state.

*Gold Issue Min. & Mill. Co. v. Pa. Fire Ins. Co. of Phila.*, 184 S.W. 999, 1003 (Mo. 1916) (quoting Mo. Rev. Stat. § 7042 (1909)), *aff'd*, *Pa. Fire. Ins. Co.*, 243 U.S. at 97. This statute did not include language by which the nonresident company expressly consented to jurisdiction, unlike in *Mallory*. *Cf. Mallory*, 2023 WL 4187749 at \*7 ("Among other things, Pennsylvania law is explicit that 'qualification as a foreign corporation' shall permit state courts to 'exercise general personal jurisdiction' over a registered foreign corporation, just as they can over domestic corporations." (quoting 42 Pa. Cons. Stat. § 5301(a)(2)(i))). Yet, the Supreme Court rejected the constitutional challenge to Missouri's exercise of personal jurisdiction. *See Pa. Fire Ins. Co.*, 243 U.S. at 95. And in *Mallory*, the Supreme Court explained why:

> all *International Shoe* did was stake out an additional road to jurisdiction over out-of-state corporations. *Pennsylvania Fire* held that an out-of-state corporation that *has* consented to in-state suits in order to do business in the forum is susceptible to suit there. *International Shoe* held that an out-of-state corporation that *has not* consented to in-state suits may also be susceptible to claims in the forum State based on "the quality and nature of its activity" in the forum. Consistent with all this, our precedents applying *International Shoe* have long spoken of the decision as asking whether a state court may exercise jurisdiction over a corporate defendant "'that *has not consented* to suit in the forum.'" Our precedents have recognized, too, that "express or implied consent" can continue to ground personal jurisdiction—and consent may be manifested in various ways by word or deed.

*Mallory*, 2023 WL 4187749 at *8 (plurality opinion) (citations and brackets omitted). One of the ways consent is manifested is when a nonresident company appoints an agent to receive service of process as part of the registration process for doing business.

Given the plain language of Form ADV, a form prepared by the SEC presumably under congressional authorization, and further considering that "Congress' typical mode of providing for the exercise of personal jurisdiction has been to authorize service of process[,]" *Tyrrell*, 581 U.S. at 409, the underlined concludes, and recommends that the Court find, that BFM, BCM, BIM, and PIMCO have consented, on a limited basis, to suit in the Virgin Islands. That basis is limited to the plain language of the Form ADV: actions arising out of activities connected with their investment advisory business and founded (directly or indirectly) on Virgin Islands law. All of the Plaintiffs' claims are founded on Virgin Islands law. The CICO claims are authorized by statute, Altisource's interference claims have been recognized by the Virgin Islands Supreme Court, and, for the reasons given above, the Court should also recognize the prima facie tort and civil conspiracy claims. Furthermore, each of these claims arises out of the investment advisory business of BFM, BCM, BIM, and PIMCO, albeit business conducted outside the Territory. That is not a hurdle, however, because *Pennsylvania Fire* saw no issue with "the fact that Gold Issue Mining was not from Missouri (but from Arizona) and its claim did not arise there (but in Colorado)[,]" *Mallory*, 2023 WL 4187749 at *7, and *Mallory* saw no issue with the fact that "*Mallory* no

longer lives in Pennsylvania and his cause of action did not accrue there." *Id.* Assessing a nonresident

defendant's contacts with the forum is unnecessary because the defendant consented to suit.

This is not an action for wrongful eviction, for example. The Plaintiffs have not sued the

Defendants for battery, false imprisonment, or trespass, for example. Although these claims are authorized

under Virgin Islands law, Form ADV would not authorize jurisdiction because battery and false

imprisonment, for example, are not activities connected with providing investment advice. Further,

whether the forms the Plaintiffs submitted are accurate and cover the times relevant to their claims brought

here are factual questions to be resolved later. *Cf.* 9 V.I.C. § 656 ("The filing of an application for

registration, a registration statement, a notice filing under this chapter, or the registration of a person, the

notice filing by a person, or the registration of a security under this chapter does not constitute a finding

by the Administrator that a record filed under this chapter is true, complete, and not misleading."). But at

the *prima facie* phase, all doubts over evidence must be resolved in Plaintiffs' favor. For this reason, the

undersigned concludes that Plaintiffs have made out a *prima facie* case of jurisdiction based on consent

as reflected in the Forms ADV.

Regarding the broker-dealer registration forms Plaintiffs submitted, the undersigned acknowledges

that the language of this form is not as straightforward as Form ADV. Form BD, a uniform application

form used by broker-dealers to register as broker-dealers in a jurisdiction, was executed by PI and BI and

filed so they could serve as broker-dealers in the Virgin Islands. (*See* Pls.' Opp'n, Exs. 3-4.) Form BD

contains the following pertinent language:

> For the purpose of complying with the laws of the State(s) designated in Item 2 relating to
> either the offer or sale of securities or commodities, the undersigned and applicant hereby
> certify that the applicant is in compliance with applicable state surety bonding requirements
> and irrevocably appoint the administrator of each of those State(s) or such other person
> designated by law, and the successors in such office, attorney for the applicant in said
> State(s), upon whom may be served any notice, process, or pleading in any action or
> proceeding against the applicant arising out of or in connection with the offer or sale of
> securities or commodities, or out of the violation or alleged violation of the laws of those

State(s), and the applicant hereby consents that any such action or proceeding against the applicant may be commenced in any court of competent jurisdiction and proper venue within said State(s) by service of process upon said appointee with the same effect as if applicant were a resident in said State(s) and had lawfully been served with process in said State(s).

*Id.*[41] Plaintiffs point to this paragraph and assert that it reflects the consent of PI and BI to this lawsuit. Because doubts over the evidence must be resolved in Plaintiffs' favor, the undersigned agrees. *Accord Perry v. Markman Capital Mgmt.*, No. 02-744, 2002 U.S. Dist. LEXIS 19103, *12-15 (E.D. Pa. Oct. 4, 2002). But it is not as clear as the Plaintiffs contend.

First, one could argue that the consent given in Form BD encompasses only claims "relating to either the offer or sale of securities or commodities." This lawsuit does not involve claims relating to the offer or sale of securities or commodities by PI and BI in the Virgin Islands. But if this introductory clause is read to qualify everything that follows it, then all judicial, quasi-judicial, and administrative proceedings of any type would be restricted to actions arising out of or connected with the offer or sale of securities or commodities. That construction would render other provisions superfluous, particularly since the applicant appoints an agent to accept service of process in "any action or proceeding against the applicant arising out of or in connection with the offer or sale of securities or commodities." Including this language would be superfluous, and circular, if the opening phrase limited consent to suits only "relating to either the offer or sale of securities or commodities." It would also render the "violations of" clause redundant. And Plaintiffs home in on this language and argue that it controls. (*See generally* Pls.' Supp Br. re: Staff Master Apr. 11, 2023 Order 2.)

A question neither side has addressed is whether the word "violation" is meant only in criminal or quasi-criminal sense. The explanation of terms section, available in the online version of Form BD, does seem to use violation in a penal sense. *See* Form BD: Unif. App. For Broker-Dealer Reg., p. 4 (explaining

---

[41] The form is also available on the SEC's website at https://www.sec.gov/about/forms/formbd.pdf (last visited June 14, 2023).

that the term "minor rule violation" means "[a] violation of a self-regulatory organization rule that has been designated as 'minor' pursuant to a plan approved by the SEC. A rule violation may be designated as ' minor' under a plan if the sanction imposed consists of a fine of $2,500 or less, and if the sanctioned person does not contest the fine."), *available at* https://www.sec.gov/about/forms/formbd.pdf (last visited June 16, 2023). But courts have found that the word "violation" can include civil actions, particularly when used in reference to judicial proceedings. *See SST Glob. Tech., LLC v. Chapman*, 270 F. Supp. 2d 444, 453 (S.D.N.Y. 2003) ("The language referring to where 'any act or transaction constituting the violation occurred,' has been held to apply to civil cases." (citing *Grossman v. Young*, 70 F. Supp. 970 (S.D.N.Y. 1947)); *Grossman*, 70 F. Supp. at 971 (construing section 27 of the Securities Exchange Act of 1934) ("I do not believe that it was the intention of Congress to limit the meaning of the word 'violation' to a criminal case."); *see also Tex. Cont'l Life Ins. Co. v. Bankers Bond Co.*, 187 F. Supp. 14, 23 (W.D. Ky. 1960) ("The word 'violation' is not limited to a criminal case but includes civil litigation."), *rev'd on other grounds sub nom. Tex. Cont'l Life Ins. Co. v. Dunne*, 307 F.2d 242, 250 (6th Cir. 1962). *Cf. Featzka v. Millcraft Paper Co.*, 405 N.E.2d 264, 266 (Ohio 1980) ("Black's Law Dictionary (5th Ed.) defines 'offense' as 'a felony or misdemeanor; a breach of the criminal laws.' . . . Black's Law Dictionary defines 'violation' as a 'breach of right, duty, or law.'" (brackets omitted). This is persuasive authority that the word "violation" in Form BD includes civil actions arising out state or territorial law that do not necessarily involve the sale or offer of commodities or securities. This action arises out of the violation or alleged violation of the laws of the Virgin Islands. Thus, PI and BI consented to jurisdiction.

That said, at least one court construed another phrase found in Form BD, the "court of competent jurisdiction" phrase, as not reflecting consent to suit anywhere one registers. *See Freeney v. Bank of Am. Corp.*, No. CV 15-02376, 2015 U.S. Dist. LEXIS 189247, *126-30 (C.D. Cal. Nov. 19, 2015). In *Freeney*, which involved identical language found in Form U4, not Form BD, the court rejected the plaintiff's

assertion that the defendant consented to jurisdiction by signing and filing the form, explaining that if "the clause intended to indicate consent to jurisdiction in any state covered by the agreement" was construed in way the plaintiff suggested, "the 'competent jurisdiction and proper venue' language would be meaningless." *Id.* at *128. The court bolstered its analysis by pointing to other language in the form, namely the language that "service" would have "the same effect as if applicant were a resident in said State(s)" *Id.* The plaintiff had relied on this language to argue that the defendant was deemed to be a resident of California and, therefore, the court effectively had general jurisdiction. "The more natural reading of the provision[,]" the court reasoned, "is that service on the agent will be treated as service on [the defendant] personally *solely for the purpose of determining whether service has been effected.*" *Id.* at *130. "This interpretation is more consistent with the provision's overall focus on the mechanisms or procedures for effecting service," the court concluded, "as well as the fact that the phrase 'of competent jurisdiction' is used to describe the court(s) in which a proceeding can be brought." *Id.*

While *Freeney* does bolster the Defendants' position, the undersigned cannot agree with its conclusion, particularly after *Mallory*. First, *Freeney* acknowledged that the phrase "as if applicant were a resident" could work in the plaintiff's favor. *See id.* ("The quoted phrase could be interpreted to mean that, for jurisdictional purposes, a court should treat service on the agent as if it were service on Bock personally while he was present in California. This would subject Bock to jurisdiction in California."): *see also id.* ("A non-resident served with process while physically present in a state is subject to jurisdiction in that state." (citing *Burnham v. Super. Ct. of Cal.*, 495 U.S. 604, 610 (1990)). But the court then rejected a plain reading of the form in place of a "more natural reading." If similar reasoning were applied to Form BD, it would nullify the language providing that the broker-dealer "consents" to "any action or proceeding" "in any court of competent jurisdiction and proper venue within said State(s) . . . as if applicant were a resident in said State(s) . . . ." If this language was intended only to authorize service,

language authorizing jurisdiction in a competent court **within the state** would not have been included. Courts generally should not go beyond the plain language of statutes, contracts, and, presumably, standard forms like Form BD (and Form ADV), and ascribe a different meaning. Form BD provides that the applicant is to be treated "as if" it were a resident of the Virgin Islands. At this juncture, doubts over this evidence must be resolved in Plaintiffs' favor. *See Mallory*, 2023 WL 4187749 at *9 (plurality opinion) ("In *Burnham*, the defendant contended that *International Shoe* implicitly overruled the traditional tag rule holding that individuals physically served in a State are subject to suit there for claims of any kind. This Court rejected that submission. Instead, as Justice Scalia explained, *International Shoe* simply provided a 'novel' way to secure personal jurisdiction that did nothing to displace other 'traditional ones.' What held true there must hold true here." (citations omitted)).

Lastly, both Form ADV and Form BD were filed (or notice filed) pursuant to section 671 of title 9 of the Virgin Islands Code. The undersigned agrees with Plaintiffs: "The filings are voluntary acts constituting consents to jurisdiction as if the registrants were USVI residents who had been personally served in the USVI." (Pls.' Supp. Br. re: Staff Master Apr. 11, 2023 Order 3.) "This language cannot be denigrated as merely an instruction manual for process servers seeking to deliver court papers. It goes qualitatively beyond that. In the law, this is the language of express consent to personal jurisdiction." *Id.* As Plaintiffs note, the Virgin Islands Uniform Securities Act was adopted from the model Uniform Securities Act of 2002. *See id.* at 3 n.4. This "legislative history" explains that section 611 of the uniform act, corresponding to section 671 of title 9 of Virgin Islands Code, "was originally based on the type of nonresident motorist statute whose constitutionality was sustained in *Hess v. Pawlowski*, 274 U.S. 352 (1927) and subsequently in other contexts. *See, e.g.*, *International Shoe Co. v. State of Wash.*, 326 U.S. 310 (1945); *Travelers Health Ass'n v. Commonwealth of Va.*, 339 U.S. 643 (1950)." Nat'l Conf. of Comm'rs on Unif. State Laws, *Uniform Securities Act* (2002), official cmt 4, p. 167, *available at*

https://www.nasaa.org/wp-content/uploads/2021/09/2002-Uniform-Securities-Act.pdf (last visited Apr. 20, 2023). As the United States Supreme Court cautioned, "when a power actually is conferred by a document, the party executing it takes the risk of the interpretation that may be put upon it by the courts." *Pa. Fire Ins. Co.*, 243 U.S. at 96. Consent is a valid basis for exercising personal jurisdiction over nonresident defendants and disputed fact should be construed in favor of jurisdiction, particularly at this phase. *St. Croix, Ltd.*, 60 V.I. at 473 ("construe all disputed facts in favor of finding personal jurisdiction."). Form ADV and Form BD both can be read as consent and section 671 is patterned after statutes such as those upheld in *Hess*, which relied on *Pennsylvania Fire*. *See Hess*, 274 U.S. at 356-57. *But cf. Kisiel v. RAS Sec. Corp.*, Case No. 3:01-CV-294-X, 2001 U.S. Dist. LEXIS 11848, at *9 (N.D. Tex. Aug. 9, 2001) (questioning whether "Form BD includes consent to personal jurisdiction in Texas for all causes of action, or only causes of action more directly connected to the sale of securities or commodities."). Plaintiffs have made a *prima facie* showing that all Defendants except BlackRock have consented to adjudicate claims related to their investment management or broker dealer services that are founded, directly or indirectly, on Virgin Islands law, or that arise out of the violation or alleged violation of Virgin Islands law.[42]

## B. *Forum Non Conveniens*

In addition to challenging the Superior Court's jurisdiction over them, the Defendants also moved to dismiss claiming the Virgin Islands is an inconvenient forum. The BlackRock Defendants contend that "[t]his case is essentially unrelated to the Virgin Islands . . . [because] Plaintiffs allege no relevant activity occurring here." (BlackRock Mot. 13.) The PIMCO Defendants make the same argument. (*See* PIMCO

---

[42] Because the undersigned concludes that BFM, BIM, BCM, and PIMCO consented, per Form ADV, and that BI and PI consented, per Form BD, the undersigned declines to address the Defendants' arguments regarding the Plaintiffs attempt to attribute the contacts of subsidiary companies to their corporate parents. Such an attempt appears to be foreclosed by precedent. *See Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014) ("But we need not pass judgment on invocation of an agency theory in the context of general jurisdiction, for in no event can the appeals court's analysis be sustained.").

Mot. 14 ("Even if personal jurisdiction over PIMCO existed, the [complaint] should be dismissed on *forum non conveniens* grounds.").)

### i. Legal Standard

Section 4905 of title 5 of the Virgin Islands Code gives the court discretion to "stay or dismiss the action in whole or in part on any conditions that may be just" provided that "the court finds that in the interest of substantial justice the action should be heard in another forum[.]" As the Virgin Islands Supreme Court explained, section 4905 of title 5 is "based on section 1.05 of the Uniform Interstate and International Procedure Act . . . which was adopted by the National Conference of Commissioners on Uniform State Laws . . . in 1962 and enacted by the Virgin Islands in 1965." *Evans-Freke*, 75 V.I. at 417. The statutory language was

> "drafted by the Columbia Law School Project on International Procedure, in collaboration with the Advisory Committee to the Commission on International Rules of Judicial Procedure," with the intent of allowing the "unrestricted application of the doctrine of *forum non conveniens* when statutory requirements for the exercise of personal jurisdiction are satisfied but other factors indicate that the forum is inconvenient."

*Id.* at 418 (quoting *Pain v. United Technologies Corp.*, 637 F.2d 775, 794 n.106 (D.C. Cir. 1980)). Courts can

> consider a nearly unlimited number of factors, including amenability of the parties to personal jurisdiction, party and witness convenience, conflict of law rules, as well as any other factors having substantial bearing upon the selection of a convenient, reasonable and fair place of trial, with the central concern being furthering the just, speedy and inexpensive determination of the action..

*Id.* (quotation marks, brackets, and citation omitted). Among other factors, courts must consider "(1) the existence of an alternative forum; (2) private interests; and (3) public interests . . . ." *Id.* at 417; *see also id.* at 418 ("Certainly, the three *Gulf Oil* factors themselves are highly relevant to any such inquiry under a statute modeled after section 1.05 of the UIIPA and *must be considered* by the trial court." (emphasis added)). Other factors include "the substantive law of the other jurisdiction, or whether the party seeking

dismissal on *forum non conveniens* grounds has agreed to waive the statute of limitations and other defenses that would preclude a merits adjudication in the other jurisdiction." *Id.* at 419. Additionally, because section 4905 provides for a stay and dismissal, "a dismissal on *forum non conveniens* grounds . . . requires a substantially higher showing . . . and dismissal without a stay has been characterized as an 'extraordinary' remedy under the statute." *Id.* at 419-20 (citation omitted). By contrast, "a stay permits the court to retain jurisdiction so that it may 'compel the foreign party to cooperate . . . and 'can resume proceedings if the foreign action is unreasonably delayed or fails to reach a resolution on the merits.'" *Id.* at 419 (citation omitted). Here, all Defendants seek a dismissal, and not a stay, thus they all have substantially higher showing to satisfy.

### ii. Arguments & Discussion

Regarding the alternate fora, the BlackRock Defendants suggest either New York or Delaware and "agree to submit to the jurisdiction of the courts" in those States. (S. Ahrens Affid. ¶ 8, attached to BlackRock Mot.) BCM, BFM, and BlackRock are all incorporated under Delaware law, while BI and BIM are organized under Delaware law. *See id.* ¶ 2. BFM, BI, and BlackRock have offices in New York, while BIM has offices in New Jersey. By contrast, BCM has its office in Delaware. "The requirement of an adequate alternative forum is generally satisfied when the defendant is amenable to process in another jurisdiction." *In re: St. Croix Seamen's Asbestos Cases*, No. 606/92, *et seq.,* 1993 V.I. LEXIS 19, *11 (V.I. Terr. Ct. June 18, 1993) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)). Three of the five BlackRock Defendants are located in New York, while all five are "at home" in Delaware for purposes of general jurisdiction.

The PIMCO Defendants, by contrast, assert that "the acts giving rise to Plaintiffs' claims occurred in California and New York." (PIMCO Mot. 15.) And they contend that "[p]ractical issues would make the case easier, more expeditious, and less expensive if tried in Delaware or New York." *Id.* PIMCO is

organized under Delaware law, with its principal place of business in California and an office in New York. PI is also organized under Delaware law with its principal office in New York. (*See* PIMCO Defs.' Mem. of Law in Supp. of Mot. to Dismiss Compl., W. Galipeau Decl. (July 10, 2018), filed July 18, 2018.[43]) Both PIMCO Defendants are amenable to service of process in Delaware, while only PI is clearly "at home" in New York. Under United States Supreme Court precedent, PIMCO is not "at home" in New York, even though it may have an office there. What's more, unlike the BlackRock Defendants, the PIMCO Defendants did not agree to submit themselves to jurisdiction in New York. All seven Defendants are amenable to process in Delaware, whereas only four are amendable to process in New York.

In addition to the availability of another forum, courts must also consider public and private interests. Regarding private interests, courts consider "'practical problems that do or do not make a trial easy, expeditious, and inexpensive, such as the ease of access to proof, the availability of compulsory process, and the cost of attendance of witnesses.'" *Oxford Glob. Res., LLC v. Hernandez*, 106 N.E.3d 556, 568 (Mass. 2018) (citation omitted); *see Evans-Freke*, 75 V.I. at 418 (citing *Hernandez*, 106 N.E.3d at 569-70). As for public interests, courts consider "'administrative burdens caused by litigation that has its origins elsewhere and the desirability of the trial of a case in a forum that is at home with the governing law' . . . ." *Oxford Glob. Res., LLC v. Hernandez*, 106 N.E.3d at 568 (citation omitted). Because some interests overlap or intersect, particularly, as an example, administrative burdens on courts and increased costs for parties, the undersigned will consider both public and private factors together.

---

[43] The PIMCO Defendants reference the Galipeau declaration is in motion. (*See* PIMCO Mot. 15 n.24.) But that declaration was submitted in support of their initial motion. It was not resubmitted—so far as the record shows—in support of the second motion, which was filed in response to the amended complaint. However, because of issues with the record, (*see, e.g.*, PIMCO Defs.' Notice re. Certain Hard Copy Ct. Filings in 2018 and 2019, filed May 10, 2023), the undersigned considered the declaration. Plaintiffs did not point out the omission and the undersigned sees no harm in considering it. Neglecting to refile it was an oversight. Further, Plaintiffs also refiled an exhibit that was omitted from their response. (*See* Pls.' Not. of Filing Corr. Ex., filed Mar. 18, 2019.)

Regarding burdens from litigating in the Virgin Islands, many that, in the past, increased expense and delay have been significantly reduced, if not eliminated, in recent years. The Virgin Islands Judiciary has implemented electronic filing at the trial court level, including for "[e]xhibits offered at trials or hearings that are capable of being maintained in an electronic format[.]" V.I. E-Filing R. 7(a)(5). Increased cost and delay associated with transporting documents to the courthouse, whether for filing or for use at a hearing, and shipping boxes of documents or printing them locally for trial have been largely eliminated. The Judiciary also implemented

> "CaseLines" – a cloud based platform for case preparation, evidence sharing, courtroom presentations for remote and in-person proceedings. CaseLines allows litigants to upload materials in advance of hearings or trial to a single repository, which can be shared with the Court, opposing counsel and witnesses during the course of the proceeding. The platform supports the ability to upload various types of files including multimedia files and provides a means to direct those also viewing the platform to a specific section.

V.I. Bar Ass'n, *Add'l Software Platform for Evid. Presentation to be Implemented in V.I. Cts*, Weekly Digest (Sept. 10, 2021), *available at* https://cdn.ymaws.com/www.usvibar.org/resource/resmgr/media/september_2021.pdf (last visited June 26, 2023). Clearly, burdens and problems that, in the past, made getting papers and exhibits to the Virgin Islands burdensome have been significantly reduced.

Additionally, and beyond delays that already happened, further administrative burdens or problems of the same nature should not persist. [44] The establishment of a staff master for the Complex Litigation

---

[44] The undersigned must acknowledge the delay to date. The prior judge heard argument on the Defendants' motions in March of 2019, but that judge's term concluded before he was able to issue a ruling. The COVID-19 pandemic occurred shortly before the prior judge's term ended and overlapped with emergency measures and several territory-wide or island-wide lockdowns. For reasons outside the Court's control, but likely due to the exigencies the pandemic presented, the Governor of the Virgin Islands did not nominate a successor judge until July 2020, and the Legislature of the Virgin Islands did not confirm that nominee until September 2020. While the process was underway, the Virgin Islands, including the Judiciary, reentered a "lockdown" due to the pandemic. *See In re Continuation of Suspension of Non-Essential Judicial Branch Servs. in Response to Coronavirus Disease 2019*, Admin No. 2020-0017, 2020 V.I. Supreme LEXIS 33, *1 (V.I. Aug. 31, 2020) (noting "a resurgence of COVID-19 cases, on July 17, 2020," followed by a suspension of "all non-essential in-person proceedings" and a "'Stay At Home' phase effective August 17, 2020," which continued through "September 8, 2020"). The St. Croix District had to restrict operations again in December 2020. *See generally In re: Ext. of Temp. Closure of R.H. Amphlett Leader Just. Ctr.*, Admin No. 2020-0022, 2020 V.I. Supreme LEXIS 45 (V.I. Dec. 14, 2020). And the Judiciary, as a whole, followed shortly thereafter due to an increase in COVID-19 positive cases. *See generally In re: Temp. Suspension of All In-Person Proceedings in the Jud. Branch of the V.I.*, Admin. No. 2020-0023, 2020 V.I. Supreme LEXIS 46 (V.I. Dec. 17, 2020) (closure until January

Division has helped to aid in moving complex cases through the court system, a position that was implemented only recently. What's more, the Virgin Islands Supreme Court has retained many of the pandemic-era allowances enacted to manage the public health emergency. *See generally In re Adoption of Measures to Manage the COVID-19 Endemic*, Admin. No. 2022-0004, 2022 V.I. Supreme LEXIS 19 (V.I. July 21, 2022). "The courts of the Virgin Islands will continue to utilize remote proceedings for all matters other than jury trials and hearings not amenable to being conducted remotely." *Id.* at *3-4. The requirement under "Rule 30(b)(4) of the Virgin Islands Rules of Civil Procedure, which in the absence of a stipulation requires court-approval of depositions taken by telephone or other remote means[,]" *id.* at *5, has been suspended. In-person attendance at discovery conferences has also been suspended. *See id.* And depositions "may be noticed to proceed technologically and remotely without a stipulation or court approval." *Id.* Attorneys, witnesses, and stenographers may not have to travel and certainly do not have to travel to the Virgin Islands, unlike in the past.

Nonetheless, the Defendants do have a point, that all of the alleged misconduct occurred outside the Virgin Islands, a point Plaintiffs have conceded. Thus, few, if any, witnesses will be in the Virgin Islands. And, as the BlackRock Defendants state, "discovery from Altisource . . . will be required . . . ." BlackRock Reply 15.) But the Plaintiffs will also need discovery from the Defendants and the other co-conspirators. (*See* Compl. ¶ 83 ("The enterprise consisted of, among others, Defendants, KORE Advisors ("KORE"), Metropolitan Life Insurance Company ("MetLife"), Sealink Funding Limited acting through

---

18, 2021). The closure was later extended through the end of January 2021. *See generally In re: Ext. of Temp. Suspension of All In-Person Proceedings in the Jud. Branch of the V.I.*, Admin. No. 2021-0001, 2021 V.I. Supreme LEXIS 32 (V.I. Jan. 15, 2021). Further restrictive emergency measures were implemented throughout much of 2021. *See, e.g., In re: Temp. Suspension of In-Person Servs. & Proceedings in the Jud. Branch of the V.I.*, Admin. No. 2021-0011, 2021 V.I. Supreme LEXIS 30 (V.I. July 30, 2021). During this time, the Court (Willocks, J.), in its capacity as presiding judge, stepped in in a limited capacity to help with cases assigned to the prior judge. *See generally In re: Temp. Assignment of Case Loads in the Event of a Judicial Vacancy*, No. SX-2020-MC-00082, 2020 V.I. LEXIS 72 (V.I. Super. Ct. Nov. 6, 2020). The Court (Willocks, J.) later agreed to assist with the complex docket and retained this case. And in August 2021, the Supreme Court authorized the creation of a staff master position for the Complex Litigation Division, to which the undersigned was appointed in October 2021.

its investment advisor Neuberger Berman Europe Limited ("Sealink"), BlueMountain Capital Management ("BlueMountain"), and the Association of Mortgage Investors, a political well-connected and secretive lobbying group ("AMI")." (footnotes omitted)).) None of these witnesses are located in the Territory. Obtaining documents from persons, businesses, or organizations located in New York, Delaware, California, Nevada, Florida, Connecticut, or the District of Columbia (jurisdictions referenced by the parties) should not be burdensome because, as Plaintiffs point out, they—like the Virgin Islands, *see* 5 V.I.C. § 4922, *et seq.*—each enacted the Uniform Interstate Depositions and Discovery Act, or UIDDA. *See generally* David C. Marshall, *An Overview of the UIDDA and the States that Have Adopted It*, p.3 (2014) (collecting jurisdictions) ("Similar legislation is pending in Rhode Island, Connecticut, and Wisconsin."), *available at* https://www.turnerpadget.com/828895/assets/files/News/2014_Overview_of_UIDDA.pdf (last accessed June 16, 2023). Florida, the other jurisdiction the parties referenced, adopted the UIDDA in 2019. *See* Fla. Stat. § 92.251, *et seq.* The UIDDA "provides simple procedures for courts in one state to issue subpoenas for out-of-state document requests . . . . It applies if both states have adopted the Act." Marshall, *Overview*, p.3. Since the relevant jurisdictions have all enacted the UIDDA, obtaining documents should be less burdensome and expensive than in the past. But more importantly, as Plaintiffs correctly point out, the physical location of documents and other papers is no longer a compelling factor in a *forum non conveniens* analysis. (*See* Pls.' Opp'n 44 ("'[I]n the age of modern technology, the location of documents matters a great deal less in the forum analysis.'" (quoting *Epstein v. Fancelli Paneling, Inc.*, 55 V.I. 150, 168 (Super. Ct. 2011)).)

The location of witnesses is not as straightforward, however. The UIDDA does cover depositions as well as documents. So, obtaining a subpoena to depose an individual in California, Texas, Florida, Delaware, New York, Connecticut, or the District of Columbia should not be difficult. And if, as Defendants' point out, several of Plaintiffs' *pro hac* counsel—and several of Defendants' *pro hac vice*

counsel—are all located in New York, costs associated with conducting depositions in New York would largely be the same, whether the case was transferred to New York or remained in the Virgin Islands. Only local counsel might have the expense of traveling, assuming they did not to (or chose not to) attend remotely per our Supreme Court's *Measures to Manage the COVID-19 Endemic* order. Transferring the case to Delaware, by contrast, would increase costs for everyone. And traveling to California, Connecticut, the District of Columbia, or Florida would likely bring costs for all involved. Practical problems with witnesses being outside the Virgin Islands is not dispositive.

Compelling witnesses to appear for trial in the Virgin Islands is a different story since the UIDDA does not address trial. *But cf.* Marshall, *Overview* at 14 (Pennsylvania "expand[ed] the definition of a subpoena to include subpoenas to attend or give testimony at a hearing or trial and not just at depositions."). Remote appearance is also not *per se* permissible in jury trials. *See In re: Adoption of Measures*, 2022 V.I. Supreme LEXIS 19 at *3-4 ("The courts of the Virgin Islands will continue to utilize remote proceedings for all matters *other than* jury trials and hearings not amenable to being conducted remotely." (emphasis added)). Courts do have inherent authority to allow remote testimony where appropriate. *Cf. In re: Ferguson v. LeClair*, 191 A.D.3d 1380, 1380 (N.Y. App. Div. 2021) ("[A] court has the inherent authority to grant permission to testify remotely . . . ." (citing *People v Wrotten*, 923 N.E.2d 1099 (N.Y. 2009), *cert denied* 560 U.S. 959 (2010) (other citation omitted)). *See also* V.I. R. Civ. P. 43(a) ("For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."). Presumably, the majority of witnesses will be outside the reach of the Superior Court's subpoena power. So, this factor does give the undersigned reason to pause. The parties, of course, must appear. But the Court may be powerless to subpoena, for example, alleged co-conspirators scattered around the country. As Plaintiffs point out, "counsel, who drafted the Fraudulent Default Notice, is located in Texas. AMI is located in

Washington, DC. The servicing expert responsible for the fraudulent servicing analysis is located in Connecticut. And . . . KORE . . . [and] OCN . . . are all located in Florida." (Pls.' Opp'n 43-44 (citations omitted).) Most nonparty witnesses are outside the Virgin Islands. But they would also be outside the reach of New York and Delaware courts. "It is well settled . . . that a state court's subpoena power is limited to the state's borders." *State v. Bennett*, 155 A.3d 188, 197 (Conn. 2017) (citing *Minder v. Georgia*, 183 U.S. 559, 562 (1902)). For this reason, "the 1936 Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings was adopted in all fifty states, as well as the Virgin Islands and the District of Columbia." *Id.* at 198. Similar legislation does not exist for civil proceedings. *But cf.* V.I. R. Civ. P. 4(c)(1) ("A subpoena may command a person to attend a trial . . . (B) *within the state where the person resides*, is employed, or regularly transacts business in person, if the person . . . (ii) is commanded to attend a trial and would not incur substantial expense."). So, the distance of witnesses from the Virgin Islands is not determinative. Trial in Delaware, the only jurisdiction where all seven Defendants are amenable to process, would be the most difficult. Trial in New York might be less difficult but only for witnesses located in that state. All three jurisdictions, New York, Delaware, and the Virgin Islands, would face similar difficulties in compelling witnesses from Connecticut, Washington, D.C., California, and Florida to appear for trial.

Next, concerns with the Virgin Islands having to apply New York law are misplaced. The PIMCO Defendants contend New York law governs because

> all of the alleged conduct occurred in California or New York; the principal place of distribution of the alleged fraudulent statements was New York; and, the main alleged injury (the decrease in the market prices of Ocwen and Altisource on the NYSE), was suffered in New York; and . . . whether Ocwen serviced the mortgage loans owned by RMBS trusts appropriately pursuant to servicing contracts [which are] typically governed by New York law.

(PIMCO Mot. 26-27 n.41.) For this reason, "the Court should apply 'the local law of the state which, with respect to each issue, has the most significant relationship to the occurrence and the parties.'" *Id.* at 26

n.41 (brackets omitted) (quoting *Restatement (Second) of Conflict of Laws* § 145 (1971)). It is not as clear as the PIMCO Defendants contend.

First, Insofar as the PIMCO Defendants are asserting that the Plaintiffs' claims are subordinate to the PSAs, which are contracts, that argument no longer carries weight after the Supreme Court held in *Robertson* that the Virgin Islands does not follow the gist of the action doctrine. *See Roberson*, 2022 VI 3 at ¶ 38. Second, our Supreme Court has also not adopted section 145 of the Restatement (Second) of Conflicts of Laws. To do so now requires a *Banks* analysis. The PIMCO Defendants did not undertake that analysis. Instead, they cite persuasive precedent and misattribute what it says. *See id.* ("As noted in *Takata*, Virgin Islands courts (like courts in many other jurisdictions) continue to apply the Restatement as the applicable choice of law rules." (citing *Gov't of the U.S.V.I. v. Takata Corp.*, 67 V.I. 316, 426 n.449 (Super. Ct. 2017)).[45] Third, only the PIMCO Defendants press the argument that New York law governs. The BlackRock Defendants did "not concede that Virgin Islands substantive law governs Plaintiffs' tort claims[,]" but "reserve[d] all rights to assert at a later time that some or all of Plaintiffs' claims are governed by other laws." (BlackRock Mot. 31 n.18.) Whether New York law governs some or all of the Plaintiffs' claims can be addressed at a later date, when fully briefed by all parties rather than addressing it solely with respect to the PIMCO Defendants at this point.

The last interest to consider is the Virgin Islands' connection to the litigation. *Cf. In re: St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 19 at *13 (public factors include "'local interest in having localized controversies decided at home . . . and the unfairness of burdening citizens in an unrelated forum

---

[45] *Takata* did not state that Virgin Islands courts continue to apply the restatements. Instead, *Takata* addressed, first, the different positions of the parties. *See Takata*, 67 V.I. at 425-26. The court then pointed out that a *Banks* analysis was necessary, *see id.* at 426-27, but in a footnote—the footnote the PIMCO Defendants cite—the court criticized the parties for failing to conduct a *Banks* analysis. *See id.* at 426 n.449 ("In support of their arguments regarding the applicable choice of law rules in the Virgin Islands, the parties rely on a variety of sources, including, *inter alia*, case law or secondary materials that involve mechanistic applications of the Restatement (Second) of Conflicts of Law *in violation of Banks* . . . ." (emphasis added)). Contrary to the PIMCO Defendants' assertion, *Takata* did not state that Virgin Islands courts continue to apply the Restatement rule.

with jury duty.'" (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 180 (3d Cir. 1991)); *see also id.* at *14-15 ("The private interest of the litigant factor involves the plaintiff's choice of forum."). The Defendants contend that the Plaintiffs' choice of the Virgin Islands is not entitled to any weight because most Plaintiffs are not located in the Virgin Islands. (*See* PIMCO Mot. 14 ("The majority of the named Plaintiffs are not Virgin Islands residents and thus their preference is immaterial."); BlackRock Mot. 15 ("'Finally, 'where the plaintiff does not reside in the chosen forum, the court is entitled to be far less deferential toward its choice in conducting a forum non conveniens analysis.'" (citation omitted)).) But once the Court granted the Plaintiffs' motion for leave to file a second verified amended complaint, Altisource became a party-plaintiff. While the Shareholder Plaintiffs dispute the Defendants' assertion that this is merely a shareholder derivative action, it is worth noting that, if Defendants prevail on this point, the remaining plaintiff would be Altisource. Altisource's choice of forum would matter since Altisource is organized under Virgin Islands law and has its principal place of business on St. Croix. The Defendants' arguments about the Plaintiffs' insufficient connection to the Virgin Islands is not compelling.

Turning to the "locus of the alleged culpable conduct . . . and the connection of the conduct to the Plaintiffs' chosen forum[,]" *In re: St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 19 at *16, the Defendants claim the Virgin Islands is not the right forum because the alleged acts of misconduct occurred elsewhere. Here, they stand on firmer footing. Virgin Islands jurors would be called to hear and judge the facts of a dispute that happened elsewhere – among bankers and investors in New York, at a meeting in California, via Twitter from Washington, D.C. But jurors in Delaware would have even less of a connection than jurors in the Virgin Islands. No one points to any conduct in Delaware. Much is alleged to have taken place in New York, however, which is also where several Defendants have offices. Presumably, New York was also the base of operations for the conspiracy. BlueMountain is alleged to

have engaged in put options with the intent of "driving OCN and related companies out of business by driving down the price of their stock so that industry participants would no longer view those companies as viable." (Compl. ¶ 85.) BlueMountain is also located in New York. (*See* BlackRock Mot., Ex. J.[46]) By contrast, Sealink Funding, Ltd. is based in Ireland. *See id.* at Wilhite Decl., Ex. 3. KORE allegedly "stepped up the attack on Ocwen when its principal, Gary Kosinski, leveled the false and outrageous accusation . . . to a leading MBS investor . . . that Ocwen was engaged in 'criminal behavior.'" (Compl. ¶ 109.) And KORE is based in Florida. (*See* Pls.' Opp'n, Ex. 48 (Boyton Beach, Fl, principal place of business).) Gibbs & Bruns is based in Texas. (*See* Compl. ¶ 87.) Clearly, New York has more of a connection than Delaware.

However, even though New York may have a strong connection to this lawsuit—certainly more than Delaware does—it cannot be said that the Virgin Islands has no connection. Altisource is a Virgin Islands corporation with its headquarters in Frederiksted, which opened on December 11, 2012, (Pls.' Opp'n, Ex. 29), just before the Plaintiffs contend the "pattern of criminal activity" began. (*See* Compl. ¶ 82 ("Faced with Ocwen's rejection of the Defendants' aggressive foreclosure policy, as detailed below, from at least *as early as 2013* through at least as late as 2016, Defendants participated in an "association-in-fact" enterprise that engaged in a pattern of criminal activity in violation of CICO, 14 V.I.C. § 600 *et seq.*" (emphasis added)).) Ocwen USVI was part of the December 2012 opening in Frederiksted. (*See* Pls.' Opp'n, Ex. 29.) While percentages were not stated, Ocwen USVI and Altisource were, combined, expected to bring "at least 70 new jobs within the next two years . . . ." *Id.* According to the Plaintiffs, those jobs evaporated.

> Defendants' misconduct caused Virgin Islanders to lose jobs and suffer lost job opportunities. In two years after Ocwen's operations were established in the USVI, Ocwen USVI had approximately eighty-five employees, the vast majority of whom were longtime

---

[46] BlueMountain Capital Management, LLC was acquired by Assured Guaranty, Ltd. in October 2019, and renamed as Assured Investment Management, LLC. It maintains offices in New York and London.

> residents of St. Croix, and who collectively were earning millions of dollars in compensation and benefits. Given Ocwen's rapidly increasing mortgage portfolio, significant additional job growth in the USVI was expected. Additionally, Altisource USVI anticipated adding more than fifty St. Croix-based professionals. Instead of realizing this job growth in the USVI, Defendants crippled Ocwen/Altisource, causing Ocwen USVI's presence and employee workforce in the Territory to shrink and Altisource's USVI's growth to stagnate.

(Compl. ¶ 64.) This is a connection between the Virgin Islands and this litigation. Further, as beneficiaries if the Virgin Islands Economic Development Program, Ocwen USVI and Altisource agreed to provide educational assistance to residents of the Virgin Islands, *see* 29 V.I.C. § 708(m), to purchase goods from, and use the services of, business in the Virgin Islands, *id.* § 708(h), to establish a donated leave policy for their employees, *see id.* § 708(s), among other conditions – all in exchange for tax benefits.

The impacts of the Defendants' alleged misconduct on Altisource and Ocwen USVI, and the alleged ripple effects on the Territory, are valid consideration. *Cf. Ex parte Sawyer*, 892 So. 2d 898, 904 (Ala. 2004) (*per curiam*) ("This Court has previously held that litigation should be handled in the forum where the injury occurred."); *Cradle Soc. v. Adopt Am. Network*, 904 N.E.2d 1137, 1144 (Ill. Ct. App. 2009) ("Cradle chose to bring this cause of action in its home state, where some of the witnesses reside, where it relied on the alleged misrepresentations, and where the ultimate economic injury was felt. It cannot be said that no reasonable person would adopt the position taken by the court."); *see also Petra Sys., Inc. v. Everest Nat'l Ins. Co.*, 70 V.I. 409, 429 (Super. Ct. 2019) ("While the Policy was handled, negotiated, and delivered in New Jersey, the cause of action arose due to damaged property in the U.S. Virgin Islands, which impacts the people of the U.S. Virgin Islands."). Virgin Islanders lost jobs and job prospects. (*See*. Compl. ¶ 64.) Altisource and Ocwen USVI suffered reductions in revenue, which may have impacted their ability to provide education assistance and may have reduced the business they, in turn, gave to other companies in the Territory. Further, Ocwen's MSRs "were assets of Ocwen USVI subject to taxation in the USVI and generated significant tax revenues here." (Sec. Ver. Am. Compl. ¶

56.) The Virgin Islands certainly has a connection to this action and trying it here is unlike the *St. Croix Seamen's Asbestos Cases*, where multiple plaintiffs, none of whom lived in the Virgin Islands, sued multiple companies claiming asbestos exposure, all but one of which (Hess Oil Virgin Islands Corporation ) were not Virgin Islands companies. *See* 1993 V.I. LEXIS 19 at *14-17. *Cf. Hefner v. Owens-Corning Fiberglas Corp.*, 659 N.E.2d 448, 454 (Ill. Ct. App. 1995) ("While the county where the injury occurred generally has a strong interest in the outcome of litigation, this general rule does not necessarily apply to cases involving complex products liability issues."); Clearly, this is not a situation where "[j]ury duty" would be "a burden . . . imposed upon the people of a community which has no relation to the litigation." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947).

Furthermore, while "the three *Gulf Oil* factors" are "highly relevant," courts can also "consider other relevant factors . . . ." *Evans-Freke*, 75 V.I. at 420. And here, the only factor that weighs in the Defendants' favor is that New York may be the location where most of the conduct occurred. But even that is not clear because this case does not involve a car accident, for example. It concerns a nationwide conspiracy to take down Ocwen and its affiliates with actors located all around the country. The Plaintiffs do not allege, for example, that PIMCO and BlackRock executives met in Manhattan with executives from BlueMountain, MetLife, AMI, and Sealink where they all hatched the plan to have Ocwen replaced. Perhaps this supposed plan was devised at the conference held in Las Vegas in January 2014. (*See* Compl. ¶ 89.) Or at PIMCO's offices in California in April 2014. *See id*. ¶ 91. Or perhaps, it was devised via phone calls, emails, and text messages. We simply do not know at this point where the alleged criminal enterprise was formed or where the participants operated from.

One other factor is relevant here, namely that the Defendants sought a dismissal, not a stay, and none agreed to waive any defenses in exchange, even after oral argument where the undersigned discussed the *Evans-Freke* decision and granted the parties leave to see if there might be any "daylight" between

them. (*See generally* Hr'g Tr. 73:17-74:16 (Mar. 3, 2023.) While the parties did meet and confer as directed, they restated their positions. (*See generally* Jt. Not. re. Staff Master's Mar. 6, 2023 Order 5, filed Mar. 18. 2023.) So, this factor is compelling, namely that the Defendants did not agree to forego any defense, including the statute of limitations or personal jurisdiction, in exchange for dismissal. *Accord In re: St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 19 at \*12 ("An agreement by all Defendants to submit to service of process in another jurisdiction, to waive the assertion of any limitation defenses and to agree to discovery will establish an adequate alternative forum."). PIMCO, for example, did not agree to waive any challenge to litigating in New York. Instead, PIMCO represented that Delaware or New York would be more convenient but without committing to forego any challenge to either jurisdiction. Similarly, while the BlackRock Defendants consented, through Ahrens, to jurisdiction in New York or Delaware, they too did not agree to waive any limitation defenses or even agree to discovery. If the Court were to dismiss this action now, five years after it was commenced, the Plaintiffs' claims may be blocked.

In New York, civil conspiracy is not an independent tort so "[t]he statute of limitations for civil conspiracy is that of the underlying tort, meaning that a Plaintiffs' tort claims must be viable and timely in order for those claims to form the basis for a civil conspiracy cause of action." *DeCarlo v. Nat'l Football League*, 2017 NY Slip Op 30165(U), ¶ 4 (Sup. Ct.). And the statute of limitations in New York for prima facie tort is one year. *See, e.g.*, *Havell v. Islam*, 739 N.Y.S.2d 371, 372 (App. Div. 2002). Generally speaking, the statute of limitations cannot be tolled in New York if the underlying claim is based on a contract. *See ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 628 (N.Y. 2015) ("New York does not apply the 'discovery' rule to statutes of limitations in contract actions "). In reality, the issue may be more nuanced than that. But the overall concern is still valid. *See Evans-Freke*, 75 V.I. at 418-19 ("[A] court applying section [4905] may consider factors such as the substantive law of the other jurisdiction, or whether the party seeking dismissal on *forum non*

*conveniens* grounds has agreed to waive the statute of limitations and other defenses that would preclude a merits adjudication in the other jurisdiction.").

Plaintiffs can bring a civil RICO claim in New York courts. *See Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). But they also could have brought a civil RICO claim in this lawsuit and chose not to. Instead, they asserted a CICO claim. And it is not entirely clear that they would be able to assert a Virgin Islands statutory cause of action in a New York court. *Cf. Bradford Elec. Light Co. v. Clapper*, 286 U.S. 145, 160 (1932) ("Thus, a plaintiff suing in New Hampshire on a statutory cause of action arising in Vermont might be denied relief because the forum fails to provide a court with jurisdiction of the controversy; or because it fails to provide procedure appropriate to its determination; or because the enforcement of the right conferred would be obnoxious to the public policy of the forum; or because the liability imposed is deemed a penal one . . . ." (citations omitted)); *see also id.* ("A State may, on occasion, decline to enforce a foreign cause of action. In so doing, it merely denies a remedy, leaving unimpaired the plaintiff's substantive right, so that he is free to enforce it elsewhere."). *But cf. Franchise Tax Bd. v. Hyatt*, 578 U.S. 171, 179 (2016) ("We have since abandoned that approach, and we continue to recognize that a State need not 'substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'" (quoting *Franchise Tax Bd. v. Hyatt*, 538 U.S. 488, 496 (2003) (citing, *inter alia*, *Clapper*). While this area of the law is complex, involving nuanced with the Full Faith and Credit Clause (complicated, potentially, further by Territories not being States), it suffices to say that it is not clear, contrary to what the Defendants contend, that New York would entertain the Plaintiffs' CICO claims. (*Cf.* Hr'g Tr. 78:9-25 (Mar. 3, 2023).) Given that that CICO is at least quasi-penal in nature, and further that this entire case is premised on a conspiracy, the Plaintiffs may not be able to plead all their claims in a New York court. (*See* PIMCO Mot. 28 ("New York law 'does not contain a provision permitting a private civil cause of action' under its racketeering statute." (citing *Eviner v. Eng*, No. 13-CV -6940, 2015 WL

4600541, \*11 (E.D.N.Y. July 29, 2015).) *See also Islamic Republic of Iran v. Pahlavi*, 467 N.E.2d 245, 249 (N.Y. 1984). This factor, while not one of the *Gulf Oil* factors, is compelling.

### iii. Conclusion

For the reasons given above, the undersigned concludes, and recommends that the Court find, that the Defendants' motions to dismiss on *forum non conveniens* grounds be denied without prejudice. Delaware is the only jurisdiction where all seven named Defendants would be amenable to process, but Delaware has less of a connection to this lawsuit than the Virgin Islands. "Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil Corp.*, 330 U.S. at 508-09. Delaware has no connection to this litigation other than the being the place of organization or incorporation of the Defendants.

New York does have a connection to this lawsuit, being the place where the majority of Defendants have offices and, presumably, where the misconduct occurred. And documents and witnesses may also be located in New York. But the location of documents and witnesses is not the only factor to consider. Recent improvements in procedure and technology allow for issuing subpoenas to other jurisdiction and for remote appearance at depositions. Documents are largely maintained electronically now and can be transported to or filed in the Virgin Islands through websites accessible from anywhere in the world. Thus, the increase in cost and expense previously associated with "conducting a lawsuit several hundred miles away from witnesses and the sources of proof" no longer equate automatically "to needless delay and inordinate expense." *In re: St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 19 at \*16. Further, there is a real risk that the Plaintiffs may lose one or more of the claims if the Virgin Islands were to dismiss and allow New York to assume jurisdiction. Finally, given that all the Defendants seek dismissal, not a stay, and that none of the Defendants agreed to forego any defense in exchange for a dismissal, the undersigned cannot conclude (or recommend that the Court find) that the Defendants have met the

"substantially higher showing . . . required for . . . dismissal without a stay . . . ." *Evans-Freke*, 75 V.I. at 420.

## C.     Failure to State a Claim for Relief

In addition to challenging the Superior Court's personal jurisdiction and the convenience of the Virgin Islands as the proper forum for this action, the Defendants also challenge the sufficiency of the Plaintiffs' complaint. The Defendants first challenged the Shareholder Plaintiffs' ability to assert claims individually, particularly after Altisource became a party-plaintiff. The Defendants next argue that the common law claims, i.e., all claims except the CICO claims, are time barred. And finally, the Defendants argue that all eight counts were insufficiently pled in part because the complaint fails to allege fraud with particularity, and thus fail to state claims upon which relief could be granted.

### i.  Legal Standard

The Virgin Islands is a notice pleading jurisdiction. *See Mills-Williams v. Mapp*, 67 V.I. 574, 585 (2017). Therefore, Virgin Islands courts "'generally decline[] to enter dismissals of cases based on failure to allege specific facts which, if established, plausibly entitle the pleader to relief.'" *Id.* (citation omitted). Nonetheless, "[a] complaint that 'fails to state a claim upon which relief can be granted' may be dismissed by motion." *Oliver v. Terminix Int'l Co.*, 73 V.I. 210, 214 (Super. Ct. 2020) (brackets and citation omitted). Such a "motion tests the sufficiency of the complaint." *Id.* In evaluating sufficiency, "the court does not address the merits. Instead, the court must assume the truth of the allegations in the complaint and ask whether the allegations state a cause of action and give the defendants sufficient notice to be able to defend." *Id.*

Generally, courts cannot look outside the four corners of the complaint in evaluating its sufficiency. *See* V.I. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary

judgment … ."). For example, "'[b]ecause the statute of limitations is an affirmative defense involving issues of fact, it typically cannot be decided on the pleadings alone.' But 'where the facts are so clear that reasonable minds cannot differ, the commencement period may be determined as a matter of law.'" *Oliver*, 73 V.I. at 214 (citations omitted). Likewise, even though claims sounding in fraud must be plead with particularity, "courts 'considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice pleading.' 'Rule 9(b) must not be read to abrogate Rule 8(a) requiring notice pleading.'" *Gov't of the V.I. v. The ServiceMaster Co., LLC*, 72 V.I. 114, 152 (Super. Ct. 2019) (citations omitted).

Further, courts have also recognized that "'[l]egal labels characterizing a claim cannot, standing alone, determine whether it fails.'" *Arno*, 71 V.I. at 500 (ellipsis and citation omitted). Courts must also grant leave to amend unless granting leave would be futile. *Cf. Fleming*, 62 V.I. at 717 n.12. "Even if a complaint is vague, inartfully drafted, a bare-bones outline, or not a model of specificity, the complaint may still be adequate so long as it can reasonably be read as supporting a claim for relief, giving the defendant notice of that claim." *Basic Servs.*, 71 V.I. at 660 (quotation marks and citation omitted)."Importantly, 'the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to present evidence to support the claims.'" *Grisar v. Am. Fed. of Teachers*, 73 V.I. 491, 495 (2020) (brackets and citation omitted). Instead, "[t]he basic purpose of a motion to dismiss is to test the legal sufficiency of the complaint to state an actionable claim, not to test the truth of the facts alleged in the complaint." *Arno*, 71 V.I. at 495 (ellipsis and citation omitted). A motion to dismiss for failure to state a claim for relief is

> typically used in one of three situations: (1) the allegations in the complaint are so insufficient that the pleader has stated no claim for relief; (2) the pleader has alleged sufficient facts to state a claim for relief but has also alleged facts that disclose a bar to the suit or claim (such as when the complaint establishes a statute-of-limitations defense); and (3) the pleader has made an allegation that is not recognized in the law as a basis for recovery.

*Id.* (citation omitted).

Here, the Defendants' arguments implicate all three bases. They contend that the allegations are insufficient such that no claims have been stated. They contend that the complaint discloses a bar to the entire lawsuit, i.e., lack of standing, as well as to certain claims, i.e., statute of limitations. Each will be discussed in turn, beginning with standing.[47]

### ii. Arguments and Analysis

### 1. Shareholder Plaintiff Standing

Under Virgin Islands law, "'standing, like mootness, functions in the courts of the Virgin Islands as a claims processing rule that is subject to waiver should the party asserting the issue fail to raise it in a timely manner.'" *Hess Oil V.I. Corp. v. Fluor Daniel*, 72 V.I. 676, 697 (Super. Ct. 2020) (quoting *Benjamin v. AIG Ins. Co. of P.R.*, 56 V.I. 558, 564-65 (2012)). Here, the Defendants timely raised questions of standing because they included it as a ground for dismissal in their initial motions to dismiss and renewed it in subsequent motions.

Raising standing in a pre-answer motion may not be proper, however, because "'standing'—as that concept is understood in federal constitutional law—does not exist in any form in Virgin Islands courts." *United Corp. v. Hamed*, 64 V.I. 297, 304 (2016). Instead, standing under Virgin Islands law asks "whether the party bringing suit ha[s] a right to the relief it [is] seeking. This, of course, goes to the merits of the cause of action—not the Superior Court's authority to hear the case in the first place." *Id.* (citing *Hamed*, 63 V.I. at 533 n.2); *accord Fluor Daniel*, 72 V.I. at 697 ("Thus, standing in the Virgin Islands challenges whether a plaintiff has stated a claim for relief.").

---

[47] The Defendants had argued that the Shareholder Plaintiffs failed to comply with Rule 23.1 of the Virgin Islands Rules of Civil Procedure. These arguments were withdrawn once Altisource was realigned as a party-plaintiff. (*See generally* Jt. Not. re: Staff Master Mar. 6, 2023 Order 3-4.)

Since standing, like mootness and other federal constitutional doctrines, are claims-processing rules in the Virgin Islands, the rule that governs a motion to dismiss for lack of standing is not Rule 12(b)(1), lack of subject-matter jurisdiction, but rather "Rule 12(b)(6), failure to state a claim for relief, Rule 12(c), judgment on the pleadings, or Rule 56, summary judgment."

*Fluor Daniel*, 72 V.I. at 697 (quoting *Stanley v. V.I. Bureau of Corr.*, 72 V.I. 657, 665 (Super. Ct. 2020)).

Here, the Defendants moved to dismiss the Shareholder Plaintiffs under Rule 12(b)(6), arguing that "[t]he principal injury alleged here is to the corporation, not the individual Plaintiffs as stockholders, and thus [the Shareholder] Plaintiffs lack standing to sue as individuals." (BlackRock Mot. 23.) The problem is that the Shareholder Plaintiffs alleged in the complaint that they suffered damages. (*See* Compl. ¶ 22 ("Throughout the relevant time period, Shareholder Plaintiffs were owners of shares of OCN, Altisource USVI and other publicly-traded related companies, and suffered damages as a result of Defendants' misconduct.."); *id.* ¶ 127 ("As a direct and proximate result of Defendants' criminal activity and violations of 14 V.I.C. § 605(a), Shareholder Plaintiffs suffered significant indirect injury, including *but not limited to* lost value of their stock holdings." (emphasis added)); *id.* ¶¶174, 179 ("As a direct and proximate result of the outrageous actions of Defendants, Shareholder Plaintiffs suffered damages in an amount to be proven at trial.").) The Shareholder Plaintiffs allege damages that are not limited solely to owning Ocwen or Altisource stock. And these allegations, like all other allegations, must be taken as true at this stage.

The Defendants invoke a legal doctrine, the standing of a shareholder in a derivative action to recover individually, to defeat the complaint. But under Virgin Islands law, standing cannot be invoked in this way. As one Superior Court judge explained regarding mootness, another claims-processing rule, it is "'akin to an affirmative defense." *Stanley*, 72 V.I. at 668-69 (ellipsis omitted) (quoting *St. Croix Avis v. W. Ind. Co., Ltd.*, 71 V.I. 39, 49 (Super. Ct. 2019)). "The Court reasoned that 'mootness is akin to, not identical to, an affirmative defense' because 'it is not proven. Instead, mootness results from changes that

occur during litigation, a change in the circumstances that prevailed at the beginning of litigation.'" *Id.* at 669 (brackets omitted) (quoting *St. Croix Avis*, 71 V.I. at 49). Whereas mootness concerns something that occurs while the case is pending, standing concerns events that precede the filing of the case. *Cf. Duncan v. Gov. of the V.I.*, 48 F.4th 195, 204 (3d Cir. 2022) ("Standing looks to whether a live controversy exists 'at the start of litigation,' while mootness examines whether 'some development' occurred during the litigation such 'that there is no longer a live controversy.'" (brackets and citation omitted)). However, as with any other defense that seeks to bar a claim, it is rarely successful on a pre-answer motion. *Cf. United Corp.*, 64 V.I. at 306 ("Because 'the statute of limitations is an affirmative defense' involving issues of fact, it typically cannot be decided on the pleadings alone." (citation omitted)).

The Defendants lean on the legal doctrine that "[t]he principal injury . . . is to the corporation, not the individual . . . stockholders," (BlackRock Mot. 23), to assert that the Shareholder "Plaintiffs cannot evade the rules governing derivative litigation by artful pleading." *Id.* But in a notice pleading jurisdiction like the Virgin Islands, it is unclear how a defendant, on a pre-answer motion, could ever contradict the allegations of a complaint by, in essence, simply denying it. In other words, the Defendants dispute that the Shareholder Plaintiffs incurred individual damages separate and apart from the damages they incurred by owning Altisource stock. They dispute the Shareholder Plaintiffs' allegations because they them to be legally insufficient. But the Virgin Islands Supreme Court has not addressed pleading standards with respect to shareholder derivative actions and the authority the Defendants do rely on is not helpful. *Cf. id.* at 24 ("Although the Virgin Islands Supreme Court has not ruled on this specific issue, it is well established in that 'a stockholder of a corporation may not recover for damages to an individual which are derived from an injury to the corporation.'" (cleaned up) (quoting *Pemberton Sales & Serv., Inc. v. Banco Popular de P.R.*, 877 F. Supp. 961, 965 (D.V.I. 1994) (remaining citations omitted)). In fact, several problems surface on further inspection.

First, *Pemberton Sales* relied on federal precedent, not Virgin Islands law, for its holding. *See* 877 F. Supp. at 965 n.8 (citing *Pitchford v. Pepi, Inc.*, 531 F.2d 92, 96-97 (3d Cir. 1975), *cert. denied*, 426 U.S. 935 (1976); *Temp-Way Corp. v. Continental Bank*, 139 B.R. 299 (E.D. Pa. 1992)); *see also id.* at 965 (discussing *Temp-Way Corp.*). And *Pitchford* involved the Clayton Act. *See* 531 F.2d at 95 n.1 ("The causes of action were based on section 1 of the Sherman Act, 15 U.S.C. § 1 (1970), and section 3 of the Clayton Act, 15 U.S.C. § 14 (1970)."). It was on this basis that the Third Circuit in *Pitchford* reversed the damages awarded to the plaintiff individually, concluding that he lacked standing. *See id.* at 98 ("Mr. Pitchford is without standing to sue as an individual, and all portions of the judgment granting recovery to Mr. Pitchford personally must be reversed."); *see also id.* at 97 ("This Court has adopted the precept that 'the language in section 4 of the Clayton Act does not include indirect harm that the individual may have suffered as a stockholder through injury inflicted upon the corporation.'" (brackets and footnoted citation omitted)). *Temp-Way* also based its conclusion—"that a stockholder, director, officer or employee of a corporation has no personal or individual right of action against third persons for damages that result indirectly to the individual because of an injury to the corporation[,]" 139 B.R. at 316-17—on federal precedent. *See id.* at 317 (citing *Pitchford*, 531 F.2d at 97; *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970); and *Nagle v. Comm. Credit Business Loans Inc.*, 102 F.R.D. 27, 29 (E.D. Pa. 1983)).

Second, and more importantly, all of the cases just discussed resolved questions over standing on the merits, after discovery had occurred. *Temp*-Way concluded, after "[t]he case [had been] tried over ten days," *Temp-Way Corp.*, 139 B.R. at 303, that the stockholders, the Spellmans, had standing as to some claims but not others. *See id.* at 317. *Pitchman*'s conclusion that the individual plaintiff lacked standing appears to have been raised for the first time on appeal. *See generally* 531 F.2d at 95 ("The manufacturer brings this appeal, asserting a series of contentions concerning the standing of the officer to sue . . . ."). There was no discussion in *Pitchman* about standing having been waived or preserved for appeal, and no

discussion of how the trial court ruled on the issue. Given that standing in federal courts is jurisdictional, it could be raised on appeal. But the individual plaintiff's standing to sue was decided after a jury had already found in his favor. *See id.* at 96 ("Trial began on February 26, 1974 . . . $72,000 was awarded Mr. Pitchford for substantially the same violations [as the corporate plaintiffs] . . . ."). And *Pemberton Sales* decided standing on a motion for summary judgment. *See* 877 F. Supp. at 963 ("Reference is hereby made to defendant's motion to dismiss the corporate plaintiff, dated April 4, 1994. Reference is also made to defendant's motion for summary judgment with regard to all of plaintiffs' claims, as well as, for summary judgment upon its own counterclaim, dated July 25, 1994."). Other authorities the BlackRock Defendants rely on address standing in a similar way, e.g., *Gassett v. Nissan N.A.*, 877 F. Supp. 974 (D.V.I. 1994), and *Kramer v. W Pac. Indus., Inc.*, 546 A.2d 348 (Del. 1988), with each addressing standing on summary judgment. *See Gassett*, 877 F. Supp. at 975; *Kramer*, 546 A.2d at 349..

Not all of the cases the BlackRock Defendants cited decided standing on the merits, however. Other cases, e.g., *Diva's Inc. v. City of Bangor*, 411 F.3d 30 (1st Cir. 2005), and *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243 (Del. 1999), did address standing at the pleading phase. *Diva's* involved a motion to dismiss claims under section 1983 of title 42 of the United States Code and, for that reason, is distinguishable on its facts. *Parnes* involved a motion for judgment on the pleadings. *See* 722 A.2d at 1244. However, even *Parnes* pointed out that "[s]tockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek relief for direct injuries that are independent of any injury to the corporation." *Id.* at 1245.

The cases cited by the PIMCO Defendants fare no better. *Turnbull v. Parker*, which the PIMCO Defendants rely on for the general assertion that, "'[i]n a derivative action, the corporation is the real party in interest to whose benefit any relief granted by the trial court flows[,]'" (PIMCO Mot. 16 (quoting *Turnbull v. Parker*, No. ST-11-CV-429, 2011 WL 4703040, *2 (V.I. Super. Ct. July 20, 2011)), is

unavailing. First, standing was not mentioned in *Turnbull* and the concerns about "the real party" were raised because the plaintiffs had failed to obtain and serve process on the corporation. *See Turnbull*, 2011 WL 4703040 at *3 ("[T]he Plaintiffs must properly serve the nominal defendant V.I. Taxi Association, Inc. before this matter can proceed."). The PIMCO Defendants also cite to *Romney v. Thomas* for support because "[f]orm does not trump substance."(PIMCO Mot. 23 (citing *Romney v. Thomas*, No. CV 339/98, 2000 WL 36724498, *1 (V.I. Terr. Ct. May 18, 2000)).) But, while *Romney* did acknowledge the general rule, that "'an action enforces a corporate right if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual shareholders[,]'" *Romney*, 2000 WL 36724498 at *1 (quoting *Sax v. World Wide Press. Inc.*, 809 F.2d 610, 613 (9th Cir. 1987)), *Romney* also acknowledged that "'[a] direct action can be brought either when there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, or when the shareholder suffers injury *separate and distinct* from that suffered by other shareholders.'" *Id.* (quoting *Sax*, 809 F.2d at 613) (emphasis added).

Third, and perhaps most importantly, rules regarding derivative actions and stockholders' standing to sue were "an invention of equity as a form of 'representative' action." 12B Fletcher Cyc. Corp. § 5908 (Sept. 2022). Equity and common law are, of course, different.[48] But for purposes of judge-made rules, whether governed, historically, by equity or common law, a *Banks* analysis is required now under Virgin Islands law in the absence of binding precedent. *Cf. Cuneo v. Champlin Ref. Co*, 62 P.2d 82, 86 (Okla. 1936) ("Estoppel is an instrumentality recognized in equity for the protection of persons who would be injuriously and unconscionably affected by the assertion of a claim contrary to a position previously taken

---

[48] *Cf.* Joseph T. Gasper, II, *Too Big to Fail:* Banks *and the Reception of the Common Law in the U.S. Virgin Islands*, 46 Stetson L. Rev. 295, 300 n.19 (2017) ("'Common law has several meanings, depending upon the context in which it is used. It sometimes refers to judge-made as distinct from statute law. It may also connote the law historically administered by the royal common law courts of England (King's Bench, Common Pleas, and Exchequer), rather than the equity courts (the Court of Chancery and the prerogative courts). The term is occasionally used as well in contradistinction to civil or canon law.'" (citation omitted)).

by a party to be estopped."); *see Sarauw v. Fawkes*, 66 V.I. 253, 260-65 (2017) (conducting a *Banks* analysis on judicial estoppel); *see also 3RC & Co. v. Boynes Trucking Sys.*, 63 V.I. 544, 551-52 (2015) (conducting a *Banks* analysis to determine the proper injunction standard). No one conducted a *Banks* analysis to determine the soundest rule for the Virgin Islands, specifically whether to recognize the distinction between derivative and direct actions or to hold stockholders are barred from seeking relief if their derivative complaint includes direct claims.

With respect to the CICO count specifically, the Plaintiffs point to persuasive precedent holding that "CICO claims 'need not be brought as a derivative action . . . .'" (Pls.' Opp'n 50 (quoting *Cameron v. Rohn*, Civ. No. 10-126, 2012 WL 511443, *13 (D.V.I. Feb. 14, 2012)).) *Cameron* concluded that "minority members of an LLC [could] bring[] suit against the controlling owners of that entity, even for claims directly harming the LLC." 2012 WL 511443 at *13. The court based its reasoning on "the plain language of the act," which provides that "'[a]ny person, *directly or indirectly*, injured by conduct constituting a violation by any person of the provisions of CICO shall, in addition to any other relief under this section, have a cause of action. *Damages under this section shall **not** be limited to distinct injury*." *Id.* (brackets and ellipses omitted) (quoting 14 V.I.C. § 607). The District Court of the Virgin Islands continues to follow *Cameron*. *E.g.*, *Helman v. Marriott Int'l, Inc.*, No. CV 2019-36, 2022 WL 3444931, *12 (D.V.I. Aug. 17, 2022) ("The only significant difference between the language of the two statutes is the fact that a plaintiff seeking to recover under CICO need not prove that he was directly injured by a defendant's conduct; a showing of indirect injury will suffice." (citing *Cameron*, 2012 WL 511443 at *8-13)). Although *Cameron* is not binding on the Superior Court, it is directly on point and does align with Virgin Islands law. *Cf. Gumbs v. People*, 59 V.I. 784, 798 (2013) ("[I]f the "statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive.' Further, 'if the

statutory language is clear, a court must give it effect unless this will produce a result demonstrably at odds with the intention of the drafters.'" (citations and brackets omitted)).

Given the absence of binding precedent, and recognizing the approach in *Pitchford*, *Pemberton Sales*, *Temp-Way*, *Gassett*, and *Kramer* – the undersigned concludes (and recommends that the Court find) that the Defendants' motion to dismiss based on the Shareholder Plaintiffs' lack of standing should be denied without prejudice. The Defendants can reassert standing on summary judgment. Standing need not be pled in an answer. *Cf. Gerace v. Bentley*, 2022 VI Super 78, ¶ 31 ("'[A] defense which points out a defect in the prima facie case is not an affirmative defense. These defenses are sometimes referred to as negative defenses because they are simply an attack on a party's prima facie case.'" (citation and brackets omitted)). But at this juncture, considering that this is a notice pleading jurisdiction, and given that the Shareholder Plaintiffs do allege that they suffered direct and indirect injury as a result of the Defendants' alleged misconduct, the safer course is to reject the Defendants' standing challenge. This is not an instance where the "'complaint so clearly reveals the existence of a defense'" that it warrants denying the plaintiff an opportunity to obtain discovery. *United Corp.*, 64 V.I. at 306 (citation omitted). Again, "'the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to present evidence to support the claims.'" *Grisar*, 73 V.I. at 495 (brackets and citation omitted).

### 2. Statute of Limitations

The Defendants also contend that Counts III through VII, i.e., both prima facie tort claims, both civil conspiracy claims, and the intentional interference claims, are barred by the statute of limitations. They assert that "a two-year statute of limitations applies to each of these Counts." (PIMCO Mot. 25.) "All of Plaintiffs' claims arise out of conduct alleged to have occurred in 2013, 2014, and 2015. The Complaint was not filed until April 2018, three years later, and thus the tort and conspiracy claims are all time-barred[,]" they argue. (BlackRock Mot. 31.) Plaintiffs disagree, explaining that they alleged "that

Defendants' conduct continued through at least 2016 and that (i) Plaintiffs did not discover the intentionally fraudulent nature of Defendants' conduct until as early as mid-2016, and (ii) Defendants actively concealed their wrongdoing." (Pls.' Opp'n 61.)

"Because 'the statute of limitations is an affirmative defense' involving issues of fact, it typically cannot be decided on the pleadings alone." *United Corp.*, 64 V.I. at 306 (quoting *Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 536 (2015)). This is because the "statute of limitations is typically an affirmative defense which defendant must plead and prove[.]" *Rennie*, 62 V.I. at 536 (citation omitted). In some instances, "a defendant may raise a limitations defense in a motion to dismiss. For the defendant to prevail, though, the plaintiff's tardiness in bringing the action must be apparent from the face of the complaint." *Id.* at 536 n.3 (quoting *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 105 n.13 (3d Cir. 2010)).

In opposition, the Plaintiff invoked the discovery rule. "'The discovery rule tolls the statute of limitations when, despite the exercise of due diligence, the injury or its cause is not immediately evident to the victim.'" *Oliver*, 73 V.I. at 215 (quoting *Santiago v. V.I. Hous. Auth.*, 57 V.I. 256, 273 (2012)). "Because the application of the discovery rule rests on when a party knew or should have known of its injury, it is typically a question of fact." *United Corp.*, 64 V.I. at 306. As a result, it typically cannot be resolved on the pleadings because the discovery rule focuses "'not on the plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise of diligence, knowable to the plaintiff.'" *Id.* (quoting *Santiago*, 57 V.I. at 273). Furthermore, "determining whether the running of the statute of limitations is tolled by the discovery rule is for the Court to decide." *Oliver*, 73 V.I. at 216. In other words, a plaintiff "cannot plead the discovery rule in their complaints in an attempt to preempt a motion to dismiss." *Id.*

In *Oliver*, a Superior Court judge rejected an attempt by the plaintiffs to preempt a statute of limitations defense. *See id.* Three individuals sued a local pesticide company and its parent company after

their home was treated and they became ill. *See id.* at 213-14. Two plaintiffs owned the home; the third was the son of the wife and lived there with his mother and stepfather. All three experienced some reaction to the pesticide treatment during the application, *see id.* at 213, and became ill, needing to vacate the premises roughly three weeks later. *See id.* The plaintiffs reached out to the pesticide company to learn what chemicals were used, sought medical help, and lodged a complaint with a government agency. *See id.* Two years and twenty-four days after the home was treated, the plaintiffs filed their complaint with the Superior Court. *See id.* at 217 ("Plaintiffs knew they were injured on May 27, 2016 and could have filed suit by May 27, 2018. The complaint, filed June 20, 2018, was filed more than two years after the negligence claim arose."). The Superior Court concluded that "the complaint so clearly reveals the existence of the statute of limitations defense," *id.*, that the court had to grant the defendants motion to dismiss the plaintiffs' negligence claims.

Unlike *Oliver*, this complaint does not reveal the existence of a statute of limitations defense. To be sure, like *Oliver*, the Plaintiffs cannot preempt a statute of limitations challenge by alleging in their complaint that they exercised due diligence. So, the Defendants do have a point, that "the alleged communications at the core of the[ Plaintiffs'] claims were 'publicized,' such that reasonable diligence [c]ould have identified any misrepresentations therein." (PIMCO Defs.' Reply. in Further Supp. of Mot. to Dismiss. Am. Compl. 28, filed Oct. 9, 2018.) "[T]he core of Plaintiffs' case is that Defendants engaged in a very public scheme to publish falsehoods about 'Ocwen/Altisource' in order to destroy Altisource." (BlackRock Reply 25-26.) But what the Defendants overlook is that the Plaintiffs' theory—as far as it appears to the undersigned—it is not that they (and Ocwen and its affiliate) were unaware of the misstatements. The complaint cites the June 28, 2013 letter sent by Gibbs & Bruns, a January 2014 publication also from Gibbs & Bruns, and a public assertion by Gibbs & Bruns in February 2014 that the firm was contemplating filing a suit against Ocwen. (*See* Compl. ¶¶ 87-90.) And the "Fraudulent Default

Notice" was dated January 23, 2015. *See id.* ¶ 100. All these events occurred more than two years before this action was commenced, on April 12, 2018. Again, however, what Plaintiffs seem to be claiming—so far as the undersigned understands—is they did not know the motivation behind these misstatements until about mid-2016. In other words, it was not until mid-2016 that the Plaintiffs first learned that the statements were not only incorrect, but they were also deliberately false.

Similarly, there is no question that Ocwen and its stockholders, including the Shareholder Plaintiffs, knew when Ocwen's stock price suffered. One share of OCN stock closed at $889.55 on October 25, 2013. By January 23, 2015, the date of the alleged "Fraudulent Default Notice," OCN closed at $95.25 a share.[49] Ocwen's stock dropped nearly $900.00 a share within 15 months. Clearly, Ocwen, Altisource, and the Shareholder Plaintiffs were aware—or through due diligence could have learned—about this drop in price.

But the Plaintiffs are not alleging that they did not know of the price drop. They also do not allege that they did not know, for example, that the January 23, 2015 "Fraudulent Default Notice" from Gibbs & Bruns was issued "on the same day that Ocwen entered into a consent order with the California Department of Business Oversight . . . ." *Id.* ¶ 29. Instead, what Plaintiffs are alleging is that they did not know that what seemed to be a coincidence was, in fact, "no coincidence." *Id.* ¶ 107. And they did not begin to see the bigger picture until "mid-2016." *Id.* ¶ 110. For example, in the January 23, 2015 letter, Gibbs & Bruns "claimed that Defendants and others had 'engaged a highly qualified non-agency servicing expert to analyze a massive amount of publicly available loan-level information,' whose conclusions allegedly demonstrated various servicing violations by Ocwen." *Id.* ¶ 102. Plaintiffs later learned through

> discussions with individuals in the financial industry from mid to late 2016 through 2018, including an individual who had direct conversations with the servicing expert, it has since

---

[49] Courts can take judicial notice "of closing stock prices." *Ravens v. Iftikar*, 174 F.R.D. 651, 661 (N.D. Cal. 1997) (quoting *SEC v Bilzerian*, 814 F. Supp. 116, 123 (D DC 1993), parenthetically); *see also In re Marriage of Brigden*, 145 Cal. Rptr. 716, 719 n.3 (Ct. App. 1978). The stock prices given about were taken from Yahoo! Finance.

been revealed that the data, assumptions and findings of the servicing expert had been intentionally manipulated to make it appear that they supported the enterprise's false conclusions.

*Id.* ¶ 103 (footnote omitted). Plaintiffs allege that they did not learn about this Connecticut-based manipulator, *cf. id.* ¶ 103 n.3, until, at the earliest, mid-2016. "Because the application of the discovery rule rests on when a party knew or should have known of its injury," *United Corp.*, 64 V.I. at 306, the undersigned cannot conclude that the Plaintiffs' tort claims are barred by the statute of limitations. When, precisely, the Plaintiffs first learned that something was amiss will be revealed in discovery. And whether the date when they knew is the same date when they should have known – that may have to be decided by a jury. But it cannot be determined on a pre-answer motion. Therefore, the undersigned concludes and recommends that the Defendants' motion to dismiss Counts III through VII based on the statute of limitations be denied.

### 3.  Rule 9(b) of the Virgin Islands Rules of Civil Procedure

The Defendants next argue that "[b]ecause every single Count . . . sounds in fraud, Plaintiffs must plead their allegations of fraud, including the falsity of the challenged statements, with particularly." (PIMCO Mot. 27 (citation omitted); *see also* BlackRock Mot. 28-29 & n. 17.) Plaintiffs raise three arguments in opposition. "First, none of Plaintiffs' claims are fraud claims and therefore at most only certain allegations are subject to Rule 9(b). Second . . . Rule 9(b) does not apply to the CICO statute, which contains its own standard for evaluating allegations of fraud." (Pls.' Opp'n 53.) And lastly, "'courts should apply Rule 9(b) with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.'" *Id.* (brackets omitted) (quoting *Fin. Tr. Co. v. CitiBank, N.A.*, 351 F. Supp. 2d 329, 331 (D.V.I. 2004).

Rule 9(b) of the Virgin Islands Rules of Civil Procedure provides that, "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge,

and other conditions of a person's mind may be alleged generally." The Virgin Islands Supreme Court has not had occasion to weigh the requirements of Rule 9(b) with Rule 8(a). But one Superior Court judge cautioned that "courts 'considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice pleading.' 'Rule 9(b) must not be read to abrogate Rule 8(a) requiring notice pleading.'" *ServiceMaster*, 72 V.I. at 152 (citations omitted). So, "courts do allow 'some leniency . . . for complex issues or transactions covering a long period of time.'" *Id.* (quoting *Elster v. Alexander*, 75 F.R.D. 458, 461 (N.D. Ga. 1977)). But Rule 9(b) does "demand[] that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (ellipsis and citations omitted). Because "in general, 'Rule 9(b) exists to eliminate general, unsubstantiated charges of fraud that can do damage to a defendant's reputation.'" *ServiceMaster*, 72 V.I. at 152 (citations omitted). "'A complaint that presents in detail the who, what, when, where, and how' of the alleged fraud has generally been held to comply with Rule 9(b)." *Id.* at 153 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 198 F.R.D. 560, 561 (N.D. Ga. 2000)).

The threshold question here, however, that must be answered first is whether Rule 9(b) applies at all and, if it does, to which of the Plaintiffs' claims. Technically, the BlackRock Defendants contend the Plaintiffs failed to plead their CICO claims with particularity. (*See* BlackRock Mot. 28 ("In addition to the above failings, Plaintiffs have failed to plead the fraudulent scheme at the heart of their CICO claim with particularity."); *see also id.* at 29 ("Plaintiffs allege no particularized facts supporting their CICO claims.").) However, the BlackRock Defendants also noted that "all Plaintiffs' claims. including the CICO claim, are based on fraud." *Id.* at 29 n.11. The PIMCO Defendants, by contrast, contend that all claims sound in fraud. Since the Plaintiffs did not point out the difference in the two motions and, instead, treated

them the same, the undersigned will as well. (*Cf.* Pls.' Opp'n 53 ("Throughout their motions, Defendants suggest that all of the allegations in the FAVC are subject to a heightened pleading standard under Rule 9(b).").)

The question remains, however, whether Rule 9(b) applies and, if it does, to which claims. Federal courts interpreting Rule 9(b) of the Federal Rules of Civil Procedure, from which the Virgin Islands' rule was borrowed, distinguish between complaints that sound in fraud and claims that sound in fraud. For example, the United States Court of Appeals for the Ninth Circuit explained that, while "Rule 9(b) applies to 'averments of fraud'[,]" "in cases in which fraud is ***not*** an essential element of the claim, Rule 9(b) applies, but only to particular averments of fraud." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (emphasis added). In other words,

> where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b). . . . In other cases, however, a plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct. In such cases, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements.

*Id.* at 1103-04 (citations and paragraph break omitted). Where allegations of fraudulent and non-fraudulent conduct are pled in a complaint, and fraud is not an element of any claim, the United States Courts of Appeal for the Ninth, Fifth, and Eight Circuits "disregard" or "strip" the (allegedly insufficient) allegations of fraud to see if the complaint still states a claim for relief. *See id.* at 1104-05 ("Two of our sister circuits have provided such an analysis, however, and we now join them . . . . Thus, if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim. The court should then examine the allegations that remain to determine whether they state a claim." (citing *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001);

*In re: NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997)). The United States Court of Appeals for the Fourth Circuit later adopted the same approach. *See Balt. Cty. v. Cigna Healthcare*, 238 F. App'x 914, 922 (4th Cir. 2007) ("We also reject this contention and conclude, as have our sister circuits, that in such circumstances only the fraud allegations of a complaint must satisfy the heightened pleading standards of Rule 9(b)." (citing *Vess*, 317 F.3d at 1104-05; *In re: NationsMart Corp.*, 130 F.3d at 315)).

The reason the federal appellate courts take this approach is because "Rule 9(b) refers to 'alleging fraud,' not to causes of action or elements of fraud." *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008); *accord* V.I. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). As the United States Court of Appeals for the Eleventh Circuit explained, "if a complaint were to state properly a claim for battery and fraud, the allegations surrounding the fraud claim would have to be stated with particularity whereas the allegations surrounding the battery claim would only need be stated in accordance with notice pleading standards." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006) As the Supreme Court of Indiana explained:

> The reasoning behind most of these decisions is that although fraud is not an element of the action, the action is nonetheless based on fraud. For example, a complaint under the 1933 [Securities] Act need not prove fraud to prevail, but the allegations in the complaint often accuse the defendant of knowingly, wilfully, or intentionally misrepresenting information. This type of action is "grounded in fraud" and Rule 9(b) applies for the same reason it applies in typical "averments of fraud."

*McKinney v. State*, 693 N.E.2d 65, 72 (Ind. 1998). Thus, the question here is not whether the "Plaintiffs' claims are fraud claims . . . ." (Pls.' Opp'n 53.) Rather, the question is whether this action is grounded in fraud.

There is no question that the Plaintiffs allege that the Defendants engaged in acts that were "intentionally unlawful", "criminal", "slander[ous]", "knowingly false," and "reckless". (*See* Compl. ¶¶ 9, 10.) The Plaintiffs also allege the Defendants engaged in a "willful and wanton scheme" and "a covert

criminal conspiracy[.]" *Id.* ¶ 1. And the Plaintiffs pepper the complaint with the words "fraudulent" and "fraudulently". *See, e.g., id.* ¶¶ 8, 9, 48, 82-84, 86-87, 123, & 136. Unfortunately, Rule 9(b) does not define the word "fraud" and the Virgin Islands Supreme Court has recognized a distinction "between actions for fraud or deceit—sounding in tort and seeking damages—and claims to void or rescind a contract where the claimant's assent was obtained through fraud—commonly called 'fraud in the inducement.'" *Wilkinson v. Wilkinson*, 70 V.I. 901, 907 (2019). Even though the Court addressed fraud as a tort claim and a contact claim, *see id.* at 914 (adopting elements of a fraud in the inducement claim); *see Love Peace*, 75 V.I. at 291 (adopting elements of a fraudulent misrepresentation claim), the Court has not defined fraud in a broad, catch-all context. And other courts have cautioned "that 'fraud has no all-embracing definition and is better left undefined lest crafty men find a way of committing fraud which avoids the definition.'" *Bardes v. Mass. Mut. Life Ins. Co.*, 932 F. Supp. 2d 636, 640 (M.D.N.C. 2013) (quoting *Ragsdale v. Kennedy*, 209 S.E.2d 494, 500 (N.C. 1974)); *see also XO Bistro, LLC v. Anthony Merrill & White Star, LLC*, No. ST-18-CV-780, 2021 V.I. LEXIS 58, *19 (V.I. Super. Ct. July 21, 2021) (same).

The reason why it matters here is because, if the definition the Virgin Islands Supreme Court adopted for fraud applies here, this action would not sound in fraud. The are not seeking to rescind a contract based on fraudulent misrepresentations of the Defendants. *Cf. Love Peace*, 75 V.I. at 288-28. Plaintiffs are also not seeking to recover damages for losses suffered from relying on misrepresentations of the Defendants. *Cf. id.* at 291 (adopting elements of tortious fraudulent misrepresentation claim). In *XO Bistro*, a Superior Court judge, after conducting a *Banks* analysis on fraudulent misrepresentation, acknowledged a minor rule "in cases where a third party relies on misrepresentations made by the defendant which harms the plaintiff . . . ." *XO Bistro*, 2021 V.I. LEXIS 58 at *18. "These states recognize a plaintiff may suffer damages even when the plaintiff does not directly rely on the representations from

the defendant to a third party. Courts from these states broadened the definition of fraud to adapt to the modern reality of fraudulent behavior." *Id.* at \*19 (citing *Bardes*, 932 F. Supp. 2d at 640). In following the minority approach, *XO Bistro* reasoned that

> a defendant should be held liable to those who may be foreseeably injured by their actions, particularly in those situations where it was intended to affect the plaintiff, and not only those a defendant speaks with. To hold otherwise would result in a legal lacuna and enable a tortfeasor to escape liability for their purposeful or reckless misrepresentations by simply using a third party as a conduit for their fraud. Particularly in the Virgin Islands, a relatively small community, where fraudulent misrepresentations against an individual may have the potential to tarnish their reputation and impede their efforts to earn a livelihood. The best approach for the Virgin Islands is to hold those who make misrepresentations to third parties to the detriment of the plaintiff liable

*Id.* at \*19-20.

*Love Peace* did not cite *XO Bistro* in its *Banks* analysis. But *XO Bistro* did involve different circumstances, namely misrepresentations made to others, not the plaintiff directly. *See generally id.* at \*15. Nonetheless, *XO Bistro*'s broader concerns about "broaden[ing] the definition of fraud to adapt to the modern reality of fraudulent behavior[,]" *id.* at \*19, is relevant here because the Plaintiffs' allegations resound with an "everyday" or common sense use of the word fraud. Plaintiffs are not, technically-speaking, asserting a claim that requires proof of fraud to recover. But they do contend that

> [t]his case is about a covert criminal conspiracy perpetrated by two of the largest, most powerful financial firms in the world . . . with the specific intent and purpose of gouging enormous profits from the forced foreclosures and confiscation of the homes of hundreds of thousands of struggling families all across the United States.

(Compl. ¶ 1.) This entire action sounds in fraud. It is only right that the Plaintiffs must comply with Rule 9(b).

The Plaintiffs, for the most part, do not disagree. While they do argue that "none of [their] claims are fraud claims and therefore at most only certain allegations are subject to Rule 9(b)[,]" (Pls.' Opp'n 53), they then assert that they "have more than met their Rule 9(b) obligations." *Id.* at 54. The undersigned largely agrees. As noted, our Supreme Court has not addressed the requirements of Rule 9(b) in light of

Rule 8(a). Federal courts, prior to the "heightened pleading standard" being announced, did, however, and those courts generally held that "'[a] complaint that presents in detail the 'who, what, when, where, and how' of the alleged fraud has generally been held to comply with Rule 9(b).'" *ServiceMaster*, 72 V.I. at 153 (quoting *Clausen*, 198 F.R.D. at 561). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re: Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (citation omitted). "'Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). "Despite Rule 9(b)'s stringent requirements . . . 'courts should be sensitive to the fact that application of the Rule prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *In re: Burlington Coat Factory*, 114 F.3d at 1418 (citations omitted). "Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *Id.* "But even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice." *Id.*

To be sure, the complaint is light (to say the least) on what the BlackRock Defendants, or any of them individually, did. The complaint says nothing, for example, about what BIM did, when BIM did it, or where BIM's officers and employees were when they acted to further the criminal conspiracy. In fact, the complaint does not name any officer or employee whose conduct led to this lawsuit. The same is true for the other BlackRock Defendants. Only PIMCO is alleged to have tried to coerce or bully Ocwen, through Mr. Erbey, into foreclosing on more properties, presumably in furtherance of the desire to cut losses and increase profits. And other than AMI's tongue-in-cheek tweet—on July 24, 2014, claiming no

Ocwen MSRs were harmed when AMI and others met with regulators, and on December 22, 2014, when AMI applauded New York regulators and called Ocwen (and Mr. Erbey) "naughty"—the complaint is silent about who said what to whom and when, and who did what and where: the basics covered in every first-year tort class.

However, if the factual information is peculiarly within the defendants' knowledge or control, then more specificity may not be possible. *See In re: Burlington Coat Factory*, 114 F.3d at 1418. But the Plaintiffs could have, for example, named the servicing expert based in Connecticut or, if the expert's identity is unknown, the individual(s) who spoke with that expert. This information is at least twice removed: Plaintiffs spoke with individuals who had direct conversations with the servicing expert who allegedly admitted to doctoring the data that Gibbs & Bruns relied on in the January 23, 2015 letter.

Nonetheless, broadly speaking, the Plaintiffs alleged enough to satisfy Rule 9(b). This is not an instance where "*all the facts* [will be] . . . learned through discovery *after* the complaint is filed.'" *Id.* at 152 (first emphasis added) (quoting *Scott v. Pfizer, Inc.*, 249 F.R.D. 248, 259 (S.D. Tex. 2008)). Plaintiffs have given significant information. Plaintiffs stated **who**: BlackRock, BIM, BFM, BI, BCM, PIMCO, and PI in conjunction with BlueMountain, KORE, AMI, MetLife, and Sealink, aided by Gibbs & Bruns and a servicing expert allegedly based in Connecticut. Plaintiffs stated **what**: the manipulation of publicly available data about how Ocwen (and its affiliated companies) serviced the mortgages it managed; manipulative short selling and put offers of Ocwen stock; and negative information to the public (via Twitter and Gibbs & Bruns) based on false information. Plaintiffs stated **when**: "from at least as early as 2013 through at least as late as 2016 . . . ." (Sec. Ver. Am. Compl. ¶ 82.) More specifically, on June 28, 2013, on July 24, 2014, on December 22, 2014, and on January 23, 2015 – to name only a few dates cited in the complaint. Plaintiffs stated **where**: in California, where "PIMCO representatives threatened Ocwen, and attempted to coerce Ocwen into using a sham discount rate . . . which PIMCO knew would have been

in violation of applicable regulations and industry standards and made it virtually impossible to make modifications." *Id.* ¶ 91. Via Twitter on March 21, 2014, where "AMI announced . . . that AMI 'unites RMBS around criticism of Ocwen servicing abuses. Look for a forthcoming letter to Trustees, Mastr Servicers, xo AMI.'" *Id.* ¶ 93. Via Twitter again when AMI tweeted on July 23, 2014, that it had held meetings with various federal and state regulators that week and, the next day, on Thursday, July 24th, when AMI tweeted that "'[n]o $Ocwen MSRs were harmed during its meetings with regulators that week.'" *Id.* ¶¶ 94-95. And presumably in Texas, where Gibbs & Bruns is based. *See id.* ¶ 87. Plaintiffs also stated **how**: by hiring a servicing expert who manipulated publicly available data to make it appear as though Ocwen, and its affiliated companies, were incompetent or engaged in intentional conduct.

Defendants know, for example, that the Plaintiffs claim they engaged in a scheme to manipulate information about Ocwen and its affiliated companies to drive Ocwen and its affiliates out of the mortgage servicing business. Why? Because Ocwen prioritized keeping owners in their homes and modified and remodified their mortgages to meet this goal, all to the determinant of senior MBS tranche holders. Allegedly. Defendants disagree and, while the arguments they mad in support of changing venue or dismissing for lack of personal jurisdiction cannot be considered on a motion to dismiss for failure to state a claim, it is still clear that they have enough information, broadly-speaking, about the fraud Plaintiffs claim to either admit or deny the Plaintiffs' allegations.

That said, there is one allegation that fails to comply with Rule 9(b). *See id.* ¶ 103 ("[B]ased on discussions with individuals in the financial industry from mid to late 2016 through 2018, including an individual who had direct conversations with the servicing expert, it has since been revealed that the data, assumptions and findings of the servicing expert had been intentionally manipulated to make it appear that they supported the enterprise's false conclusions." (footnote omitted). Plaintiffs should be able to name the individuals who had discussions "from mid to late 2016 through 2018," *id.*, who these

individuals spoke with, who is the specific individual that "had direct conversations with the servicing expert," *id.*, who that servicing expert is, and when, where, and how this all came about. Paragraph 103 is the lynchpin of the complaint. It is the only true allegation of wrongdoing. The Plaintiffs, in a footnote, state that the servicing expert who allegedly doctored his data "and his consulting firm are located in Connecticut." *Id.* ¶ 103 n.3. Plaintiffs should have named this individual, and his consulting firm, and identified who spoke with him, on what dates, and what led "individuals in the financial industry" to the Connecticut servicing expert. Paragraph 103 fails to comply with Rule 9(b). The Defendants can file a Rule 12(e) motion, or the Plaintiffs can seek leave to amend. That is not for the undersigned to decide. But the undersigned believes that paragraph 103 of the Second Amended Verified Complaint does not satisfy Rule 9(b). And if the Court agrees, the remedy, when Rule 9(b) is not satisfied, "'is not dismissal but amendment . . . to comply with Rule 9(b).'" *ServiceMaster*, 72 V.I. at 151 (quoting *Francis v. Graham Miller (Caribbean) Ltd.*, 26 V.I. 184, 187 (Terr. Ct. 1991), parenthetically).

The Defendants will, undoubtedly, object because the Plaintiffs are now on their third pleading. But the Plaintiffs have not yet had the benefit of anyone's analysis, other than the Defendants', regarding the sufficiency of their allegations. *Accord Rivera v. Sch. Dist. of the City of York*, No. 1:22-CV-00914, 2023 U.S. Dist. LEXIS 100786, *45 (M.D. Pa. June 8, 2023) ("Here, because Rivera has already amended his complaint twice, we are reluctant to recommend that he be given further leave to amend. But Rivera previously amended his complaint without the benefit of the court's analysis of his claims. And we cannot say that further leave to amend would be inequitable or futile."); *see also Gutta v. Sedgwick Claims Mgmt. Servs.*, No. 3:22-cv-01145-HZ, 2023 U.S. Dist. LEXIS 54890, at *21 (D. Or. Mar. 29, 2023) ("The Court declines to grant Plaintiff further leave to amend his complaint. Plaintiff has had multiple opportunities to amend, most recently with the benefit of the Court's detailed analysis of each of his claims."). Clearly, if the Plaintiffs can prove what they allege, their claims would not be futile, and futility is the focus when

considering whether leave to amend should be granted. *See Mills-Williams*, 67 V.I. at 582. Therefore, the undersigned concludes (and recommends that the Court find) that the Plaintiffs generally have satisfied Rule 9(b), except as to paragraph 103 and footnote 3.

## 4.  Failure to State a Claim Upon Which Relief Can Be Granted

Finally, the Defendants argue that all the claims in the complaint fail to state a basis for granting any relief. (*See* PIMCO Mot. 26 ("While the Court should apply New York law to each Count, the FAC fails in its entirety whether New York or Virgin Islands substantive law applies because it does not plead the asserted fraud allegations with the particularity required and otherwise fails to state a claim for any Count." (footnote omitted)); BlackRock Mot. 25 ("Even if this Court had personal jurisdiction over the Defendants, this was a convenient forum, and Plaintiffs had standing, Plaintiffs' Complaint still would fail. Counts I to VIII all lack essential elements of the alleged claims.").) The undersigned agrees in part for the reasons stated below. The undersigned will first address the Shareholder Plaintiffs' tort claims, and then Altisource's tort claims, and finally the CICO claims.

### a.  Shareholder Plaintiffs' Tort Claims

In addition to bringing statutory claims under CICO, the Shareholder Plaintiffs assert claims of prima facie tort (Count VII) and civil conspiracy (Count VIII) against all the Defendants. The undersigned incorporates the *Banks* analyses conducted above with respect to both causes of action. To state a prima facie tort claim, the Shareholder Plaintiffs must allege: (1) an intentional lawful act by defendant; (2) defendant's intent to injure the plaintiff; (3) injury; and (4) an absence of or insufficient justification for defendant's act. To state a civil conspiracy claim, the Shareholder Plaintiffs must allege that: two or more persons agreed to engage in a wrongful act or engaged in an otherwise lawful or proper act for an improper purpose, that resulted in damage to the target of the conspiracy. The Shareholder Plaintiffs fail to state either claim.

Nothing in the complaint alleges that the Defendants knew that the Shareholder Plaintiffs were shareholders of Ocwen or Altisource during the time in question. Prima facie tort requires proof of intent to injure the plaintiff. But the complaint does not allege that the Defendants intended to insure Salt Pond Holdings, Carisma, Tribue, Munus, or the Erbey Plaintiffs. In fact, the complaint repeatedly alleges intent to harm Ocwen/Altisource, not the Shareholder Plaintiffs themselves. (*See* Compl. ¶ 169 ("Each of the Defendants intentionally took aforesaid actions, including false statements and short selling, to damage the business and property of Ocwen/Altisource."); *id.* ¶ 170 ("Each of the Defendants intended that their actions would cause harm to Ocwen/Altisource."); *id.* ¶ 171 ("Defendants knew that their acts would cause harm to Ocwen/Altisource.").) Even though the Shareholder Plaintiffs may not have known what rule might be the soundest for the Virgin Islands when they commenced this action, they should have known that prima facie tort is an intentional tort and intent to harm would have to be shown. But no intent to harm is alleged in the complaint. Therefore, the complaint, on its face, fails to state a claim for relief for prima facie tort.

For similar reasons, the Shareholder Plaintiffs also fail to state a claim of civil conspiracy. Again, the Shareholder Plaintiffs may not have known what rule might be the soundest for the Virgin Islands when they commenced this action. But the Shareholder Plaintiffs would have known that civil conspiracy, like prima facie tort, is an intentional tort that requires proof of intent to harm the target of the conspiracy. Carisma, Munus, the Erbey Plaintiffs, Salt Pond Holdings, and Tribue Limited Partnership were not the "targets" of the Defendants' conspiracy, not according to the complaint. While the operative portions of the complaint may not align neatly with the rule the undersigned proposed above, it does incorporate all preceding paragraphs by reference. *See id.* ¶ 175. And nowhere in the complaint do the Shareholder Plaintiffs allege that any of them are the target of the Defendants' conspiracy. The Shareholder Plaintiffs are not included within the term "Ocwen/Altisource" as defined by the complaint. *See id.* ¶ 1 ("The

linchpin of the willful and wanton scheme unleashed by these behemoth firms – they manage trillions of dollars of assets, more than the entire budget of the federal government – was to cripple, if not outright destroy, Ocwen Financial Corp. ("OCN"), Ocwen Mortgage Servicing, Inc. ("Ocwen USVI," and, together with OCN and its subsidiaries, "Ocwen"), Altisource USVI, and certain of their subsidiaries, affiliates and related companies (collectively, "Ocwen/Altisource")." There is simply no connection between the Defendants' alleged actions, including the actions of Gibbs & Bruns or AMI, and the Shareholder Plaintiffs. For this reason, the complaint fails to state a claim for relief for civil conspiracy.

### b.  Altisource's Tort Claims

Unlike the Shareholder Plaintiffs, Altisource has stated claims for relief for intentional interference with contract (Count III), intentional interference with prospective advantage (Count IV), prima facie tort (Count V), and civil conspiracy (Count VI). To state a claim for interference with contract, Altisource must allege: (1) a professional business relationship that is reasonably certain to produce an economic benefit, (2) interference with that relationship by Defendants, (3) interference accomplished through improper means or for an improper purpose, and (4) damages. *See Love Peace*, 2022 V.I. Supreme LEXIS 2 at *5; *accord Love Peace*, 75 V.I. at 295 (elements of interference with contract are: "(1) the existence of a contract between the plaintiff and a third party; (2) that the defendant knew of that contract; (3) that the defendant interfered with the contract using improper means or with an improper motive; and (4) that the plaintiff was damaged as a result."). Because "the requirements for . . . interference with business relations includes the same elements as interference with existing contracts[,]" 2022 V.I. Supreme LEXIS 2 at *5., the interference torts will be considered together. And, as just stated, to state a claim of prima facie tort, Altisource must allege: (1) an intentional lawful act by defendant; (2) defendant's intent to injure the plaintiff; (3) injury; and (4) an absence of or insufficient justification for defendant's act. To state a claim of civil conspiracy, Altisource must allege that two or more persons agreed to engage in a

wrongful act or engaged in an otherwise lawful or proper act for an improper purpose, which resulted in damage to the target of the conspiracy.

Regarding the inference torts, the complaint alleges that Altisource had existing contracts with Ocwen and Ocwen USVI and others and had expectations of future business relationships with them. (*See* Compl. ¶ 144 ("Altisource USVI, Ocwen, the REIT, HLSS and ASPS had contracts and strategic relationships with each other and third parties concerning asset management, real estate management, financing and the servicing of mortgages, including mortgages for homeowners in the USVI."); *id.* ¶ 151 ("Altisource USVI, Ocwen, the REIT, HLSS and ASPS had business relations, including strategic relationships, with each other and third parties that were reasonably likely to lead to an economic benefit and to other third parties entering into additional or more lucrative contracts with Altisource USVI and its affiliates, including the REIT.").) The complaint alleges that the Defendants knew about Altisource's contracts and future business prospects with Ocwen and others, including Ocwen USVI. *See id.* ¶¶ 145, 152. The complaint alleges that the Defendants interfered with those contracts and prospective business relations and did so improperly, for reasons discussed at length above regarding Rule 9(b). Lastly, Altisource alleged that it incurred damages. *See id.* ¶¶ 149, 155. Thus, Altisource has stated claims for relief for intentional interference with contract and for intentional interference with prospective advantage and the Defendants' motion to dismiss for failure to state a claim should be denied as to Counts III and IV.

Regarding prima facie tort, the complaint alleges lawful acts done by the Defendant, namely communications with regulators, short selling of Ocwen stock, efforts by Gibbs & Bruns to alert bankers to events of default, and the dissemination of information to the public, among other acts. The complaint alleges that the Defendants intended to injure Altisource, that Altisource was, in fact, injured, and that the Defendants lack a justification for their actions. *See id.* ¶ 8 ("{Defendants] sought to have Ocwen removed

as loan servicer on thousands of its long-standing servicing contracts, including those for the servicing of loans managed by Altisource USVI, and put Ocwen/Altisource out of business altogether."). The complaint alleges that the Defendants targeted Ocwen and, by extension, Altisource, and sought to destroy "Ocwen/Altisource." *See id.* ¶ 63 ("When Defendants and their co-conspirators targeted Ocwen/Altisource for destruction, it not only seriously hurt Ocwen, but it also crippled Altisource USVI's business, ultimately ending Altisource USVI's strategic relationship with Ocwen. In addition, Defendants' unlawful conspiracy destroyed the REIT's ability to raise capital, which was critical to Altisource USVI's ability to expand its business. As a result, the stock price and business prospects of Altisource USVI collapsed, as they did for Ocwen and ASPS."). Prima facie tort provides recovery for acts otherwise lawful that are done for an improper purpose. The complaint states a claim for prima facie tort.

Lastly, regarding civil conspiracy, the complaint alleges that BlackRock, BIM, BFM, BI, BCM, PIMCO, and PI in conjunction with BlueMountain, KORE, AMI, MetLife, and Sealink, aided by Gibbs & Bruns and a servicing expert allegedly based in Connecticut, worked together to commit otherwise lawful and proper acts for an improper purpose. The complaint alleges coordination between Gibbs & Bruns, on behalf of the Defendants, and BlueMountain. The complaint alleges coordination between AMI and the Defendants to cause regulatory action to be taken against Ocwen. The complaint allege Gibbs & Bruns, acting on the Defendants' behalf, retained an expert who analyzed publicly available data about Ocwen's practices and then intentionally manipulated that data in order to portray Ocwen in a bad light. *See id.* ¶ 105 ("Each of the foregoing statements and others in the Fraudulent Default Notice was known, or should have been known, by the enterprise participants to be false, misleading and based on manipulated data, and made with the purpose and intent to deceive the recipients and others and to inflict harm on Ocwen/Altisource, with the effect of injuring Plaintiffs that resulted in damage to the target of the conspiracy."). The complaint also alleged Altisource was one of the targets of the conspiracy. *See id.*; *see*

*also id.* ¶ 7 ("Because Ocwen refused to go along with Defendants' coldly calculated foreclosure plan, Ocwen/Altisource became the target of a concerted campaign of lies and vilification."). Thus, the complaint states a claim of civil conspiracy.

### c. Plaintiffs' Statutory Claims

Lastly, Altisource and the Shareholder Plaintiffs each assert a claim under CICO. "[I]n order to state a claim under CICO, Plaintiff[s] must identify: (1) a 'person'; (2) an 'enterprise'; and (3) demonstrate that the person conducted or participated in the affairs of the enterprise through a 'pattern of criminal activity.'" *Takata*, 67 V.I. at 638. Defendants contend that the Plaintiffs failed to satisfy the second and third elements, while the Plaintiffs assert that they satisfied all three elements.

### i. Person

As corporations and limited liability companies, each Defendant is an entity "holding or capable of holding a legal or beneficial interest in property." 14 V.I.C. § 604(l). They qualify as "persons" under CICO. In fact, the Defendants do not dispute that they are "persons" for purposes of the CICO statute. Therefore, the complaint satisfies the "person" element for stating a CICO claim.

### ii. Enterprise

An enterprise "includes any . . . partnership, corporation, trust, or other legal entity, or . . . association or group of persons, associated in fact although not a legal entity . . . ." *Id.* § 604(h). A corporation or limited liability company can be both a person, *see* 14 V.I.C. § 604(l) ("'Person' means any individual or entity holding or capable of holding a legal or beneficial interest in property."), and an "enterprise," *see id.* § 604(h) ("'Enterprise' includes any individual, sole proprietorship, partnership, corporation, trust, or other legal entity . . . ."), but not at the same time. *See Charleswell v. Chase Manhattan Bank, N.A.*, 45 V.I. 495, 532 (D.V.I. 2004) ("A plaintiff may not name a single corporation as both defendant and 'enterprise' . . . ."); *see also id.* at 534-35 (applying RICO analysis to CICO claims).

Thus, the BlackRock Defendants, comprising three corporations and two limited liability companies, cannot be persons and enterprises at the same time. The same is true for the PIMCO Defendants, comprising two limited liability companies.

Further, federal courts treat corporate parents and their subsidiaries as the same person for purposes of RICO, authority that is persuasive when interpreting CICO. *See Gasoline Sales v. Aero Oil Co.*, 39 F.3d 70, 73 (3d Cir. 1994) ("We have also held that a corporation generally cannot be a defendant under section 1962(c) for conducting an 'enterprise' consisting of its own subsidiaries or employees, or consisting of the corporation itself in association with its subsidiaries or employees."); *accord Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("We do not quarrel with the basic principle that to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."); *see In re: Najawicz*, 52 V.I. 311, 330 (2009) ("CICO is cast in the mold of the federal RICO statute."). What's more, the complaint also alleges that the BlackRock Defendants and the PIMCO Defendants are each, collectively, one "person". (*See* Compl. ¶ 30 ("By virtue of Blackrock's ownership, direction, management and control of each of its subsidiaries, the conduct of each of the other Blackrock Defendants is imputed to the parent company, Blackrock."); *id.* ¶ 43 ("By virtue of PIMCO's ownership, direction, management and control of PI, the conduct of PI is imputed to its parent, PIMCO.").)

Thus, even though the BlackRock Defendants could not associate with each other, nor could the PIMCO Defendants, BlackRock and PIMCO, as separate "persons," could associate with each other and with others to form a criminal enterprise, which is what the Plaintiffs allege. BlackRock and PIMCO conspired with KORE, Sealink, Metlife, BlueMountain, and others, including AMI. (*See* Compl. ¶ 83.) These companies, corporations, and organizations allegedly worked together as an association in fact toward a common, criminal goal. But when, as here, the enterprise is "not a legal entity," 14 V.I.C. §

604(h), but is instead just a loose association of "persons", the complaint must then allege an association in fact.

In *Takata*, the Superior Court noted that our Supreme Court had not interpreted the "associated in fact" phrase as used in the CICO statute and looked to decisions of the United States Supreme Court for guidance. *See Takata*, 67 V.I. at 370-71 (quoting *Boyle v. United States*, 556 U.S. 938, 948 (2009)). As the United States Supreme Court explained in *Boyle*, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Takata*, 67 V.I. at 370-71 (quoting *Boyle*, 556 U.S. at 948). A complaint that alleges an association-in-fact enterprise must plead sufficient facts to show a purpose, a relationship between the members, and longevity. The complaint satisfies these requirements.

Plaintiffs allege that the goal of the Defendants and their co-conspirators was to cripple Ocwen and Altisource. (*See* Compl. ¶ 83 ("The enterprise's purpose was to attempt to destroy Ocwen/Altisource by means of false and fraudulent misrepresentations designed to (i) limit Ocwen/Altisource's continued modification of mortgage loans; (ii) damage Ocwen/Altisource's business and standing with investors, regulators and others in the industry, including the New York State Department of Financial Services ("NYSDFS"); and (iii) block Ocwen/Altisource from obtaining new servicing contracts and business relations").) This was the "common interest" of the participants. *Boyle*, 556 U.S. at 946.

Longevity must be "sufficient to permit the[] associates to pursue the enterprise's purpose." *Id.* Plaintiffs allege that the association-in-fact continued their efforts "from at least as early as 2013 through at least as late as 2016 . . . ." (Compl. ¶ 82.) A fair reading of the complaint also shows that the associates may have begun their efforts after Mr. Erbey rejected the Defendants' "aggressive foreclosure policy . . . ." *Id.* And, presumably, their efforts ended once their goal was achieved. That is, the "smear campaign" began in 2013, after Mr. Erbey refused PIMCO's demand to increase the number of foreclosures, *see id.* ¶¶ 82, 91, and continued into 2016, when, by then, Wells Fargo had terminated Ocwen as a servicer on two trusts, *see id.* ¶ 115, state regulators had initiated investigations, *see id.* ¶¶ 92, 97-98, Ocwen and Altisource's "strategic relationship" had crumbled, *see id.* ¶ 63, and the stock price of Ocwen and Altisource had plummeted, *see id.* ¶ 64. These allegations are sufficient to show "that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'" *Boyle*, 556 U.S. at 946.

Plaintiffs also allege a relationship "among those associated with the enterprise . . . ." *Id.* Gibbs & Bruns sent a letter on January 23, 2015, allegedly rife with manipulated data and misstatements, on behalf of BlackRock, PIMCO, KORE, MetLife, and Sealink. (*See* Compl. ¶ 101.) Gibbs & Bruns had also send a letter two years earlier, on June 28, 2013, on behalf of the same companies, i.e., BlackRock, PIMCO, KORE, MetLife, and Sealink, also allegedly containing "fraudulent and/or misleading statements . . . ." *Id.* ¶ 47. Clearly, BlackRock, PIMCO, KORE, MetLife, and Sealink had some sort of relationship with each other that they either entered into a joint representation agreement or agreed to let the same law firm act on all their behalf. Gibbs & Bruns did not send multiple letters on June 28, 2013 and on January 23, 2015, on behalf of each holder or investment manager, separately. Rather, each time it sent one on behalf of multiple holders and investment managers for holders collectively.

Concerning the January 23, 2015 letter in particular, if the complaint is true, which must be assumed at this point, it could only mean that: (1) Gibbs & Bruns acted *ultra vires* by retaining a servicing expert and directed him to manipulate publicly available data about Ocwen to portray Ocwen in a bad light; or (2) the servicing expert acted on his own when he manipulated the data about Ocwen; or (3) (as Plaintiffs' allege) BlackRock, PIMCO, KORE, MetLife, and Sealink instructed the servicing expert to manipulate the data, either directly or indirectly through Gibbs & Bruns. The timing of the letter sent by BlueMountain, and the timing of both letters sent the same day Ocwen entered into a consent order with California regulators, was not coincidental, again, assuming the complaint to be true. It is also unlikely that the extensive analysis contained in the January 23, 2015 letter, as detailed in the complaint, *see id.* ¶ 104, was done within a few hours after news of the California consent order went public. It is more likely that Gibbs & Bruns and BlueMountain had their default letters prepared and "timed" them, as Plaintiffs allege, to coincide with news of the consent order.

When the Gibbs & Bruns letters are coupled with the negative publicity generated by AMI, a "well-connected and secretive lobbying group" who BlackRock and PIMCO "are members of[,]" *id.* ¶ 84 & n.2, it all supports a showing of a relationship. Gibbs & Bruns acted as a common agent for BlackRock, PIMCO, Sealink, KORE, and Metlife, and the Defendants were members of AMI, who issued multiple tweets that, at best, were flippant about the potential effects of its messages. *See, e.g.*, *id.* ¶ 93 (signing a tweet with hugs and kisses "xo"), *id.* ¶ 95 (quipping that Ocwen's business was not harmed during meeting with regulators at a conference AMI hosted); *id.* ¶ 99 (using Santa Clause terminology to refer to New York regulators as "nice" and Ocwen and Erbey as "naughty"). Plaintiffs allege that the enterprise participants were behind these and other tweets sent out by AMI. *See id.* ¶¶ 92-93. This all shows an association in fact.

### iii.  Pattern of Criminal Activity

In addition to alleging that persons associated together in a common enterprise, a complaint must also allege that the enterprise members "conducted or participated in the affairs of the enterprise through a 'pattern of criminal activity.'" *Takata*, 67 V.I. at 638. The complaint cites three predicate statutes which the Defendants allegedly violated. Only one statute might suffice, barely. But the complaint does fairly disclose alleged violations of a fourth statute, which could form the basis of a pattern of criminal activity.

Plaintiffs point to Section 1089 of title 14 of the Virgin Islands Code, which concerns embezzlement by public or private officers. Even assuming, *arguendo*, that, by being registered as broker-dealers and investment advisors in the Virgin Islands, all Defendants (except BlackRock) would qualify as private officers under the statute, *cf.* 14 V.I.C. § 1089 (referring to persons "being . . . an officer, director, trustee, clerk, servant, attorney, or agent of any association, society, or corporation (public or private),"), Plaintiffs have not named any officer, director, attorney, or agent of BlackRock or PIMCO as a defendant. They also have not named any such person in the complaint. Section 1089 criminalizes acts done by individuals, not by business organizations. *See* 14 V.I.C. § 1089 ("Whoever, being an officer of the Virgin Islands or a subdivision thereof, or a deputy, clerk, or servant of such officer, or an officer, director, trustee, clerk, servant, attorney, or agent of any association, society, or corporation (public or private), fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."). Corporations and limited liability companies are not subject to the statute.

But more importantly, Plaintiffs do not allege any money or property that was entrusted to BlackRock or PIMCO, which they later appropriated for their own use. The complaint does not address ownership in the context of mortgage-backed securities. "Banks and other mortgage originators that make mortgage loans to homeowners often sell those loans to investors." (Compl. ¶ 66.) "To do this, banks and

mortgage originators package mortgages into pools and sell them to specially created trusts that issue securities (or bonds) called MBS. When an investor buys an MBS, the investor in effect buys an interest in all of the underlying mortgages owned by the trust." *Id.* ¶ 67. Presumably, the trusts that purchase pooled mortgages own the right to foreclose. Investors, like BlackRock and PIMCO, who then purchase trances in the trusts would not own the underlying loans, or the right to foreclose, and would also not have possession of the monies received from mortgage payments. In opposing the Defendants' motion, the Plaintiffs argued in support of section 1089 by asserting that the "Defendants . . . 'fraudulently appropriated' their MBS interests for an illegal purpose in violation of 14 V.I.C. § 1089." (Pls.' Opp'n 56-57 (brackets omitted).) But phrases in statutes cannot be cherry-picked and quoted out of context. Plaintiffs ignore the requirement that fraudulent appropriation has to be done by officers, not corporations. Thus, section 1089 cannot apply here.

Plaintiffs next point to section 833 of title 14 of the Virgin Islands Code, which concerns fraud on creditors. The complaint alleges that the Defendants are parties to bonds, contracts, or conveyances had, made, or contrived with intent to deceive and defraud others, or to defeat, hinder, or delay others of their just debts. (*See* Compl. ¶ 124b.) In opposing the Defendants' motion, the Plaintiffs argue that the "Defendants . . . as 'parties' to 'bonds' (i.e. MBS) owned by Defendants, conspired with enterprise participants 'with the intent to deceive or defraud others' in violation of 14 V.I.C. § 833 . . . ." (Pls. Opp'n 56-57 (brackets omitted).) But other than quoting the predicate statute, the complaint fails to allege any bond, contract, or conveyance that BlackRock or PIMCO entered into with the intent to defraud others. Plaintiffs could be seen as alleging that the BlackRock and PIMCO Defendants wanted homes to be foreclosed on and, thus, wanted properties to be conveyed, and acted fraudulently to bring that about. BlackRock and PIMCO wanted Ocwen to foreclose on more homes so they could reduce their own losses. But the complaint does not allege that BlackRock or PIMCO owned these properties. Instead, they owned

interest in the securities issued on the trusts that contained pooled mortgages. Section 833 concerns the fraudulent conveyance of property or agreements to convey property obtained through fraud. *See* 14 V.I.C. § 833 ("Whoever . . . (2) being a party [to any fraudulent conveyance] as aforesaid, at any time wittingly and willingly puts in, uses, avows, maintains, justifies or defends the same, or any of them, as true, done, had, or made in good faith, or upon good consideration, or aliens, assigns, or sells any of the property, real or personal, or other things before mentioned, conveyed to him as aforesaid, or any part thereof . . . shall be fined not more than $200 or imprisoned not more than 1 year, or both." (line breaks omitted)). The Defendants did not obtain their MBS interests through fraud and did not try to convey them through fraud. Section 833 just cannot apply here.

Lastly, Plaintiffs point to section 834 of title 14 of the Virgin Islands Code, which concerns obtaining money by false pretenses. Here, Plaintiffs appear to be on firmer footing. *See* 14 V.I.C. § 834 ("Whoever—knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person of money or property, shall (1) if such property or money was less than $100 in value, be fined not more than $200 or imprisoned not more than 1 year, or both; or (2) if such property or money was $100 or more in value, be imprisoned not more than 10 years." (line breaks omitted)). In opposing the Defendants' motion, the Plaintiffs argue that the "Defendants . . . 'knowingly and designedly' made 'false and fraudulent representations' in attempt to defraud others of money and property (e.g., increased foreclosure proceeds) in violation of 14 V.I.C. § 834 . . . ." (Pls. Opp'n 56-57 (brackets omitted).) Section 834 "does not define false, fraudulent representations, or what constitutes defrauding another of money or property." *Todmann*, 59 V.I. at 941. As a result, courts "use the definition of fraud that is consistent with the common law construction which establishes that 'a person "defrauds" another if he makes a representation of an existing material fact, knowing it to be false, intending one to rely and under circumstances in which such person does rely to his damage.'" *Id.* (ellipsis and citation omitted). Section

834 also does not define property. But the Code defines it as including real and personal property with personal property defined to "include[] money, goods, chattels, things in action, and evidence of debt[.]" 1 V.I.C. § 41. For section 834 to qualify as a predicate offense under CICO, the complaint must allege representations of material facts, known to be false, under circumstances in which the representations resulted in the loss of money or property valued at $100 or more. Viewed in the light most favorable to the Plaintiffs, the complaint makes out a predicate claim of obtaining money by false pretenses.

Plaintiffs allege that Gibbs & Bruns issued an event-of-default letter on January 23, 2015, simultaneously with BlueMountain who issued a similar letter – with both letters being sent "on the same day that Ocwen entered into a consent order with the California Department of Business Oversight . . . ." (Compl. ¶ 107.) According to the Plaintiffs, the January 23, 2015 letter contained information "known, by the enterprise participants to be false, misleading and based on manipulated data, and made with the purpose and intent to deceive the recipients and others and to inflict harm on Ocwen/Altisource . . . ." *Id.* ¶ 105. The complaint also alleges that the January 23, 2015 letter was sent by Gibbs & Bruns on the Defendants' behalf. *See id.* ¶ 101. After the January 23, 2015 letter were sent, "Wells Fargo, as trustee, terminated Ocwen as servicer for two trusts." *Id.* ¶ 115. Ocwen was "blocked . . . from getting mortgage servicing business from banks and other financial institutions . . . ." *Id.* And Altisource was "forced . . . to drop Ocwen as servicer." *Id.*

These allegations, if true, make out a claim for a ***single*** violation of section 834. But more than one instance is necessary because CICO concerns a pattern of criminal conduct. The complaint references another Gibbs & Bruns letter, sent two years earlier on June 28, 2013, which might support a predicate offense under section 834. In that letter, Gibbs & Bruns, again on behalf of the Defendants, *see id.* ¶ 87, sought to block the transfer of OneWest's MSRs to Ocwen. But the complaint does not say whether the Defendants were successful. Further, the complaint also does not state whether the Defendants owned any

interests in the OneWest MSRs. One must obtain money by false pretenses, not block others from obtaining money through false pretenses. What the Plaintiffs seem to be alleging is a steady drip of misinformation that culminated in the Defendants obtaining money by false pretenses. But it is not at all clear that predicate statutes can be used in this broad way.

CICO requires, not only that persons participate in a criminal enterprise, but that they "participate[] . . . through a 'pattern of criminal activity.'" *Takata*, 67 V.I. at 638. Even when all the allegations are taken as true, the complaint fails to allege what actions the BlackRock Defendants the PIMCO Defendants took. The complaint does allege that "[m]anipulative short selling . . . was an integral part of the enterprise's" scheme. (Compl. ¶ 85.) But the complaint does not identify which Defendants engaged in this practice, instead using passive voice to refer to what happened. *See, e.g.*, *id.* ¶ 86 ("Throughout 2013, 2014 and 2015, when the enterprise publicized, through counsel, their fraudulent and misleading statements and threats of legal action against OCN, short sales of OCN's and the other related public companies' common stock surged just prior to such announcements."). This statement does not identify who shorted Ocwen stock or even that the short sales were done by enterprise members. And while complaints must be read as a whole, even the operative paragraphs within Counts I and II, the CICO counts, do not attribute short selling to the Defendants directly. *See, e.g*., *id.* ¶ 123 ("At all times relevant, *the enterprise engaged in* repeated concerted acts of intentional misconduct designed to destroy Ocwen/Altisource and the strategic relationships among the companies, and to improperly force foreclosures on homeowners, including by, among other things, (i) maliciously disseminating knowingly false conclusions in the Fraudulent Default Notice; (ii) repeatedly publicizing other fraudulent claims concerning Ocwen/Altisource, including allegations of improperly taking money, improper modifications and poor quality servicing; (iii) short selling intended to damage Ocwen/Altisource; and (iv) attempting to pressure Ocwen to employ a sham discount rate in calculating NPV to increase foreclosures." (emphasis

added)). But enterprises are not subject to civil liability under CICO. Persons are. And those persons must be active participants, not passive bystanders. *Cf. Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1155 (11th Cir. 2006) ("[F]ederal RICO violations, as a matter of law, require affirmative wrongdoing rather than passive acquiescence . . . .").

The complaint does not allege any acts done by the BlackRock or PIMCO Defendants, unlike *Boyle*, *Takata*, or *ServiceMaster*, for example. The complaint does not allege the *Boyle* equivalent of who the getaway man was, who the lookout was, who got the guns, or who came up with the scheme. *Cf. Boyle*, 556 U.S. at 941 ("Each theft was typically carried out by a group of participants who met beforehand to plan the crime, gather tools (such as crowbars, fishing gaffs, and walkie-talkies), and assign the roles that each participant would play (such as lookout and driver). The participants generally split the proceeds from the thefts. The group was loosely and informally organized. It does not appear to have had a leader or hierarchy; nor does it appear that the participants ever formulated any long-term master plan or agreement."). In *Takata*, the plaintiff had alleged that several companies "associated 'with one another to sell cars equipped with . . . defective airbags and to conceal the nature and extent of their defect' in order 'to sell as may airbags, and vehicles containing such airbags, as possible . . . .'" *Id.* at 371 (citation omitted). Similarly, *ServiceMaster* concerned several companies having allegedly "'colluded with . . . [others] illegally to import pesticides containing methyl bromide into the Virgin Islands,' all with the 'common purpose of illegally importing, selling and distributing pesticides containing methyl bromide, and selling fumigation services using those pesticides in the Virgin Islands for economic gain.'" 72 V.I. at 138; *see also id.* at 140 ("Defendants 'colluded' with a Puerto Rican company to 'import pesticides containing methyl bromide illegally into the Virgin Islands,' and did not tell their customers that their homes and residences were being fumigated and treated with a banned pesticide. This was done knowingly, and by design . . . because the substance is controlled, and its use indoors is illegal. From these

actions, the Defendants obtained money: payments from their customers for extermination services. Taking all this to be true, as the Court must on a motion to dismiss, the Defendants were on notice that applying methyl bromide indoors within the United States is a violation of the law. And violating the law thirty-five times for profit can support a CICO claim." (citation omitted)).

CICO, being cast in the mold of RICO, provides for civil liability for persons who engage in a pattern of criminal conduct. *Accord Jaguar Cars v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 268 (3d Cir. 1995) ("[A] corporation would be liable under § 1962(c), only if it engages in racketeering activity as a 'person' in another distinct 'enterprise,' since only 'persons' are liable for violating § 1962(c)."). Gibbs & Bruns issued the June 28, 2013 and January 23, 2015 letters which, allegedly, contains the fraudulent misrepresentations, which constituted obtaining money by false pretenses. The BlackRock Defendants and the PIMCO Defendants did not issue those letters and Plaintiffs have not alleged that the Defendants should be held vicariously liable for the actions of their attorneys under an agency theory. Further, vicarious liability in the RICO context is rare and typically limited to intra-corporate instances, i.e., holding a corporation vicariously liable for the acts of its agents, officers, and employees. The undersigned has not found any instances where RICO liability was alleged based on multiple corporate "persons" being vicariously liable for the acts of their law firm as agent. And most importantly, Plaintiffs did not assert a vicarious liability theory here.

However, even though the undersigned does not believe that the complaint makes out a claim under CICO based on the Defendants having engaged in a pattern of obtaining money by false pretenses, embezzlement, or fraudulent conveyance of property, the complaint does make out a pattern of criminal activity based on the Defendants having violated section 652 of title 9 of the Virgin Islands Code. Section 652 makes it an offense to "engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person" or "employ a devise, scheme, or artifice to defraud another

person" if the perpetrator "advises others, either directly or indirectly, or though publications as to the value of securities or the advisability of investing in, purchasing or selling securities . . . ." 9 V.I.C. § 652(a).

Given the discussion in Section II, and mindful of how courts treat complaints—disregarding labels and citations to authority and ensuring that no claim is alleged before dismissing—the Plaintiffs' complaint may state another predicate act, particularly as CICO defines "criminal activity" to include "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in the crimes, offenses, violations or the prohibited conduct as variously described in the laws governing this jurisdiction[,]" so long as "the violation . . . is a felony . . . ." 14 V.I.C. § 604(e). In other words, CICO is not limited only to "those crimes, offenses, violations or prohibited conduct as found in the Virgin Islands Code" enumerated in statute because of the words "and, in addition . . . ." *Id.* "Federal criminal laws" can also provide the basis for a CICO claim or charge. *Id.* So long as conduct is punishable as a felony under Virgin Islands or federal law, it can form the basis of the predicate offense when stating a claim under CICO. *Accord Takata*, 67 V.I. at 378. And here, the complaint could make out a claim for a violation of section 652 of title 9 as a predicate offense. Section 652 makes

> [i]t unlawful for a person that advises others, for compensation, either directly or indirectly, or through publications or writings, as to the value of securities or the advisability of investing in, purchasing or selling securities, or that, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities:
>
>> (1) to employ a device, scheme, or artifice to defraud another person; or
>> (2) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

9 V.I.C. § 652(a). Anyone who "willfully violates this chapter . . . knowing the statement made to be false or misleading in a material respect, upon conviction, shall be fined not more than $1,000,000 or imprisoned not more than 10 years, or both." *Id.* § 658(a). Since a violation of section 652 is punishable as a felony, it qualifies as a predicate offense under CICO. *See* 14 V.I.C. § 2(b)(1) ("[A] felony is a crime

or offense which is punishable by imprisonment for more than one year"); *see id.* § 604(e) ("Criminal activity" means . . . a felony . . . .").

The complaint alleges that the BlackRock Defendants "manage and/or advise dozens, if not hundreds, of funds . . . including funds that hold MBS certificates at issue in this action." *Id.* ¶ 23. The complaint also alleges that "PIMCO acts as investment advisor to, and directs and controls the actions of, its subsidiaries, including PI, and the PIMCO Funds." *Id.* ¶ 40. The complaint also alleges a criminal scheme, *see id.* ¶ 77, in which the Defendants attempted to defraud others "by means of false and fraudulent misrepresentations . . . ." *Id.* ¶ 83. The complaint is also replete with allegations that the Defendants employed a scheme to defraud others by retaining Gibbs & Bruns, by directing AMI, and by conspiring with KORE, Sealink, MetLife, BlueMountain, and others, to cripple Ocwen and have Ocwen removed from the mortgage servicing industry. Arguably, the Defendants could also be seen as having indirectly advised others, through Gibbs & Bruns, because the letter Gibbs & Bruns sent on January 23, 2015 was disseminated to the public. *See id.* ¶ 104 ("The enterprise participants knew that those conclusions were fraudulent but nevertheless featured them in the enterprise's "default" letter and publicized falsified conclusions to the public and to Ocwen's contractual counterparties.").

Assuming the complaint to be true, Plaintiffs have alleged affirmative wrongdoing by the Defendants, not passive acquiescence in the affairs of an enterprise. Again, assuming that the Defendants "maliciously disseminat[ed] knowingly false conclusions in the Fraudulent Default Notice;" "repeatedly publiciz[ed] other fraudulent claims concerning Ocwen/Altisource, including allegations of improperly taking money, improper modifications and poor quality servicing;" "engaged in repeated . . . short selling intended to damage Ocwen/Altisource;" and "attempt[ed] to pressure Ocwen to employ a sham discount rate in calculating NPV to increase foreclosures[,]" *id.* ¶¶ 123, 136, this conduct would constitute a pattern of engaging in a "scheme, or artifice to defraud" or "an act, practice, or course of business that . . . would

operate as a fraud or deceit upon another person." 9 V.I.C. § 652 (a). The official comments to section 652, which is section 502 in the uniform act, states that this section "applies to any person that commits fraud in providing investment advice" and is "not limited to persons registered as investment advisers or investment adviser representatives." *Uniform Securities Act* (2002), official cmt 1, p. 125. Therefore, the complaint states a claim under CICO.

## III.　　Conclusion

For the reasons stated at length above, and as summarized below, the undersigned concludes that the Defendants' motion to dismiss should be granted in part and denied in part. The motion to dismiss for lack of personal jurisdiction should be granted as to BlackRock and denied as to the other Defendants. The motion to dismiss on forum non conveniens grounds should be denied as to all Defendants. And the motion to dismiss for failure to state a claim should be granted as to the Shareholder Plaintiffs' tort claims, i.e., prima facie tort (Count VII) and civil conspiracy (Count VIII). The motion should also be granted but with leave to amend for the Plaintiffs to cure the Rule 9(b) deficiency in paragraph 103 and footnote 3. Otherwise, the motion to dismiss for failure to state a claim for relief should be denied as to all remaining counts, including the CICO claims, provided, however, that the Court agrees with the undersigned's assessment that the complaint states a predicate offense under a different statute than the statutes alleged by the Plaintiffs.

***First***, Plaintiffs have not carried their burden to show a *prima facie* case for exercising personal jurisdiction over the Defendants under section 607(j) of title 14 of the Virgin Islands Code as to their CICO claims. The undersigned concludes that Section 607(j) is a separate, narrower basis for exercising jurisdiction over civil CICO claims. But it requires that a defendant engage in conduct violating CICO "in this Territory." 14 V.I.C. § 607(j). The complaint does not allege any conduct in the Virgin Islands.

Plaintiffs also conceded that all conduct occurred outside the Territory. Therefore, the Court does not have jurisdiction over the Defendants pursuant to section 607(j) as to Counts I and II.

*Second*, Altisource has carried its burden to show a *prima facie* case for personal jurisdiction over the Defendants under the Virgin Islands Long Arm statute, section 4903 of title 5 of the Virgin Islands Code, but the Shareholder Plaintiffs have not. Subsections (a)(5) through (a)(8) of section 4903 do not apply because real property, insurance agreements, and conceiving or abandoning children are not at issue. Plaintiffs' evidence does show that the Defendants transact business per subsection (a)(1), and supply services per subsection (a)(2), but their claims do not arise out of the Defendants' business transactions or investment management or broker-dealer services. Subsection (a)(3), causing injury by act done in the Territory, also does not apply here because no "act or omission" occurred in the Territory. 5 V.I.C. § 4903(a)(3). Again, all of the alleged misconduct occurred outside the Territory. Regarding section 4903(a)(4), causing injury inside the Territory coupled with a "plus" factor, all Plaintiffs have shown that the Defendants have "regularly done business with or solicited business from the Virgin Islands . . . [and] derived substantial revenue from . . . services consumed in the Virgin Islands." *Molloy*, 56 V.I. at 180. But only Altisource has shown that long-arm jurisdiction over the Defendants as to its tort claims (prima facie tort, civil conspiracy, intentional interference with contract, and intentional interference with prospective business advantage) would be proper under section 4903(a)(4). The Shareholder Plaintiffs assert two tort claims (civil conspiracy and prima facie tort). Both claims are intentional, but the complaint fails to allege intent to injure the Shareholder Plaintiffs themselves. Further, the Erbey Plaintiffs, Munus, and Carisma,, being entities organized and headquartered outside the Virgin Islands, would not have suffered harm in the Virgin Islands, a requirement for exercising jurisdiction under section 4903(a)(4). Thus, only Altisource has shown that personal jurisdiction under section 4903(a)(4) would be proper.

***Third***, even though jurisdiction would be proper over Altisource's tort claims under the long arm statute (but not proper over the Shareholder Plaintiffs' claims), all Plaintiffs failed to show that exercising jurisdiction over the Defendants would satisfy with due process. Plaintiffs do not contend that the Superior Court has general jurisdiction over the Defendants and, even if they did, they would be mistaken because the Defendants are not Virgin Islands corporations or companies and do not have their principal places of business in the Territory. The Superior Court also cannot exercise specific jurisdiction here because Plaintiffs failed to show that the contacts the Defendants do have with the Virgin Islands are the basis for their claims. *See Ford Motor Co.*, 141 S. Ct. at 1024–25 ("Specific jurisdiction is different . . . . The plaintiff's claims, we have often stated, 'must arise out of or relate to the defendant's contacts' with the forum. Or put just a bit differently, 'there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" (citations and brackets omitted)).

***Fourth***, even though Plaintiffs did not make a prima facie case for general or specific jurisdiction, the Plaintiffs have made a *prima facie* case that the Superior Court can exercise jurisdiction over all Defendants except BlackRock based on consent, which is a valid basis for exercising jurisdiction. BFM, BCM, BIM, and PIMCO consented to jurisdiction over actions arising out of activities connected with their investment advisory business and founded (directly or indirectly) on Virgin Islands law when they filed Form ADV with the Lieutenant Governor's office. Likewise, BI and PI both consented, by filing Form BD, to personal jurisdiction in the Virgin Islands for any action or proceeding for the alleged violation of Virgin Islands law. BlackRock is not registered or notice-filed in the Virgin Islands and, therefore, it has not consented to personal jurisdiction in the Territory. Thus, BlackRock must be dismissed for lack of personal jurisdiction.

*Fifth*, all Defendants have failed to show that the Virgin Islands is an inconvenient forum. The only forum that would have jurisdiction over all seven Defendants is Delaware. But Delaware has no connection to this litigation, other than being the place of incorporation or organization of the Defendants. New York is the other forum that may have a connection to this litigation. But the concerns the Defendants raise in opposition to the Virgin Islands retaining jurisdiction, the location of witnesses, documents, and attorneys, and the distance of the Territory from the mainland, are not compelling as attorneys and witnesses can appear remotely for depositions and hearings, documents are largely kept electronically, and because the Virgin Islands Judiciary has implemented electronic filing for court papers and trial exhibits. Compelling witnesses outside the Territory may be a challenge at trial, but New York would face similar challenges, since witnesses may be scattered around the country. More importantly, the Defendants did not agree to forego any defense, including personal jurisdiction or the statute of limitations, in return for dismissal. At this point, dismissal might also result in most, if not all, of the Plaintiffs' claims being barred either by the statute of limitations or by differences in New York law. Lastly, the Virgin Islands' connection to this litigation is stronger than New York's since Altisource is a Virgin Islands corporation with its headquarters on St. Croix and, further, because the alleged harm resulted in a loss of jobs, income, revenue, business, and taxes for the Territory and residents.

*Sixth*, Altisource has stated a claim for relief for intentional interference with contract (Count III), intentional interference with prospective business advantage (Count IV), prima facie tort (Count V), and civil conspiracy (Count VII). And all Plaintiffs have stated claims under CICO but only if the complaint is viewed liberally and a predicate offense under title 9, section 652 of the Virgin Islands Code is inferred. The Shareholder Plaintiffs have not stated claims for prima facie tort (Count VII) or civil conspiracy (Count VIII) because each tort is an intentional tort, and the complaint does not allege that any Defendant intended to harm the Shareholder Plaintiffs. The Defendants' motion to dismiss for failure to state a claim

for relief should be granted as to Counts VII and VIII but otherwise denied. The Defendants' standing defense should be overruled and would be moot if the Shareholder Plaintiffs' tort claims were dismissed for failure to allege intent to harm them. CICO claims are, by statute, not limited to direct injury. Since the Shareholder Plaintiffs allege both direct and indirect injury, and those allegations must be taken as true, the Defendants cannot refute these allegations through a pre-answer motion. Additionally, the complaint does not so clearly establish that the statute of limitations has run on the Plaintiffs' tort claims. So, the Defendants' motion to dismiss should be denied on that basis. Finally, given the nature of this case, and the fact that the much of the information would be uniquely in the Defendants', and their co-conspirators' possession, the Plaintiffs have substantially complied with Rule 9(b), except with respect to one paragraph, and the accompanying footnote. Paragraph 103 contains a keystone allegation that ties the other allegations together and refers to persons and event that the Plaintiffs could have stated with more detail, particularly since a complaint should generally provide a defendant with enough information to admit or deny the allegations and assess whether to implead other parties or assert counterclaims or crossclaims. The complaint gives the Defendants enough information overall about the who, what, where, when, and how of this case, but paragraph 103 is remarkedly vague. The appropriate remedy is not dismissal but leave to amend. *See ServiceMaster*, 72 V.I. at 151.

*Seventh*, assuming the Court agrees with the undersigned's analysis, whether in whole or in part, and dismisses BlackRock for lack of personal jurisdiction, the Court should also certify the dismissal as final pursuant to Rule 54(b) of the Virgin Islands Rules of Civil Procedure. *Cf. Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 512 So. 2d 897, 900 (Miss. 1987) ("In complex litigation involving multiple claims or multiple parties, or both, Rule 54(b) is helpful because it allows judges to efficiently and fairly resolve separable claims before protracted litigation is finally resolved.").

Accordingly, for the reasons stated above, the undersigned **RECOMMENDS** that the Court

(1) : **GRANT in part** the Motion to Dismiss the Amended Complaint filed by Defendants Pacific Investment Management Company, LLC and PIMCO Investments, LLC on August 28, 2018, **CONSTRUED** to target the Second Amended Verified Complaint filed by the Plaintiffs on April 6, 2023, and **DISMISS** (A) Count VII and Count VIII as to both Defendants, but (B) **DENY** the motion in all other respects;

(2) **GRANT in part** the Motion to Dismiss the Amended Complaint filed by Defendants BlackRock Financial Management, Inc., BlackRock Investment Management, LLC, BlackRock Investments, LLC, BlackRock Capital Management, Inc., and BlackRock, Inc. on August 28, 2018, **CONSTRUED** to target the Second Amended Verified Complaint filed by the Plaintiffs on April 6, 2023, and **DISMISS** (A) Defendant BlackRock, Inc. for lack of personal jurisdiction; (B) **DISMISS** Count VII and Count VIII as to Defendants BlackRock Financial Management, Inc., BlackRock Investment Management, LLC, BlackRock Investments, LLC, and BlackRock Capital Management, Inc.; and (C) **DENY** the motion in all other respects; and

(3) **CERTIFY** the dismissal of Defendant BlackRock, Inc. as final pursuant to Rule 54(b) of the Virgin Islands Rules of Civil Procedure.

**DONE** this 13th day of July, 2023.

_____/s/_____
**JOSEPH T. GASPER**
Staff Master

**ATTEST**:
TAMARA CHARLES
Clerk of the Court

By:    Cheryl Parris_____
        Court Clerk III

Date:   July 13, 2023_____



**FILED**
December 06, 2023 09:01 AM
SX-2018-CV-00146
**TAMARA CHARLES**
**CLERK OF THE COURT**

**SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

ERBEY HOLDING CORPORATION; JOHN R. ERBEY FAMILY LIMITED PARTNERSHIP, BY ITS GENERAL PARTNER JUPITER CAPITAL INC.; SALT POND HOLDINGS, LLC; MUNUS, L.P.; CARISMA TRUST, BY ITS TRUSTEE VENIA, LLC; TRIBUE LIMITED PARTNERSHIP; AND ALTISOURCE ASSET MANAGEMENT CORPORATION,

PLAINTIFFS,

V.

BLACKROCK FINANCIAL MANAGEMENT, INC.; BLACKROCK INVESTMENT MANAGEMENT, LLC; BLACKROCK INVESTMENTS, LLC; BLACKROCK CAPITAL MANAGEMENT, INC.; BLACKROCK, INC.; PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC; PIMCO INVESTMENTS LLC; AND JOHN AND JANE DOES 1-10,

DEFENDANTS.

**CASE NO. SX-2018-CV-00146**

Complex Litigation Division

Action for Damages

Jury Trial Demanded

## ERRATA ORDER

**COMES NOW** the Court, *sua sponte*, and issues this Order to correct the following scrivener's errors in the Memorandum Opinion entered December 4, 2023 (2023 VI Super 75). Accordingly, it is hereby **ORDERED** that the following corrections shall be made:

On page 3, in paragraph 1, insert "and" between "Influenced" and "Corrupt" and, at the end of the paragraph, delete the space between "not" and "a *forum*";

On page 4, in paragraph 4, in the second sentence, delete the word "is", and three lines from the bottom, insert "it" after "alleges that"; on page 9, in paragraph 13, italicize "Federal Practice and Procedure";

On page 10, in paragraph 15, insert "a" after "believe" in the first line; on page 12, in paragraph 17, in the first line, strike "an" and replace it with "its";

In the footnote beginning on page 13, delete the period before "*Standard Equip.*" and replace it with a semi-colon, delete the second instance of the word "even" in the middle of the same footnote, and on the next page, near the end of the footnote, insert the word "a" after the word "like" and before the words "master insofar";

On page 15, in paragraph 20, midway through the paragraph, insert the word "the" after "area of" and before "law";

On page 16, in the same paragraph, replace "staff master" with "Staff Master", and delete "appears are" and replace it with "is";

On page 19, four lines from the top of the page, insert "Shareholder" after "The" and before "Plaintiffs", in paragraph 24, in the first line, replace "Defendant" with "the Defendants", and, at the end of the block quotation, delete and replace "604€" with "604(e)";

On page 22, at the end of paragraph 28, delete "persona" and replace it with "personal"; and at the end of paragraph 29, delete the duplicate period; and

On page 25, three lines from the end of paragraph 33, insert a space after the ellipsis and before the words "is the result", in paragraph 34, change the apostrophe to a quotation mark in the third line from the start of the paragraph, and two lines up from the bottom of the same page, replace "Defendant" with "Defendants".

**DONE and so ORDERED this** _6TH_ **day of December, 2023.**

**HAROLD W.L. WILLOCKS**
Administrative Judge of the Superior Court

**ATTEST**:
Tamara Charles
Clerk of the Court
By: _____
Court Clerk Supervisor
Dated: _12/6/2023_